## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK (WHITE PLAINS)

| | |
|---|---|
| TRANSEO S.A.R.L. AND PHILIPPE GELBLAT,<br><br>Plaintiffs<br><br>v.<br><br>BESSEMER VENTURE PARTNERS VI L.P., BESSEMER VENTURE PARTNERS VI INSTITUTIONAL L.P., AND BESSEMER VENTURE PARTNERS CO-INVESTMENT L.P., ET AL.<br><br>Defendants. | 11 CV 5331 (CS) (PED)<br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED VERIFIED COMPLAINT

Plaintiffs, Transeo S.A.R.L., a French limited liability company ("**Transeo**") and Mr. Philippe Gelblat ("**Gelblat**"), by and through undersigned counsel, as and for their Second Amended Verified Complaint against Bessemer Venture Partners VI L.P., Bessemer Venture Partners VI Institutional L.P., and Bessemer Venture Partners Co-Investment L.P. (collectively, "**Bessemer**"), Deer VI & Co. LLC ("**Deer & Co.**"), Mr. Jeremy Levine ("**Levine**"), Mr. Jeffrey Erwin ("**Erwin**"), Mr. Peter Price ("**Price**"), and Neutral Holdings, Inc. ("**NHI**"), the last as a nominal defendant, respectfully allege and plead:

## JURISDICTION & VENUE

1.     This is an action for: (a) breach of fiduciary duty owed by Bessemer, as the majority stockholder of a closely-held Delaware corporation, NHI, to Transeo and Gelblat, as minority stockholders of NHI; (b) breach of contract by Bessemer of the Stockholders' Agreement (as defined below) it entered into with Transeo and Gelblat; (c) breach of the implied

covenant of good faith and fair dealing by Bessemer, with respect to Transeo and Gelblat; (d) breach of Delaware General Corporate Law; (e) unjust enrichment by Bessemer; (f) tortious interference with prospective contractual advantage; (g) relief against Bessemer and certain others for aiding and abetting breaches of fiduciary duties; and (h) for other blatant tortious misconduct of certain individual defendants, such as forgery and violations of the Internal Revenue Code.   Alternatively, stockholders Transeo and Gelblat seek relief derivatively on behalf of nominal defendant NHI, which has been damaged and deprived of profitable opportunities and exposed to unwarranted risks by the improper conduct of various defendants, as more fully described below.

## SUMMARY OF CLAIMS

2.      From October 1, 1997 through 2007, Mr. Laurent Marteau ("**Marteau**") built the Intego brand into a world-renowned provider of security functions for Mac (Apple) equipment. The technical and business success of the enterprise attracted the interest of a storied venture capital firm, Bessemer Venture Partners.   Bessemer purchased Intego S.A., an entity existing under the laws of France, and its U.S. subsidiary Intego, Inc. (collectively, the "**Intego Companies**") in a transaction which left plaintiff Transeo (owned by Marteau) and plaintiff Gelblat with a minority interest in NHI, the holding entity established for the Intego Companies, but with important contractual protections in the form of board membership, restrictions on share dilution, redemption rights and the right in certain circumstances to bring about the sale of NHI by June 2012, among others.   It should be noted that, to further minority stockholders' rights, Transeo and Gelblat had negotiated and obtained the commitment that there would be one class of common stock only and that Bessemer would <u>not</u> own any preferred stock.   Gelblat was and is a stockholder of, and also was a Bessemer-appointed director of, NHI.   Prior to 2012,

however, Transeo and Gelblat found their interests being prejudiced as the result of actions by Bessemer and others, as more fully detailed below.

3.       On information and belief, Bessemer took steps to shift the focus of the Intego Companies operations and in particular the situs of its computer web services and associated intellectual property from France to the United States, not for any business reason of the Intego Companies, but purely to enhance Bessemer's ability to gain access to the Intego Companies valuable intellectual property (and to the Intego Companies cash) for Bessemer's own benefit. To permit it to do so, Bessemer replaced Gelblat as a director, removed Marteau as Chief Executive Officer of the holding entity, NHI, and of each of the Intego Companies, and purported to (and effectively did) exclude Marteau, Transeo's appointed director on the NHI board of directors (the "**NHI BOD**"), from the NHI BOD.  The NHI BOD, aided and abetted by Bessemer and others, caused or acquiesced in the forgery and creation of false and fraudulent documents, the improper adoption of a stock option plan and stock option grants, in the conduct of improper and invalid NHI BOD meetings, and also obstructed Transeo's and Gelblat's efforts to obtain information about the business as well as information needed to comply with their tax reporting obligations and other contractual obligations vis-à-vis third parties abroad.

4.       Throughout, Bessemer continuously has tried to act or acted solely or primarily for its own benefit, to Transeo's and Gelblat's repeated, extreme detriment, in ways that include: (a) Bessemer's attempt to devise a plan to pay an NHI dividend, with borrowed funds, in excess of U.S.$8,000,000 to generate immediate cash flow, which prejudiced Transeo's and Gelblat's interests in the medium-to-long term prospects, and increased goodwill, of NHI; (b) Bessemer's issuance of a promissory note as a dividend to NHI's stockholders, wrongfully structured, on information and belief, so that Bessemer did not have to report the proceeds as U.S. taxable

income, while Transeo and Gelblat would have to recognize a taxable gain under applicable foreign law; (c) the cavalier failure to give any meaningful or reasonable consideration to a serious purchase offer worth U.S.$25,000,000, on a "cash free" basis (meaning NHI's cash on hand would have been distributed *pro rata* to its stockholders), in an inexcusable breach of the fiduciary duty of loyalty to minority stockholders; (d) removing plaintiff Gelblat from the NHI BOD because he was in favor of the aforementioned purchase offer, and replacing him with the less-than-qualified, yet Bessemer-affiliated, Erwin; (e) the termination of Marteau as President and Chief Executive Officer of NHI and the Intego Companies, despite the continued success he brought to NHI and the Intego Companies, and his replacement by the again less-than-qualified Erwin; (f) refusing to respond to Transeo's repeated demands as a stockholder to inspect NHI's books and records, and to Gelblat's repeated demands to obtain NHI's financial statements; (g) the wrongful efforts to remove Marteau as a member of the NHI BOD, which violated Section 7.1 of the Stockholders' Agreement, and the later blatant denial that such efforts were made; (h) refusing to provide information requested and required by plaintiffs Transeo and Gelblat for foreign tax reporting and other purposes and for compliance with contractual requirements with third parties; and (i) Bessemer's causing and acquiescing in the creation of a fraudulent amendment to the 2009 Stock Option Plan (as defined below), which falsely states that the stockholders of NHI had approved such amendment on February 14, 2012 when neither Gelblat nor Transeo, both then and now stockholders, received notice of or attended any such stockholders' meeting and did not consent thereto by unanimous written consent, and further falsely states that the NHI BOD had adopted such amendment, when in fact the NHI BOD could act only with all directors present and Marteau, the Transeo-appointed director, never having received notice of or attended such a NHI BOD meeting.

5.      In accordance with Fed. R. Civ. P. 23.1(b)(2), it is alleged that this is not a collusive action to obtain jurisdiction that the Court otherwise would not have.  To the contrary, the instant matter is within the jurisdiction of this Honorable Court pursuant to 28 U.S.C. §1332, as, on information and belief, Bessemer is comprised of Delaware limited partnerships each with a principal place of business in New York; Deer & Co. is a Delaware limited liability company; Erwin and Price are both residents of the State of Washington; nominal defendant NHI is a corporation formed and existing under the laws of the State of Delaware; Transeo is a French limited liability company with a principal place of business located at 10 Rue Jean Baptiste Say, Paris, France 75009; Gelblat is a citizen of France, residing at 8 chemin des Sapins, 1009 Pully, Switzerland; and the amount in controversy exceeds U.S.$75,000.

6.      Transeo, Gelblat and Bessemer are parties to a stockholders' agreement dated as of June 7, 2007 (the "**Stockholders' Agreement**"), pursuant to Section 11.12 of which Bessemer has agreed to subject itself to the in personam jurisdiction of this Court.  Attached hereto as Exhibit 1 is a true and correct copy of the Stockholders' Agreement.

7.      Venue is proper under 28 U.S.C. §§1391 and 1401 because Bessemer's primary place of business is located in Larchmont, County of Westchester, New York and Bessemer is subject to personal jurisdiction there, and there is no single state in which all defendants are located.

## **PARTIES**

8.      Transeo is a French limited liability company with a principal place of business located at 10 rue Jean Baptiste Say, 75009 Paris, France.

9.      Gelblat is a French citizen residing at 8 chemin des Sapins, 1009 Pully, Switzerland.  Gelblat, who accepted to serve as a director of NHI appointed by Bessemer

(which, at that time, he believed was a reputable private equity firm), previously served in the following positions at prestigious multinational companies:

- Vice Chairman of Sicpa Product Security (Switzerland)
- President of SAS Arjowiggins Security (France)
- President of SPA GEP (Italy)
- President of SAS Arjowiggins Security Integrale Solution (France)
- President of SAS Arjobex (France)
- President -- Advisory Board of Arjowiggins Ltd. (Brazil)
- Director of Arjowiggins Ivybridge Ltd. (United Kingdom)
- Director of Arjowiggins Security Integrale Solution Ltd. (Hong Kong)
- Chairman of Ileos, a company with 4,000 employees (France).

10.     On information and belief, Bessemer operates from a single office located at 1865 Palmer Avenue, Suite 104, Larchmont, New York 10538.

11.     Defendant Deer & Co. is a limited liability company formed and existing under the laws of the State of Delaware, with a registered agent address of 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

12.     Defendant Levine is a partner of Bessemer Venture Partners and a director of NHI and the Intego Companies and, on information and belief, is a resident of the State of New York, with an address at 113 Greene Street, 3rd Floor, New York, NY 10012.

13.     Defendant Erwin is the President, Chief Executive Officer and a director of NHI and the Intego Companies and, on information and belief, is a resident of the State of Washington, with an address at 1423 Nob Hill Avenue N., Seattle, WA 98109.

14.     On information and belief, defendant Price is the Secretary and Chief Financial Officer of NHI and a resident of the State of Washington.

15.     Nominal defendant NHI is a corporation formed and existing under the laws of the State of Delaware.

## FACTUAL BACKGROUND

### Intego's Success and Acquisition

16.     Commencing on October 1, 1997, Marteau established two software companies in France and the United States specializing in security software solutions for computers and devices manufactured by Apple, Inc.  These companies consisted of Intego S.A., a French corporation, and its wholly-owned subsidiary, Intego, Inc., a Florida corporation.

17.     By a stock purchase agreement dated as of June 7, 2007 (the "**SPA**"), Bessemer acquired a controlling interest in the Intego Companies.

### Creation of NHI and the Stockholders' Agreement

18.     Pursuant to the SPA, the shares of Intego S.A. (and, indirectly, Intego, Inc.) were transferred to a newly-formed holding company, NHI.  The majority of stock in NHI was and remains owned by Bessemer, in that Bessemer became the owner of slightly less than 85% of the outstanding shares of NHI, with Marteau at all relevant times retaining control of slightly less than 15%[1] of NHI's shares through Transeo, which essentially acts as a holding company for this purpose, and Gelblat at all relevant times retaining control of slightly less than 1% of NHI's shares.

19.     At approximately the same time that the SPA was executed, Bessemer, Transeo, NHI, and Gelblat entered into the Stockholders' Agreement.

20.     The Stockholders' Agreement was entered into in order, *inter alia*, to prevent certain transfers of NHI stock and to promote the harmonious management of NHI.

---

[1] Bessemer or the Intego Companies have provided various inconsistent percentages, which was one reason for Transeo's demand to inspect books and records.  Transeo considers that it owns 14.86%.

21.     The harmonious management of NHI was an important goal of the SPA and the Stockholders' Agreement because it was anticipated that Marteau would, through his continued management of NHI and its subsidiaries, increase the value of NHI so that it could be sold at a substantial profit.

22.     Accordingly, following the incorporation of NHI, Marteau was appointed President and Chief Executive Officer of NHI. He continued as Chief Executive Officer of the Intego Companies as well, including Intego S.A. which continued to have its headquarters in France. Its principal computer servers, web services and critical intellectual property also remained located in France following the execution of the SPA.

23.     Section 5.1(b) of the Stockholders' Agreement states:

> Sale.  Subject to Laurent Marteau being the Chief Executive Officer of the Company, on or after June 7, 2012 Transeo shall be entitled to request that the Company appoint an investment bank to conduct a sale of the Company. Promptly upon such request, Transeo and Bessemer Venture Partners shall take such steps as are necessary to select and appoint such investment bank, which shall be a firm of national or international reputation with substantial experience in the software industry.

24.     The foregoing section of the Stockholders' Agreement reveals the intention of Marteau and Bessemer to take all steps necessary in anticipation of an eventual sale of NHI.

25.     Another provision, Section 5.1(a) of the Stockholders' Agreement, gave Transeo the right to demand redemption of its shares after June 7, 2012 (subject to, similarly, Marteau being the Chief Executive Officer of the Company).

26.     The meaningfulness of the redemption right for Transeo could be undermined by actions which diminished the cash available to NHI as well as by actions that diminished its overall value in the short term, or simply, by removing Marteau before June 7, 2012.

27.     At all relevant times, Bessemer was and remains the majority stockholder of NHI.

28.     At all relevant times, Transeo was and remains a "Major Stockholder" of NHI as defined by the Stockholders' Agreement.

29.     At all relevant times, Gelblat held and holds less than 1% of the outstanding shares of NHI.

30.     Pursuant to the Stockholders' Agreement, the NHI BOD may consist of no more than five (5) directors, with one (1) director appointed by Transeo, two (2) directors appointed by Bessemer at its sole discretion, and two (2) directors appointed by Bessemer subject to the approval of the other members of the NHI BOD.

31.     Accordingly, Bessemer could dominate the NHI BOD by appointing up to four (4) of the five (5) members.

32.     At all relevant times, the only stockholders of NHI were Bessemer, with a controlling majority of NHI's stock, Marteau, Gelblat, and Mr. John Goldsmith ("**Goldsmith**").

33.     The relationships between the stockholders of NHI, and in particular between Bessemer and Transeo, were excellent, especially as Marteau managed NHI and the Intego Companies successfully throughout the financial crisis, ensuring that they remained very profitable during such challenging times.  Ironically, in early 2011, at the time that Marteau was removed, he received the prestigious "Frost & Sullivan Best Practices Award" and Intego was named the "Global Mac Endpoint Security Entrepreneurial Company of the Year for 2010" by Frost & Sullivan.[2]

## THE DISPUTE

## Bessemer Seeks to Encumber NHI with a Bank Loan Sought Solely to Pay a Cash Dividend

34.     Notwithstanding the fact that NHI was earning a large amount of revenue, Bessemer approached the Silicon Valley Bank ("**SVB**") without informing the NHI BOD in

---

[2] Frost and Sullivan is a well-respected business research and consulting firm.

order to arrange for, and obtain (by using outdated information), a term sheet for a loan of U.S. $8,000,000 to NHI. The only purpose of such loan was to finance an extravagant cash dividend payment to the NHI stockholders.

35.    Although the equity interests of all stockholders would have been affected by the large debt proposed to be assumed, the proposed dividend payment was structured so that Bessemer could reap a disproportionate tax benefit not realized by the minority stockholders.

36.    Moreover, Bessemer and SVB had, and continue to have, an extensive business relationship that was never disclosed to the NHI BOD.

37.    Bessemer and SVB are partners in at least one business venture in India.

38.    On information and belief, one or more of the Bessemer entities has an ownership interest in SVB and/or its parent.

39.    One or more of the partners in Bessemer Venture Partners was or is a member of the board of directors of SVB. Further, on information and belief, Goldsmith, a Bessemer-nominated director, previously had worked with Mr. Michael Moretti, Senior Vice President of SVB and one of Bessemer's key contacts in negotiating the proposed loan.

40.    The commercial discussions between Bessemer and SVB were formalized in an SVB term sheet addressed to Bessemer on November 3, 2010.

41.    The attempt to structure a dividend payment that provided only Bessemer with a tax benefit, as well as the attempts to negotiate a loan on behalf of NHI with a lender in which Bessemer held an ownership interest, constituted self-dealing.

42.    Marteau strongly opposed the proposed loan from SVB – which was against the best interests of NHI and was not supported by any business reason – and clashed with Bessemer's position on this issue.

43.     Gelblat, also, was not in favor of the proposed loan.

44.     Moreover, Marteau was adamantly opposed to heavily encumbering NHI with unnecessary debt – to the extent of approximately one third of its value – simply in order to distribute cash to the NHI stockholders in one lump-sum payment, as such a reckless act could put NHI at substantial risk as a going concern.  Further, the vast majority of the proposed dividend payment would be paid to Bessemer to the disproportionate detriment of minority stockholders, whose interest in NHI lied and lies in NHI's medium-to-long term prospects and increased goodwill, not in short-term and short-sighted dividend distribution policies that endanger NHI's future and compromise the minority stockholders' investment.  The dividends paid to Bessemer largely would be tax-free in the U.S., while Transeo and Gelblat likely would incur significant taxes in their respective countries.  Finally, the payment of dividends disproportionate to actual profits would have the effect of reducing the value of Transeo's right to redemption under the Stockholders' Agreement.

45.     Marteau advised Levine that to burden NHI with such a large amount of debt would be a reckless decision that ultimately could destroy NHI.

46.     After lengthy and heated discussions with Marteau, Bessemer reluctantly agreed not to proceed with the loan from SVB and instead decided to issue a promissory note to its stockholders in lieu of a dividend (the "**P-Note Dividend**").

47.     The P-Note Dividend was put in place on December 28, 2010 at the urgent demand of Bessemer, which needed to implement the P-Note Dividend by no later than December 31, 2010.

48.     On information and belief, the P-Note Dividend was wrongfully structured so that Bessemer did not have to report, as it should have, the proceeds as taxable income in the United States, thereby violating U.S. tax laws.

**Marteau is Removed at Bessemer's Instance as an Officer of NHI**

49.     As a result of the dividend dispute, the relationship between Bessemer and Marteau quickly deteriorated.  On information and belief, by mid-January 2011, Bessemer had decided to terminate Marteau as an officer of NHI and the Intego Companies and also as a director of the Intego Companies.

50.     As Bessemer Venture Partners' own website recognizes, the focal point of the Intego Companies' business was in Europe.  Although the website recites that the Intego Companies' headquarters is in Paris, in fact, at Bessemer's instance, much of the Intego Companies' assets, and particularly the valuable core of its business, its computer web services and associated intellectual property, has been or is in the process of being shifted from France to the United States.

51.     The only corporate contact address given for the Intego Companies on their website, including in the French language version, is 10900 N.E. 8th Street, Suite 1000, Bellevue, WA 98004.

52.     Of the nineteen past or present companies that Bessemer Venture Partners lists in the "Trusted Internet" segment of its website, the Intego Companies is the only one with European roots and one of only three not shown with "North America" as its "geography."

53.     According to its website, Bessemer Venture Partners has no office in Europe.  Its website does not list any members of its "Team" as based in Europe.

54.     Levine, Bessemer Venture Partners' "Team" member responsible for the Intego Companies, and a director of NHI, previously had recorded his views of French business in August 2005 on his blog: "The French economy – I just returned from a brief vacation including a short stop in France.  On a beautiful Sunday in Paris, everything was closed. Not a single shop to visit.  Only the cheesiest tourist trap restaurants were open. When the entire country takes off for the month of August, it's no wonder they've got 10% unemployment."

55.     On information and belief, adding insult to injury, Levine wrote an entry on his blog "Nothing ventured, nothing gained" referring to Marteau and the Intego Companies.  On April 20, 2011, very shortly after Bessemer installed Erwin as President and Chief Executive Officer of Intego, a Bessemer Venture Partners' portfolio company for which Levine was the "Team member," he wrote a post about a "recently hired executive at one of my [sic] portfolio companies who sent me this picture today to explain how he feels on the job."  On information and belief, the executive referred to very likely is Erwin.  The photograph posted to the Levine blog is extremely vulgar and distasteful, portraying a man whose head is inserted into the anus of an elephant.  A press release announcing Erwin's appointment had been widely disseminated on March 29, 2011, and those familiar with the situation likely understood the blog post and photograph to refer to the Intego Companies and/or to refer to Marteau, who suffers from obesity.  The photograph was published on the Internet and was and is available to the public at large, and in particular to the employees of the Intego Companies who consult Levine's blog as a source of information about the Intego Companies' main stockholder.  Marteau was informed of this blog post by an employee who was offended and outraged.  The publication of the blog post and the photograph shows a lack of professionalism and worked to discredit both Marteau and the Intego Companies, and, as such, irreparably damaged Marteau's reputation.

56.     Bessemer decided to relocate a substantial part of Intego S.A.'s assets from France to the United States.  This decision was conveyed to Patrick de Talhouët, the then-Chief Financial Officer of Intego S.A., on February 28, 2011, one day prior to the termination of Marteau as President of NHI.  Patrick de Talhouët reported this decision to Marteau.

57.     Bessemer relocated all its computer web services (and associated intellectual property), which previously had been located at the Intego Companies' Paris office, to the United States, on information and belief to exercise a tighter control thereof to its own benefit.

58.     Further, in an email from Marteau to Erwin dated October 13, 2011, Marteau set forth his understanding that Intego S.A. switched from using servers in France to using servers in the United States; Erwin never indicated that Marteau's statement was incorrect.

59.     On information and belief, some of the data previously located on servers in the Intego Companies' Paris office (including the Intego Companies' invaluable source code) also was relocated to a U.S. computer location.

60.     On information and belief, this led to the first disruption of Intego's services in more than a decade, putting the security of the Intego Companies' clients at risk and seriously damaging the reputation of the Intego Companies (and hence Transeo's investment therein).  On August 6, 2011, Marteau received – by mistake as he was no longer working for the Intego Companies – an email from a customer complaining about this disruption.  Marteau redirected it to the Intego Companies.  On August 7, 2011 (ages later in the internet security world), services were still not restored.

61.     On information and belief, the relocation of server functions also facilitated the hacking of the Intego Companies' website, leading to the display of suspicious messages in Farsi on the the Intego Companies' website for a period of time.

62.     Such a hacking incident hardly reinforces the Intego Companies' image as a "Trusted Internet" company and affects Transeo's investment in NHI.

63.     On information and belief, the relocation of Intego S.A.'s assets (and hence, the assets of NHI) to the United States, in conjunction with the unjustified termination of Marteau from his various positions at NHI and the Intego Companies, was orchestrated by Bessemer so that NHI's assets and cash could be used by Bessemer for its own purposes, to the detriment of the minority stockholders, including the Plaintiffs herein.

64.     As more fully detailed below, in order for Bessemer to be able to effectuate the relocation of the assets and unlimited use of the Intego Companies' cash, it was necessary for Bessemer to cause the removal of Marteau from his positions at the Intego Companies.

65.     On information and belief, the relocation of Intego S.A.'s assets resulted in the transfer of various data from France to the United States without adequate steps having been taken to ensure that the transfer satisfied legal requirements in force in France and the European Union with respect to data privacy protection, thereby needlessly exposing the Intego Companies and its officers to potential criminal and legal risks and potential grave damage to its reputation as a reliable data security software provider.

**The AVG Offer to Buy NHI for U.S.$25,000,000 on a "Cash Free" Basis**

66.     On information and belief, on or about February 8, 2011, Levine, a partner in Bessemer Venture Partners and a member of the NHI BOD, agreed that Bessemer would consider an offer to acquire NHI for U.S.$20,000,000, and might even regard a U.S.$17,000,000 offer as compelling.

67.     Commencing in June 2009, AVG Technologies N.V., a Dutch corporation and its affiliates (collectively, "**AVG**"), which is a leader in the internet software security industry,

approached NHI about the possible sale of NHI to AVG.  NHI entered into discussions with AVG as NHI's stockholders' ultimate goal had always been to sell NHI (as reflected in the Stockholders' Agreement).

68.     On information and belief, progress on AVG's attempt to purchase NHI was delayed as AVG underwent some administrative change.  AVG expressed renewed interest in early 2011.

69.     AVG memorialized its interest in buying NHI by a letter dated February 28, 2011 and annexed to that letter was a letter of intent valid until March 2, 2011 (together, the "**AVG Offer**").

70.     The AVG Offer indicated AVG's interest in acquiring NHI for a price of U.S.$25,000,000 on a "cash free" basis (meaning NHI's cash on hand would have been distributed *pro rata* to its stockholders).  AVG had the cash on hand to complete the transaction, as supported by AVG's audited financial statements that had been previously communicated to Levine, Marteau and Gelblat.

71.     Approximately U.S.$10,000,000 of the U.S.$25,000,000 AVG Offer was tied, *inter alia*, to the requirement that the then-current NHI and Intego Companies' manager, Marteau, remain active with NHI and the Intego Companies after any acquisition by AVG.

72.     In fact, the AVG Offer specifically stated that: "[i]n addition to the positive aspects of the Company's business, the opportunity to partner long-term with the Company's management and development teams is a key factor in our interest in the Company."

73.     Accordingly, the AVG Offer valued NHI not just in light of its intrinsic value, but in light of the value and opportunity afforded by partnering with the management teams led by

Marteau, who had successfully built the Intego Companies during his thirteen-year tenure, and then successfully managed NHI.

74.     At the time NHI (and Bessemer, through the members of the NHI BOD appointed by Bessemer) became aware of AVG's interest in purchasing NHI, the NHI BOD consisted of Marteau (appointed solely by Transeo), Gelblat and Levine (both appointed solely by Bessemer, Levine then and now being a partner in Bessemer Venture Partners), and Goldsmith (appointed by Bessemer and approved by the remaining members of the NHI BOD).  It should be noted that at the time of such approval, Bessemer had not disclosed the extensive working relationship it had developed with Goldsmith over the prior years.

75.     Accordingly, at all times relevant to this action, Bessemer dominated the NHI BOD.

76.     As the majority stockholder dominating the NHI BOD, Bessemer owed a fiduciary duty to the minority stockholders of NHI, including the Plaintiffs herein.

77.     Given the closely-held nature of NHI, Bessemer had an elevated responsibility to give appropriate and reasonable consideration to acquisition offers received.  Unlike a publicly traded corporation, to stockholders of which a tender offer could be made, there was no way for a would-be acquirer to bring an offer directly to NHI's stockholders.  Because the boardroom was the only avenue for an acquisition offer, Bessemer and its dominated NHI BOD had a special responsibility not to block the door.

78.     Although the Stockholders' Agreement permits up to five (5) directors, at all relevant times hereto NHI had only four (4) directors.

79.     Informal discussions among the NHI BOD revealed that at least two (2) of the four (4) members of the NHI BOD were greatly in favor of the AVG Offer, namely Marteau and Gelblat.

80.     Aware, *inter alia*, of Gelblat's position regarding the AVG Offer, Bessemer acted to remove Gelblat from the NHI BOD.  This was done abruptly and in an embarrassing fashion, with Levine notifying NHI (and Gelblat) of the action by an email dated February 24, 2011, in which the revocation of Gelblat's appointment as a director was treated as one of several "updates."  Gelblat was told "[t]he BVP operations team will be forwarding the official documents to effect this change within the next day, and I'll copy all of you with that paperwork."  Gelblat's reputation was irreparably damaged by such an abrupt and unjustified removal.

81.     Bessemer replaced Gelblat with Erwin, who had an extensive and long-standing relationship with Bessemer and who could be expected to vote as directed by Bessemer.  Indeed, Bessemer was about to propose Erwin as Chief Executive Officer and President of NHI.

82.     Erwin did not have significant professional experience with Apple, Inc.'s hardware and software products such as those that are produced by NHI and the Intego Companies.  Erwin himself admitted such a lack of experience in a telephone conversation with Marteau, claiming he knew Apple devices through his possession of two iPhones, and further explaining that had never been successful in leading a company to a profitable stage.

83.     At the time Erwin joined NHI and the Intego Companies, approximately 80% of NHI and the Intego Companies' employees were located in France and most of Intego S.A.'s contracts were drafted in French.

84.     Erwin did not, and does not, speak, read, or write in the French language.  In consequence, Erwin could not communicate with the vast majority of the Intego Companies' employees and a large number of its customers in their native language.

85.     Having replaced without any stated reason one Bessemer-appointed member of the NHI BOD, Gelblat, who also was a minority stockholder, with an appointee who could be counted on to vote as directed, Bessemer was firmly in control of the NHI BOD and could direct it to reject the AVG Offer out of hand.

86.     Bessemer, without explanation and operating through the NHI BOD, used this majority position to terminate: (1) Marteau's services as President and Chief Executive Officer of NHI, and (2) Transeo's consulting and management services contract with NHI; all of which were subject to a special meeting of the NHI BOD to ratify this decision, which occurred on March 1, 2011 (the "**March 1, 2011 NHI BOD Meeting**").

87.     On information and belief, the unilateral terminations of Marteau's management positions were not made out of dissatisfaction with his performance, or for any other valid business reason.

88.     The unilateral terminations of Marteau's management positions were not made after any deliberations of the NHI BOD, but were instead on the orders of Bessemer as the dominating stockholder of NHI.

89.     Removing Marteau at the outset of the March 1, 2011 NHI BOD Meeting immediately mooted the AVG Offer and decreased the value of NHI by at least U.S.$10,000,000, as evidenced by the substantially higher amount offered by AVG if Marteau was to stay with NHI in the event of a sale to AVG.  It should be noted that Marteau, whose continued involvement anchored a substantial portion of the value of the AVG Offer, was first

removed from his executive positions and only then did the NHI BOD reject the AVG Offer, assuring it had no chance to survive.

90.     Accordingly, Bessemer used its control over the NHI BOD to engage in self-dealing by removing Marteau as President and Chief Executive Officer of NHI and substituting a new Chief Executive Officer who would comply with Bessemer's demands, all to the detriment of the minority stockholders of NHI.

91.     Moreover, and to the further detriment of the minority stockholders of NHI, Bessemer directed the Bessemer-appointed members of the NHI BOD to reject the AVG Offer out of hand and without considering the potential benefit of the AVG Offer to all of the stockholders.

92.     The termination of Marteau was intended to moot the AVG Offer, which had been conditioned on the continued management of NHI by the existing management team led by Marteau.

93.     This termination, which resulted in a diminution in the value of NHI, further prejudiced the minority stockholders by reducing the value of their ownership irrespective of the AVG Offer.

94.     Removing the Bessemer-appointed Gelblat as a director, terminating Marteau as President and Chief Executive Officer of NHI, and replacing Marteau as an officer of NHI with Erwin enabled Bessemer, as the majority and dominating stockholder of NHI, to take any actions it wanted in respect of NHI, including but not limited to rejecting the AVG Offer.

95.     On information and belief, Bessemer's actions were taken in order to facilitate the appropriation of cash and other of NHI's assets for itself, without any regard for the interest of the minority stockholders.

**Gross Fiduciary Failure: The Bessemer-Controlled NHI BOD, Despite Awareness of its Duty to do so, Fails to Consider the AVG Offer, Fails to Conduct Even Cursory Due Diligence, Fails to Bring in an Expert to Assess it, Despite Demand, and Fails to Keep the Possibility of Negotiation with AVG Alive.**

96.     An email from Levine, as a member of the Bessemer-controlled NHI BOD, dated February 24, 2011, indicated the NHI BOD's expectation to "receive an M&A offer from AVG this week" and the importance of responding to AVG quickly "to keep the deal alive and warm".

97.     An email from Goldsmith, as a member of the Bessemer-controlled NHI BOD, dated February 26, 2011, acknowledged that the NHI BOD was aware of its duties as a board "to do what is in the best interest of the company" and that the NHI BOD "must meet and deliberate in order to do so."

98.     During the March 1, 2011 NHI BOD Meeting the NHI BOD was purportedly scheduled, *inter alia*, to "examine" the AVG Offer.

99.     At the March 1, 2011 NHI BOD Meeting, the Bessemer-appointed members of the NHI BOD voted to appoint a new President and Chief Executive Officer, Erwin, who was friendly with, and under the nominal control of, Bessemer, and to reject the AVG Offer.

100.     None of these actions was in the best interests of NHI, but instead reflected Bessemer's desire to keep control of NHI for its own purposes.

101.     On information and belief, Bessemer did not want to sell NHI in March 2011, even at such a good price – which would have benefited all the NHI stockholders – because such a sale would have led to the following consequences:  (a) as the AVG Offer contemplated a

"cash free" deal, NHI would have retained a substantial amount of cash[3], which ultimately would had to have been distributed *pro rata* to its stockholders, including Transeo and Gelblat; (b) Marteau, as Chief Executive Officer of NHI, would have been able to continue to work for the acquiring company, AVG; (c) Bessemer would lose access to the Intego Companies' valuable intellectual property.   On further information and belief, by contrast, refusing to consider the AVG Offer and removing Marteau as Chief Executive Officer had the following effects: (x) in the short term, depressed the value of NHI, making it highly unlikely that Transeo would (or meaningfully could) invoke its right to redemption after June 2012; (y) eliminated Marteau's ability to work for AVG, thanks to a non-competition provision triggered by his termination;[4] and (z) eliminated Transeo's ability to demand steps to sell NHI after June 2012.

102.    At the March 1, 2011 NHI BOD Meeting, the idea of continuing the discussions with AVG in respect of the AVG Offer was raised by Marteau, notwithstanding the apparent desire of Bessemer to prevent any such discussions.

103.    At the March 1, 2011 NHI BOD Meeting, the Bessemer-appointed members of the NHI BOD discussed the creation of a committee to talk with AVG.

104.    However, when Marteau requested that he be a member of any such committee, Erwin instead moved to take sole control of any talks with AVG, in a motion supported by the Bessemer-appointed members of the NHI BOD.

105.    Bessemer thus used its controlling and dominating equity position in NHI, through the NHI BOD, to prevent the minority stockholders from participating in or following any further discussions with AVG.

---

[3] Cash on hand was $3,224,000 on December 31, 2010, $3,578,000 on January 31, 2011, and $3,674,000 on February 28, 2011; on information and belief, cash on hand later peaked at more than $4,000,000 during Spring 2011, but at that point such information was being withheld from Marteau.
[4] Bessemer alleges that such a non-competition obligation is valid, which is contested by Transeo.

106.    Bessemer's desire to reject the AVG Offer out of hand is demonstrated by the fact that the NHI BOD did not seriously review, consider or value the AVG Offer, despite its fiduciary duty to do so.

107.    On information and belief, Bessemer communicated to the Bessemer-appointed members of the NHI BOD that Bessemer did not want to pursue the AVG Offer.

108.    On information and belief, Bessemer directed the Bessemer-appointed members of the NHI BOD to reject the AVG Offer without examining it.

109.    The Bessemer-appointed members of the NHI BOD did not obtain any outside analysis of the AVG Offer, and offered only spurious reasons for rejection; more specifically, at no time did the NHI BOD (a) consult an investment banker or other professional experienced in considering offers such as the AVG Offer; (b) attempt to value NHI on a current basis; (c) consider making a counter-offer to the AVG Offer; or (d) otherwise examine the AVG Offer beyond the perfunctory discourse at the March 1, 2011 NHI BOD Meeting.

110.    Moreover, removing Marteau as the President and Chief Executive Officer of NHI at the outset of the March 1, 2011 NHI BOD Meeting, at which the AVG Offer was scheduled to be "examined," demonstrates that the NHI BOD could not seriously have considered the AVG Offer, having already disposed of one of its critical components, keeping Marteau as NHI's leader.

111.    Subsequently, the new NHI BOD refused to seriously consider the AVG Offer, let alone respond to the AVG Offer, which by its terms expired on March 2, 2011.

112.    On information and belief, NHI has not pursued the talks with AVG in any substantive way since the March 1, 2011 NHI BOD Meeting.

113.    Several days after the March 1, 2011 NHI BOD Meeting, Marteau's positions as

an officer and director of the Intego Companies also were terminated.

114.   This wrongful termination, which involves the termination of a French citizen and resident as an officer of a French company, by such French company, in France, is the subject of a separate lawsuit by Marteau in France.

115.   The intent of Bessemer to allow the AVG Offer to expire is further demonstrated by Bessemer's failure to execute the non-binding letter of intent included in the AVG Offer, which would not have obligated NHI to a sale, but would have allowed NHI and AVG to discuss the possible terms of any such sale of NHI to AVG.

116.   On information and belief, AVG was a company with which Intego had dealt in the past, and so was known to Bessemer as a serious potential acquirer. Moreover, the value of the AVG Offer was above the price at which Levine had stated Bessemer would be interested in entertaining an acquisition offer for NHI.

117.   Despite all this, the Bessemer-dominated NHI BOD did not even propose counter terms to the non-binding letter of intent included in the AVG Offer.

118.   Moreover, none of the material information that would normally be considered in analyzing a proposal such as the AVG Offer, such as a current valuation of NHI, profit and loss statements, or earnings information, was requested, prepared or reviewed by the NHI BOD.

119.   The NHI BOD even failed to conduct a cursory due diligence investigation into the merits of the AVG Offer.

120.   Aware that the AVG Offer was at a significant premium to any likely current valuation of NHI, and that all of the stockholders of NHI, therefore, stood to reap a significant benefit if the NHI BOD accepted the AVG Offer, Marteau advised the NHI BOD that it should consult with appropriate advisors and conduct the proper analysis in order to determine the

strength of the AVG Offer.

121.   As the founder of the Intego Companies, which had been consolidated into NHI, Marteau also warned the NHI BOD that his termination could result in serious personnel morale and retention issues with the Intego Companies' employees, many of whom were located in France and had been working with Marteau for many years.  Tragically, this prediction came true when an employee, the Senior IT/Design Manager of Intego S.A., subsequently committed suicide, apparently at least partially as a result of his concerns over his continued employment following the management change at NHI and the Intego Companies.

122.   At the March 1, 2011 NHI BOD Meeting, Marteau, acting as a member of the NHI BOD and, through Transeo, as a minority stockholder of NHI, demanded that the NHI BOD consult with the appropriate advisors, but the NHI BOD failed to do so.  Conscious of the major risks involved by ignoring fiduciary duties, in an email to the NHI BOD members dated February 24, 2011, Goldsmith himself reminded the members of the NHI BOD of their fiduciary duty to consider seriously the AVG Offer.

123.   Bessemer, as majority stockholder of NHI, owed a fiduciary duty to the minority stockholders to give proper and informed consideration to the merits of the AVG Offer.

124.   The NHI BOD owed a fiduciary duty to all the stockholders of NHI to consider the merits of the AVG Offer.

125.   The NHI BOD not only failed to consider all material information relating to the AVG Offer, but the Bessemer-appointed members of the NHI BOD affirmatively acted to block the acceptance of the AVG Offer at the behest of Bessemer.

126.   Less than two (2) months after receiving the AVG Offer to purchase NHI for U.S.$25,000,000 on a "cash free" basis (meaning NHI's cash on hand would have been

distributed *pro rata* to its stockholders), Gelblat was informed by Bessemer that NHI was worth less than U.S.$15,000,000.

127.   The self-interested, conflicted members of the NHI BOD that voted to reject the AVG Offer are not entitled to business judgment protection for their actions in rejecting the AVG Offer without having conducted any research or analysis.  The capricious nature of the NHI BOD's rejection of the AVG Offer is revealed by the fact that this rejection occurred only one day after the AVG Offer was received by NHI.

128.   On information and belief, Bessemer had to remove Marteau as the President and Chief Executive Officer of NHI and as an officer and director of the Intego Companies, and had to reject the AVG Offer, in order to implement Bessemer's plan to relocate a substantial part of Intego S.A.'s assets from France to the United States to the detriment of NHI and the Intego Companies, and to use NHI's and the Intego Companies' cash to its sole benefit.

**Denial of Access to Books and Records**

129.   Transeo, concerned that Bessemer was not acting in the best interests of all of NHI's stockholders, including Transeo and Gelblat, demanded an inspection of NHI's books and records under Section 220(c) of the Delaware General Corporation Law by letter dated June 20, 2011.

130.   On several occasions, Gelblat himself requested that Bessemer provide him with the much needed financial statements of NHI and the Intego Companies.  Bessemer never replied.

131.   On information and belief, all of NHI's books and records are under the control of Bessemer and are located at Bessemer's offices in Larchmont, New York.

132.    By refusing to grant Transeo access to NHI's books and records, Bessemer is once again engaging in self-dealing, violating Delaware corporate law, and otherwise acting to the detriment of the minority stockholders of NHI because Bessemer is the only stockholder with accurate knowledge of NHI's operational and financial condition.

133.    Transeo again demanded an inspection of NHI's books and records by letter dated June 30, 2011 (together with the June 20, 2011 demand letter, the "**Demand for Inspection**").

134.    As of the date hereof, NHI has failed to respond to the Demand for Inspection.

135.    On information and belief, NHI has failed to fulfill its obligation to allow Transeo to inspect the books and records of NHI at the order of Bessemer.

### Bessemer's Removal of Marteau as a Director of NHI

136.    Bessemer has also acted to remove Marteau from the NHI BOD.

137.    By letter and annexed agenda dated July 14, 2011 (the "**Special Meeting Notice & Agenda**") Erwin advised the NHI BOD that: "at the request of three members of the Board of Directors of the Company (the "**Board**"), a special meeting of the Board has been scheduled for Monday, August 1, 2011, at 9:00AM EST to 11:00AM EST.  The dial-in information is provided in the attached agenda hereto."  Attached hereto as Exhibit 2 is a true and correct copy of the Special Meeting Notice & Agenda.

138.    According to the Special Meeting Notice & Agenda, the special meeting was being convened at the behest of three (3) members of the NHI BOD pursuant to Section 4.01 of NHI's by-laws (the "**NHI By-Laws**").  Attached hereto as Exhibit 3 is a true and correct copy of the NHI By-Laws.

139.    Pursuant to Section 2.04 of the NHI By-Laws:

> Notice of meetings shall be in writing and shall state the place,
> date and hour of the meeting and, in the case of a special meeting,

> the purpose or purposes for which the meeting is called and to which its business will be limited. The notice for a special meeting shall also indicate that it is being issued by or at the direction of the person or persons calling the meeting.

140.   The Special Meeting Notice & Agenda did not identify "the person or persons calling the meeting."

141.   On information and belief, the three (3) members of the NHI BOD that called for the Special Meeting (as defined below) were the two (2) members of the NHI BOD appointed by Bessemer, and Goldsmith (appointed by Bessemer and approved by the remaining members of the NHI BOD).

142.   A Special Meeting of the NHI BOD was held on August 1, 2011 (the **"August 1, 2011 Special Meeting"**).

143.   At the August 1, 2011 Special Meeting, Bessemer arranged for an attorney to be present, ostensibly to serve as secretary to record the minutes of the Special Meeting.

144.   On information and belief, the attorney who took the minutes of the Special Meeting was retained by Bessemer.

145.   At the August 1, 2011 Special Meeting, the attorney supposedly acting as a secretary offered legal advice, including that notice of the meeting to Marteau was "legal."

146.   In any event, the true purpose of the August 1, 2011 Special Meeting soon became clear, as the Bessemer-controlled members of the NHI BOD, led by Erwin, quickly abandoned the Special Meeting's agenda.

147.   Agenda item number 2, "Consider approving Business Information Confidentiality Policy" was not discussed at the Special Meeting.

148.    Agenda item number 3, "Sales, financial and business update" was not fully addressed at the Special Meeting, as Erwin advised that the sales and financial information was not yet ready.

149.    To the extent that a "business update" was provided by Erwin, this update was largely an *ad hominem* attack on Marteau, consisting of a series of misleading and factually incorrect accusations relating only to his past tenure at Intego S.A.

150.    Agenda item number 4, "Appoint Pete Price CFO and Secretary" was addressed, but Marteau advised that he could not take a position with respect to this appointment because no information regarding Price's qualifications had been provided.

151.    On information and belief, Price has an extensive relationship with Bessemer, having served as a Chief Financial Officer in other companies in which Bessemer has invested.

152.    Price had previously served as a Chief Financial Officer under Erwin.

153.    Price's relationship with Bessemer was not disclosed to Marteau.

154.    On information and belief, however, the other members of the NHI BOD were aware of the relationship between Price and Bessemer.

155.    When Marteau advised that he could not opine on Price's appointment in the absence of any information about Price, Erwin took the position that NHI BOD approval was not needed for this appointment.

156.    Agenda item number 5 "Consider approving new 409A valuation" was not addressed at the Special Meeting.  Bessemer and the NHI BOD thus were aware that it was not proper to continue to use the 2008 valuation.

157.    Agenda item number 6 "Consider approving amendment to 2007 Stock Option Plan" was briefly raised at the Special Meeting when Erwin proposed amending the 2007 Stock

Option Plan to provide options on 20,000,000 shares (at the time, there were 101,000,000 shares authorized and outstanding) mostly for himself and Price.

158.    Since these shares did not exist at the time of the Special Meeting, Levine proposed increasing NHI's number of authorized shares by 20,000,000.

159.    Marteau objected to and voted against this proposal as a director of NHI on the basis that it was unreasonable to offer 20% of the equity in NHI mostly to two employees when no such plan had previously been in place, and that in any event there was no proposal on the Special Meeting Notice & Agenda to increase NHI's number of authorized shares.  Section 6.1 of the Stockholders' Agreement provides for a specific and formal anti-dilution mechanism in the event of any issuance or grant of new shares or options.  With Marteau having opposed the proposal as a director of NHI, it was clear that unanimous approval of the issuance of 20% more shares by the Major Stockholders could not be obtained in a proper fashion, as required by Section 6.1 of the Stockholders' Agreement.

160.    Agenda item number 7 "Consider approving option grants to Erwin and Pete Price" was not discussed at the Special Meeting.

161.    Agenda item number 8 "Consider approving stockholder distributions, including possible partial payment of stockholder 'dividend in kind' notes" was not discussed at the Special Meeting.

162.    Agenda item number 9 "Update on AVG discussions" was summarily addressed by Erwin, who advised that NHI could not be sold at the present time, and that he had advised AVG about certain "internal problems" at NHI.

163.    Agenda item number 10 "Consider approving minutes from March 1, 2011 meeting" was not discussed at the Special Meeting.

164.    Instead, at the conclusion of the Special Meeting, Bessemer's true agenda in arranging the Special Meeting was exposed when Erwin demanded Marteau's resignation from the NHI BOD.

165.    Other than by resignation, the Stockholders' Agreement does not provide a mechanism for the removal of Marteau as a member of the NHI BOD.

166.    When Marteau did not voluntarily resign, Erwin read a prepared statement aloud advising Marteau that NHI had previously formed a committee composed of the other members of the NHI BOD, and that this committee already had elected to remove Marteau as a member of the NHI BOD.

167.    The purported removal of Marteau as a director violated the Stockholders' Agreement.

168.    On information and belief, after the March 1, 2011 NHI BOD Meeting, the Bessemer-appointed members of the NHI BOD met and conducted improper and invalid meetings of the NHI BOD, without a proper quorum and without advising Marteau of these meetings, at which decisions regarding NHI were made.   Moreover, Bessemer has denied Marteau notices, documents and information to which a director ordinarily is entitled, including, without limitation, approved minutes and draft minutes of meetings of the NHI BOD.

169.    On information and belief, Bessemer's reason for taking these actions against Marteau is revealed by examining Sections 5.1(a) and (b) of the Stockholders' Agreement. These provisions allowed Marteau, had he remained the Chief Executive Officer of NHI, to demand the redemption of Transeo's shares of NHI after June 7, 2012, or to cause steps to be taken to sell NHI after June 7, 2012.

170.    By terminating Marteau, as well as by other steps alleged above, Bessemer effectively frustrated both any possible redemption of Transeo's shares of NHI and Transeo's ability to cause steps to be taken for the sale of NHI.

**Further Improper or Illegal Conduct**

171.    On information and belief, Bessemer has caused the following improper or illegal conduct by defendants Erwin and Price, in their capacities as officers or directors of NHI or its subsidiaries:

* creating false documents and committing a fraud in breach of the Stockholders' Agreement in connection with the adoption of the "Neutral Holdings, Inc. 2009 Stock Option Plan for Employees and Directors of French Affiliates," (the "**2009 Stock Option Plan**"), which recites its approval at a meeting of all stockholders held on February 14, 2012, when in fact neither Transeo nor Gelblat attended or was aware of any such stockholders' meeting and gave no such approval, and also falsely reciting its approval by the NHI BOD, when such board could have a quorum only with Marteau present and he never received notice of nor attended any NHI BOD meeting where this was discussed;

* creating false and fraudulent documents in connection with grants of stock options pursuant to the 2009 Stock Option Plan, which associated documents require options to be granted at the stock's current fair market value in accordance with Internal Revenue Code Section 409A and applicable U.S. Treasury Regulations; in fact, stock options were granted to employees at a discounted U.S.$0.10 per share exercise price, effectively valuing NHI at approximately U.S.$10,000,000, which was not its fair market value.  Such a discount was in flagrant violation of the Internal Revenue Code requirements and the 2009 Stock Option Plan documents, which had the additional fraudulent impact on stockholders of diluting the value of their NHI stock holdings, notwithstanding the awareness of Bessemer and its controlled

directors, at least as early as the August 1, 2011 Special Meeting, that consideration of a new valuation for Section 409A purposes was appropriate and required;

*forging a false document with regard to the Annual General Meeting of Intego S.A., an entity created and existing under the laws of France, which meeting purportedly was held in Larchmont, New York on June 29, 2011 and purportedly attended in person by defendant Erwin and the minutes of which purportedly were taken in French by defendant Price. In point of fact, defendant Erwin was not present in person and French law only permits such a meeting to be conducted in person. The potential consequence of such falsification is to render the conduct of the meeting, and any action taken at it, or in furtherance thereof, invalid under French law;

* despite demand, refusing to provide information about the financial results of NHI needed by plaintiffs Transeo and Gelblat in order to file tax reports abroad and to comply with other contractual obligations vis-à-vis third parties; and

* refusing to permit Transeo to inspect NHI's books and records despite its demand to do so on two occasions, and despite the provisions of the Stockholders' Agreement and Delaware law.

As shown by the foregoing, Bessemer and the other defendants have practiced a pattern of deceit and self-dealing that is not in the best interest of NHI and is to the detriment of the plaintiffs, and therefore have breached their fiduciary duties of loyalty, good faith and care.

### AS AND FOR A FIRST CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
### (Transeo and Gelblat against Bessemer)

172.   Plaintiffs repeat and incorporate paragraphs 1 through 171 as if set forth in full herein.

173.   Under Delaware law, Bessemer, as the majority and controlling stockholder, owed a fiduciary duty to plaintiffs Transeo and Gelblat as minority stockholders.

174.   Bessemer failed to meet its fiduciary duty by seeking to use its dominant position on the NHI BOD to make numerous decisions that disproportionately benefited Bessemer, as a majority stockholder of NHI, and did not benefit the minority stockholders of NHI, all as more fully detailed above, including without limitation: Bessemer's attempts to structure a dividend payment without authority through a loan from a related party providing a disproportionate benefit to Bessemer; the P-Note Dividend; the termination of key employees and officers, thereby reducing the value of NHI; the movement of assets from NHI's subsidiaries, the Intego Companies, to the United States to bring them under Bessemer's control and direct access; the complete failure of the Bessemer-appointed members of the NHI BOD to examine the AVG Offer; and causing or acquiescing in other improper or illegal conduct described above.

175.   Bessemer thus used its controlling and dominating equity position, expressed through Bessemer's domination and control of the NHI BOD, to engage in various acts of self-dealing, all in breach of Bessemer's fiduciary duties to plaintiffs Transeo and Gelblat.

176.   Bessemer's breach of its fiduciary duties has damaged Transeo in an amount to be determined by a jury, but in no event less than U.S.$4,400,000, the approximate fair market value of Transeo's shares of NHI, and has damaged Gelblat in an amount to be determined by a jury, but in no event less than U.S.$300,000, the approximate fair market value of Gelblat's shares of NHI.

## AS AND FOR A SECOND CAUSE OF ACTION
## BREACH OF CONTRACT
### (Transeo and Gelblat against Bessemer)

177.    Plaintiffs repeat and incorporate paragraphs 1 through 176 as if set forth in full herein.

178.    Pursuant to the Stockholders' Agreement, Transeo was and is entitled to appoint Marteau to the NHI BOD.

179.    Pursuant to the Stockholders' Agreement, Transeo has the sole right to remove Marteau from the NHI BOD.

180.    Bessemer, through Levine, Erwin and Goldsmith, unilaterally has purported to act to remove Marteau as a director on the NHI BOD.

181.    Bessemer's purported removal of Marteau is a breach of the Stockholders' Agreement, and is ineffectual.  Moreover, while it has denied that Marteau was removed from the NHI BOD, Bessemer nevertheless has denied Marteau notices and information to which a director ordinarily is entitled.  Marteau has not been paid any directors' fees since the purported removal, a powerful indication of Bessemer's contemporaneous understanding of the situation. On information and belief, Marteau's removal was planned long before the August 1, 2011 Special Meeting as no NHI BOD meeting had been held in the five months since his removal as Chief Executive Officer of NHI on March 1, 2011.  The scheduled April 1, 2011 NHI BOD meeting was cancelled.  Moreover, Erwin stated that a committee of the NHI BOD not only had been formed previously, but had decided to remove Marteau from the NHI BOD before the August 1, 2011 Special Meeting.  The August 1, 2011 Special Meeting amounted to a farce, the

ultimate and not-so-well hidden objective of which was to wrongfully remove Marteau as a director.

182.    Bessemer further has breached the Stockholders' Agreement by causing its controlled and dominated NHI directors to conduct meetings of the NHI BOD without the quorum required by the Stockholders' Agreement.

183.    Bessemer's breach of contract has damaged Transeo in an amount to be determined by a jury, but in no event less than U.S.$4,400,000, the approximate fair market value of Transeo's shares of NHI, and has damaged Gelblat in an amount to be determined by a jury, but in no event less than U.S.$300,000, the approximate fair market value of Gelblat's shares of NHI, in each case plus pre-judgment interest from the date of breach pursuant to New York Civil Practice Law and Rules § 5001.

**AS AND FOR A THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Transeo and Gelblat against Bessemer)**

184.    Plaintiffs repeat and incorporate paragraphs 1 through 183 as if set forth in full herein.

185.    Bessemer was and remains obligated to use good faith and fair dealing in negotiating and performing the Stockholders' Agreement.

186.    On information and belief, at the time the Stockholders' Agreement was entered into, Bessemer had no intention of keeping Marteau in his position as Chief Executive Officer of NHI.

187.    In the alternative, Bessemer decided that subsequent to the execution of the Stockholders' Agreement it would remove Marteau from his position as Chief Executive Officer

of NHI in order to prevent the redemption of Transeo's shares of NHI and the sale of NHI under Sections 5.1(a) and (b) of the Stockholders' Agreement.

188.    In agreeing to the Stockholders' Agreement, Bessemer violated the implied covenant of good faith and fair dealing in that it never intended to allow Transeo to have its shares of NHI redeemed or to allow Marteau to sell NHI.

189.    Bessemer further violated the implied covenant of good faith and fair dealing by causing its controlled and dominated NHI directors to conduct meetings of the NHI BOD without the quorum required by the Stockholders' Agreement.

190.    Bessemer further violated the implied covenant of good faith and fair dealing by conducting meetings of stockholders without notice to or participation by Transeo.

191.    Bessemer's breach of the implied covenant of good faith and fair dealing has damaged Transeo in an amount to be determined by a jury, but in no event less than U.S.$4,400,000, the approximate fair market value of Transeo's shares of NHI, and has damaged Gelblat in an amount to be determined by a jury, but in no event less than U.S.$300,000, the approximate fair market value of Gelblat's shares of NHI.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**BREACH OF DELAWARE GENERAL CORPORATION LAW**
**(Transeo against Bessemer)**

192.    Transeo repeats and incorporates paragraphs 1 through 191 as if set forth in full herein.

193.    Section 220(c) of the Delaware General Corporation Law affords NHI's stockholders the right to inspect NHI's books and records.

194.    On information and belief, NHI's books and records are maintained at Bessemer's offices.

195.    Despite repeated demands, Bessemer has refused to allow Transeo to inspect NHI's books and records.

196.    Bessemer's breach of Delaware law has damaged Transeo in an amount to be determined by a jury, but in no event less than U.S.$4,400,000, the approximate fair market value of Transeo's shares of NHI.

## AS AND FOR A FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT UNDER NEW YORK LAW
### (Transeo and Gelblat against Bessemer)

197.    The allegations of Paragraph 1 to 196 are repeated and realleged as if set forth in full herein.

198.    Under the provisions of the Stockholders' Agreement, Section 11.8, except as to matters within the scope of Delaware General Corporation Law, the governing law is the law of the State of New York without regard to its conflict of laws principles which would indicate the application of another state's law.

199.    By reason of the foregoing, Bessemer has been unjustly enriched under the common law of the State of New York at the expense of plaintiffs Transeo and Gelblat.

200.    The amount of the unjust enrichment will be determined at trial, but, on information and belief, has damaged Transeo in an amount to be determined by a jury, but in no event less than U.S.$4,400,000, the approximate fair market value of Transeo's shares of NHI, and has damaged Gelblat in an amount to be determined by a jury, but in no event less than U.S.$300,000, the approximate fair market value of Gelblat's shares of NHI.

## AS AND FOR A SIXTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL ADVANTAGE
### (Transeo against Bessemer)

201.    The allegations of Paragraphs 1 to 200 are repeated and realleged as if set forth in full herein.

202.    The receipt of the AVG Offer to purchase NHI, and in particular its emphasis on the desirability of "the opportunity to partner long-term with the Company's management and development teams," underscored the value which Marteau and Transeo brought to the ongoing operation of NHI and the Intego Companies.

203.    On information and belief, apart from its interest in keeping control of as much of the Intego Companies' cash, brand and technology for itself rather than for NHI, Bessemer had a further interest in restricting Marteau's and Transeo's ability to make their management and development abilities available to others in the marketplace, and ensuring Marteau could not exercise the rights afforded to Transeo under Section 5.1(b) of the Stockholders' Agreement -- to demand steps to cause a sale of NHI on or after June 7, 2012.

204.    The Stock Purchase Agreement among, *inter alia*, Bessemer and Transeo and Marteau provides at Section 8.4 that Marteau could not engage in competitive activities within France or the United States for a period of eighteen (18) months after the last day on which he was compensated for services to NHI or the Intego Companies (not including directors' fees).

205.    At times relevant to the allegations of this complaint, Bessemer has taken the position – contested by Transeo – that the event triggering the start of the eighteen (18)-month restriction is the last payment for services rendered either by Marteau personally or by Transeo.

206.    On information and belief, Bessemer in part terminated Marteau as an officer of both NHI and the Intego Companies, and also terminated Transeo's contract with NHI without providing the period of notice called for under that contract, in order to create a situation where three conditions would overlap: (a) NHI would not be sold to AVG under circumstances where Marteau's shares in NHI would be valued highly and he would be able to continue further to develop the value of NHI as part of AVG; (b) Marteau would be subject to the non-competition

provision of the Stock Purchase Agreement, and not able to provide management and development capacity to AVG; and (c) Marteau would not be able to invoke the option to demand steps for a sale of NHI on or after June 7, 2012.

207.    Given the eighteen (18)-month duration of the non-competition restriction, the fact that frictions arose between Marteau and Bessemer in December 2010 is unsurprising.

208.    On information and belief, once Marteau had infuriated Bessemer by resisting its plan to borrow from affiliated SVB to fund a cash dividend, from which it would have benefitted disproportionately as the result of differential tax treatment, Bessemer decided to extract this human thorn from NHI in a way which would deprive Marteau of prospective contractual advantage, whether under an arrangement with AVG or by forcing a sale of NHI to another third party under Section 5.1(b) of the Stockholders' Agreement.

209.    By reason of the foregoing, Transeo has been damaged in an amount which cannot now be determined, although AVG had clearly offered to pay $5,000,000 to obtain Marteau's services and an additional $5,000,000 to have Marteau manage the launch and release of new products.  Therefore, Transeo's has been damaged in an amount to be determined by a jury, but which is not less than half of the U.S.$10,000,000 value that AVG attributed to the continued involvement of Marteau in management and the development and achievement of certain product milestones, or U.S.$5,000,000.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Transeo and Gelblat against Levine, Erwin, Price and Bessemer)**

210.    The allegations of paragraphs 1 through 209 are repeated and realleged as if set forth in full herein.

211.    At all times relevant to this action, Bessemer dominated the NHI BOD. Specifically, of the four (4) NHI BOD members serving at relevant times prior to the purported

removal of Marteau as a director, Bessemer controlled the appointment of two (2) and approved the appointment of a third. The fourth was Marteau. Therefore, at all relevant times, Bessemer controlled the NHI BOD.

212.   To ensure its control, Bessemer appointed a partner of Bessemer Venture Partners, Levine, and Erwin, the President of NHI installed by the Bessemer-dominated NHI BOD, to be its representatives on the NHI BOD.

213.   Contrary to what the AVG Offer would have accomplished, Bessemer was interested in maximizing short-term cash flow from NHI to the disproportionate detriment of minority stockholders, and, simultaneously, disposing of Marteau as President and Chief Executive Officer of NHI and the Intego Companies.

214.   On information and belief, being aware that Gelblat was in favor of the AVG Offer, Bessemer removed him from the NHI BOD and replaced him with Erwin, whom Bessemer knew would follow Bessemer's instruction.

215.   On information and belief, Bessemer instructed the NHI BOD to reject the AVG Offer.  The NHI BOD, except for Marteau, did so, without conducting appropriate inquiry, analysis or discussion. The cavalier rejection of the AVG Offer, without proper consideration, improperly deprived the NHI stockholders of any possible benefit from the potential opportunity.

216.   As detailed above, since August 1, 2011, Marteau, a director of NHI, has been excluded from all participation in the meetings of the Bessemer-dominated NHI BOD.

217.   As detailed above, at the March 1, 2011 NHI BOD Meeting, the NHI BOD removed Marteau as President and Chief Executive Officer of NHI, which, as Bessemer was

acutely aware, would prevent Transeo's redemption of its shares of NHI and the sale of NHI under Section 5.1(a) and (b) of the Stockholders' Agreement.

218.    As detailed above, Bessemer used its dominant position on the NHI BOD to make a number of decisions that benefited only or primarily itself, and were in most cases detrimental to the other NHI stockholders.

219.    On information and belief, defendant Price aided and abetted defendant Erwin in committing a breach of the fiduciary duty he owed to Transeo and Gelblat in his capacities as a director of the Intego Companies and as a director of NHI.  Specifically, Price aided and abetted Erwin in preparing and executing the false documentation with respect to the Annual General Meeting of Intego S.A. on June 29, 2011.

220.    On information and belief, defendants Bessemer, Levine, Erwin, and Price knowingly participated in the breach of fiduciary duties owed to plaintiffs.

221.    Bessemer's, Levine's, Erwin's, and Price's actions in aiding and abetting the NHI BOD's breach of their fiduciary duties has damaged Transeo in an amount to be determined by a jury, in no event less than U.S.$4,400,000, the approximate fair market value of Transeo's shares of NHI, and has damaged Gelblat in an amount to be determined by a jury, but in no event less than U.S.$300,000, the approximate fair market value of Gelblat's shares of NHI.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## OTHER BLATANT TORTIOUS MISCONDUCT
## CONCERNING NHI AND ITS SUBSIDIARIES
### (Transeo and Gelblat against Erwin and Price)

222.    The allegations of Paragraphs 1 to 221 are repeated and realleged as if set forth in full herein.

223.    On information and belief, defendants Erwin and Price, with either direct

knowledge, or at least the acquiescence, of the NHI BOD, not including Marteau, committed the following wrongful acts:

* creating false documents and committing a fraud upon plaintiffs in connection with the adoption of the 2009 Stock Option Plan, by reciting its approval at a meeting of all stockholders held on February 14, 2012, when in fact neither plaintiff Transeo nor plaintiff Gelblat attended or was aware of any such stockholders' meeting and gave no such approval, and further falsely reciting its approval by the NHI BOD, all for the purpose of diluting Transeo's and Gelblat's shareholdings;

* forging a false document with regard to the Annual General Meeting of Intego S.A., an entity created and existing under the laws of France, which meeting purportedly was held in Larchmont, New York on June 29, 2011 and purportedly attended in person by defendant Erwin and the minutes of which purportedly were taken in French by defendant Price; all of the foregoing in blatant violation of applicable laws, including French laws;

* wrongfully withholding information about the financial results of NHI needed by plaintiffs Transeo and Gelblat in order for each to file tax reports abroad and comply with their contractual obligations vis-à-vis third parties, despite demand; and

* refused to permit Transeo to inspect NHI's books and records, despite its demand to do so on two occasions.

224.    The foregoing actions have damaged Transeo and Gelblat, among other things, by granting rights to others which effectively devalued their NHI shares, imposing additional costs and uncertainties upon them, exposing them to potential claims and liabilities and damaging their reputations by associating them with and attributing to them the approval of conduct which violates the Internal Revenue Code.

225.    By reason of the foregoing, plaintiffs Transeo and Gelblat have been damaged in amount to be determined at trial but which is not less than $4,700,000.

### AS AND FOR A NINTH CAUSE OF ACTION
### (TRANSEO AND GELBLAT, IN THE NAME AND FOR THE BENEFIT OF NHI, AGAINST DERIVATIVE DEFENDANTS)

226.    The allegations of Paragraphs 1 to 225 are repeated and realleged as if set forth at length.

227.    In the alternative, plaintiffs Transeo and Gelblat bring this shareholder derivative claim in the name and for the benefit of NHI and under Fed. R. Civ. P. 23.1.  As further described below, the defendants include Bessemer; Deer & Co.; Erwin, the President and Chief Executive Officer of NHI; and Levine, a partner of Bessemer Venture Partners and a director of NHI.  NHI is a nominal defendant.

228.    As set out above, plaintiff Transeo at all relevant times has been a stockholder of NHI.  It now owns 14.86% of the shares of NHI.

229.    Plaintiff Gelblat at all relevant times has been a stockholder of NHI.  He now owns less than 1% of the shares of NHI.  He previously was a Bessemer-appointed director of NHI, until his abrupt removal from that position by Bessemer in February 2011.

230.    On information and belief, defendants Bessemer Venture Partners VI L.P., Bessemer Venture Partners VI Institutional, L.P. and Bessemer Venture Partners Co-Investment L.P. are limited partnerships formed and existing under the laws of the State of Delaware.  These three entities together own 83.50% of the shares of NHI.

231.    On information and belief, the general partner of each of the Bessemer defendants referred to in Paragraph 230 is Deer & Co.

232.   On information and belief, Deer & Co. is a limited liability company formed and existing under the laws of the State of Delaware.

233.   On information and belief, by virtue of having a common general partner, namely Deer & Co., any and all of the Bessemer defendants are a collective controlling stockholder of NHI under Delaware law.

234.   Defendant Levine is a resident of the State of New York.

235.   Defendant Erwin is a resident of the State of Washington.

236.   Nominal defendant NHI is a corporation formed and existing under the laws of the State of Delaware.

237.   Defendants Bessemer, Deer & Co., Levine and Erwin are referred to collectively as the "**Derivative Defendants**."

## Breach of Fiduciary Duty of Loyalty, Good Faith and Care: The AVG Offer

238.   An email from Levine, as a member of the Bessemer-controlled NHI BOD, dated February 24, 2011, stated the NHI BOD's expectation to "receive an M&A offer from AVG this week" and the importance of responding to AVG quickly "to keep the deal alive and warm."

239.   An email from Goldsmith, as a member of the Bessemer-controlled NHI BOD, dated February 26, 2011, acknowledged that the NHI BOD was aware of its duties as a board "to do what is in the best interest of the company" and that the NHI BOD "must meet and deliberate in order to do so."

240.   The Derivative Defendants' refusal out of hand to give consideration to the AVG Offer; failure to execute a non-binding letter of intent regarding the AVG Offer; failure to establish a committee of the NHI BOD to consider the AVG Offer; failure to bring in an outside advisor to evaluate the AVG Offer, despite a plea by Marteau to do so, or even to conduct the

most cursory due diligence; and failure to explore the possibility of obtaining more time to respond to the AVG Offer, indicate that the NHI BOD intentionally failed to act in the face of a known duty to act, and consciously disregarded its duties. These failures resulted in the breach of the fiduciary duties of loyalty, care and good faith owed by each of the Derivative Defendants to plaintiffs as stockholders of NHI.

241.    The interests of Bessemer Venture Partners VI L.P., Bessemer Venture Partners VI Institutional, L.P. and Bessemer Venture Partners Co-Investment L.P., as the collective controlling stockholders of NHI, differed dramatically from the interests of Transeo and Gelblat, as minority stockholders of NHI. In particular, the collective controlling stockholders had an interest in maximizing short-term cash flow from NHI, and have control and easy access to its cash and valuable intellectual property, to the detriment of the minority stockholders, who had an interest in increasing NHI's medium-to-long-term prospects and goodwill.

242.    On information and belief, Bessemer had a further reason to reject the AVG Offer without properly considering its value or desirability. A significant component of the offer was a requirement that senior management, including Marteau, remain in place. By removing Marteau as President and Chief Executive Officer of NHI and later of Intego S.A., the collective controlling stockholders acted to reduce significantly NHI's value to AVG as an acquisition target.

243.    The majority of the NHI BOD was not disinterested with respect to the actions taken with respect to the AVG Offer.

244.    The Derivative Defendants were and are under a duty to deal with plaintiffs Transeo and Gelblat with "entire fairness" under Delaware law with regard to the AVG Offer,

not only as to the fairness of the price but also as to "fair dealing" in the process of its consideration, but failed to do so.

**Marteau's Exclusion from the NHI BOD**

245.    Since approximately August 1, 2011, Marteau, appointed as a director of NHI by plaintiff Transeo, and subject to removal only by Transeo, has been excluded from participation in the meetings of the NHI BOD.

246.    Specifically, Marteau has not been afforded notice of the NHI BOD meetings; he has not been given minutes of prior meetings, in draft form or otherwise; and he has not been provided with information about the affairs of NHI to which a director ordinarily would have access, despite his specific requests.

247.    The conduct of any meeting of the NHI BOD without all directors present violates Section 7.2 of the Stockholders' Agreement, to which Bessemer, Transeo and Gelblat are parties, and renders any action taken by the NHI BOD void.

248.    On information and belief, the NHI BOD, not including Marteau, since August 1, 2011,  improperly has taken the actions listed below without the required quorum.  These actions therefore are void:

  * the approval of minutes for meetings held on August 1, 2011 and thereafter;

  * the adoption of financial results for prior periods, on or after August 1, 2011;

  * the approval of the 2009 Stock Option Plan in early 2012; and

  * the use of a stale 2008 valuation of NHI for purposes of the 2012 adoption of the 2009 Stock Option Plan and for the options granted thereunder, despite its substantial variance both from the value of the proposed AVG Offer in early 2011 and the statements by NHI management and Bessemer in mid-2011 that NHI's valuation was U.S.$15,000,000.

**Other Blatant Misconduct Concerning NHI and its Subsidiaries**

249.  On information and belief, defendant Erwin, with either direct knowledge, or at least the acquiescence, of the NHI BOD, not including Marteau, committed the following wrongful acts:

* creating false documents and committing a fraud in connection with the adoption of the 2009 Stock Option Plan, reciting its approval at a meeting of all stockholders held on February 14, 2012, when in fact neither plaintiff Transeo nor plaintiff Gelblat attended or was aware of any such stockholders' meeting and gave no such approval, and further falsely reciting its approval by the NHI BOD;

* forging a false document with regard to the Annual General Meeting of Intego S.A., an entity created and existing under the laws of France, which meeting purportedly was held in Larchmont, New York on June 29, 2011 and purportedly attended in person by defendant Erwin and the minutes of which purportedly were taken in French by defendant Price; all of the foregoing in blatant violation of applicable laws, including French laws;

* wrongfully withheld information about the financial results of NHI needed by plaintiffs Transeo and Gelblat in order for each to file tax reports abroad and to comply with contractual obligations vis-à-vis third parties, despite demand;

* refused to permit Transeo to inspect NHI's books and records, despite its demand to do so on two occasions; and

* taking steps to relocate Intego's assets, and in particular its cash, computer web services and associated intellectual property, from France to the United States, as alleged above, with benefits to Bessemer but adverse consequences to NHI.

250. As shown by the foregoing, the Derivative Defendants have practiced a pattern of deceit and self-dealing that is not in the best interest of NHI and is to the detriment of the plaintiffs, and therefore have breached their fiduciary duty of loyalty.

251. The granting of stock options under the 2009 Stock Option Plan (which covers U.S. taxpayers who are French residents) at the price of U.S.$0.10 per share, which was significantly below market value – in essence selling the shares to employees at a discount – had the effect of inflating the value of the stock options to be awarded to employees (both then and for future grants) and thus artificially, wrongfully and disproportionately diluting Transeo's and Gelblat's investments in NHI.  Further, such a grant at discounted value in violation of Internal Revenue Code Section 409A and the 2009 Stock Option Plan documents exposes both employees and the employer to significant tax penalties, which would depreciate the value of NHI and the Intego Companies and put Transeo's and Gelblat's investments at risk.

252. By reason of the foregoing, the Derivative Defendants caused substantial injury to NHI, in an amount to be determined at trial.

**Futility of Demand**

253. Demand upon NHI to prosecute these claims against the Derivative Defendants would be futile because the NHI BOD has manifested profound hostility to the interests of Transeo, most notably by excluding Marteau from participation as a director of NHI.

254. Demand upon NHI to prosecute these claims against the Derivative Defendants would be futile as well because the NHI BOD is incapable of making an independent decision to assert the claims, even were demand to be made, because a majority of the members of the NHI BOD are interested or conflicted and are under the domination and control of Bessemer.

255. With respect to matters related to the AVG Offer, demand would be futile as well because the NHI BOD, not including Marteau, did not fully inform itself to the extent reasonably appropriate and required under the circumstances.

256. With respect to the matters identified above in paragraphs 242 to 248 under the sub-headings "Marteau's Exclusion from the NHI BOD" and "Other Blatant Misconduct Concerning NHI and its Subsidiaries," demand would be futile as well because the conduct at issue is so egregious that it could not possibly comply with the business judgment rule under Delaware law.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs Transeo and Gelblat respectfully request:

A. that process duly issue against defendants requiring defendants to appear and defend this action;

B. that a jury be empanelled to hear Plaintiffs' claims;

C. that Transeo's prayer for relief on its direct causes of action be granted by this Court and judgment be entered thereon against defendants in an amount to be determined at trial, but which amount is not less than the amount of approximately U.S.$9,400,000, plus interest and costs;

D. that Gelblat's prayer for relief on his direct causes of action be granted by this Court and judgment be entered thereon against defendants in an amount to be determined at trial, but which amount is not less than the amount of approximately U.S.$ 300,000, plus interest and costs;

E.    that an Injunction issue preventing any further meetings, decisions or acts of the

NHI BOD until such time as Bessemer's purported termination of Marteau is addressed

by further Order of this Court;

F.    in the alternative, that Transeo's and Gelblat's prayer for relief in the name and for

the benefit of nominal defendant NHI be granted, and judgment be entered against the

Derivative Defendants for damages in such amount as may be determined at trial and for

such other and further relief in favor of nominal defendant NHI as the Court may in its

discretion grant; and

G.    that judgment be entered for such other and further relief as the Court may in its

discretion grant in favor of Transeo and Gelblat on their direct causes of action, including

but not limited to an award of punitive damages, attorneys' fees and other costs incurred

in this matter.


Dated: New York, New York
         May 14, 2012


                                        Respectfully submitted,
                                        SCHIFF HARDIN LLP
                                        Attorneys for Plaintiffs


                              By:
                                        David Jacoby (DJ 8440)
                                        666 Fifth Avenue, 17th Floor
                                        New York, New York 10103
                                        (212) 753-5000

Of Counsel:

Philippe C. M. Manteau
Randi S.K. Rosenblatt
(*It is anticipated that admission will be sought for Mr. Manteau and Ms. Rosenblatt*)

NY\51168990.8

                                           51

**VERIFICATION**

We, Laurent Marteau, a principal of Transeo S.A.R.L., and Philippe Gelblat, being the Plaintiffs named herein, under penalty of perjury under the laws of the United States, verify that we have read the contents of this Second Amended Verified Complaint and that the same are true to the best of our knowledge, based on our personal knowledge or a review of documents, except for those allegations stated to be on information and belief, and as to those matters we believe them to be true.

Date:   May 14, 2012
Place:  Paris, France

_____
Laurent Marteau
Transeo S.A.R.L.


_____
Philippe Gelblat

# EXHIBIT 1

# STOCKHOLDERS' AGREEMENT

This **STOCKHOLDERS' AGREEMENT** (this "**Agreement**"), dated as of June 7, 2007, by and among Neutral Holdings, Inc., a Delaware corporation (the "**Company**"), Bessemer Venture Partners VI L.P., a Delaware limited partnership ("**BVP Partners**"), Bessemer Venture Partners VI Institutional L.P., a Delaware limited partnership ("**BVP Institutional**") and Bessemer Venture Partners Co-Investment L.P., a Delaware limited partnership ("**Bessemer Co-Investment**", and together with BVP Partners and BVP Institutional, "**BVP**") and Transeo, a French société à responsabilité limitée ("**Transeo**") and Philippe Gelblat, a French national residing at 71 Boulevard Raspail 75007 Paris ("**Gelblat**", and together with BVP, Transeo and each other Person who, in accordance with the terms hereof, shall become a party to or be bound by the terms of this Agreement after the date hereof, the "**Stockholders**").

## W I T N E S S E T H :

**WHEREAS**, the Stockholders currently own all of the issued and outstanding shares of Common Stock, par value $0.0001 per share, of the Company (the "**Common Stock**"); and

**WHEREAS**, the Company and the Stockholders believe it to be in the best interests of the Company and the Stockholders that Transfers (as defined herein) of the Common Stock be restricted as provided herein and that the other agreements contained herein be adopted in order to promote the harmonious management of the Company.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, and intending to be legally bound, the parties hereto hereby agree as follows:

## ARTICLE I

### Certain Definitions

Section 1.1. <u>Certain Definitions</u>.  As used in this Agreement, the following terms have the respective meanings set forth below.

"**Affiliate**" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person including, without limitation, any venture capital fund now or hereafter existing which is controlled by or under common control with one or more general partners or members of such Person.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto. Any Relative of an individual shall be deemed to be an Affiliate of such individual for purposes hereof.

"**Basic Amount**" means, with respect to any Rights Holder, such Rights Holder's pro rata portion of the Company Offered Securities determined by multiplying the number of Company Offered Securities by a fraction, the numerator of which is the aggregate

En accord avec les parties, les présentes ont été reliées par le procédé ASSEMBLACT R.C. empêchant toute substitution ou addition et sont seulement signées à la dernière page.

number of Shares then held by such Rights Holder and the denominator of which is the number of Shares held by all Rights Holders.

"**Beneficial Owner**" (and, with correlative meanings, "Beneficially Own" and "Beneficial Ownership") of any interest means a Person who, together with his, her, or its Affiliates, is or may be deemed a beneficial owner of such interest as defined in Rule 13d-3 or 13d-5 under the Securities Exchange Act of 1934, as amended, or who, together with his, her, or its Affiliates.

"**Board**" means the Board of Directors of the Company in office at the applicable time, as elected in accordance with the provisions of this Agreement.

"**Contract**" means any written or oral agreement, contract, arrangement, or instrument.

"**Major Stockholder**" means (a) BVP to the extent BVP Beneficially Owns more than seven and one half percent (7.5%) of the then outstanding Shares at the applicable time; and (b) Transeo, to the extent Transeo Beneficially Owns at least fifty percent (50%) of those Shares purchased pursuant to that certain Subscription Agreement dated as of May 11, 2007 by and between Transeo and the Company at the applicable time.

"**Majority of the Board**" means an affirmative decision of a simple majority of the members of the Board.

"**Person**" means an individual, partnership, corporation, joint stock company, unincorporated organization or association, trust, or joint venture, or a governmental agency or political subdivision thereof.

"**Relative**" means, with respect to any Stockholder, the spouse of such Stockholder or any of such Stockholder's ancestors, descendants, siblings, descendants of any such siblings, or the spouse of any of the foregoing.

"**Restricted Company**" means any portfolio company of BVP in which BVP (a) holds an ownership interest of twenty percent (20%) or more; and/or (b) has a nominee on the board of directors thereof.

"**Right**" means any option, warrant, security, right, or other instrument convertible into or exchangeable or exercisable for or otherwise giving the holder thereof the right to acquire, directly or indirectly, any Common Stock or any other equity securities of the Company or any other such option, warrant, security, right, or instrument, including without limitation, any instrument the value of which is measured by reference to the value of the Common Stock or any other equity securities of the Company.

"**Shares**" means shares of Common Stock, whether now owned or hereinafter acquired.

Section 1.2. <u>Interpretation</u>. Unless otherwise indicated to the contrary herein by the context or use thereof: (a) the words, "herein," "hereto," "hereof," and words of similar import refer to this Agreement as a whole and not to any particular Section or paragraph hereof; (b) words importing the masculine gender shall include the feminine and neutral genders, and vice versa; and (c) words importing the singular shall include the plural,

and vice versa.

## ARTICLE II

### Certain Restrictions on Transfers

Section 2.1. <u>General Prohibition on Transfers</u>. No Stockholder shall, directly or indirectly, transfer, sell, assign, pledge, hypothecate, give, create a security interest in or lien on, place in trust (voting or otherwise), transfer by operation of law or in any other way encumber or dispose of, directly or indirectly and whether or not voluntarily, any Shares, or any interest therein (each, a "**Transfer**"), unless (i) such Transfer is made in compliance with the terms of this Agreement (including without limitation <u>Articles 3</u> and <u>4</u> hereof); and (ii) the proposed purchaser, assignee, pledgee, mortgagee or other transferee first agrees in writing to become party to this Agreement and to be bound by all the terms and conditions hereof as were binding on the transferor. Any attempted Transfer of any Shares other than in accordance with this Agreement shall be null and void *ab initio* and the Company shall not (1) recognize any such sale, assignment, transfer, pledge, hypothecation, mortgage, disposition or encumbrance or (2) reflect in its stock register any change in registered ownership pursuant thereto. Any Person to whom Shares or any interest therein is Transferred in accordance with this Agreement is hereinafter referred to as a "**Transferee**." Notwithstanding the foregoing, (A) BVP shall be permitted to transfer all or any portion of its Shares to any Affiliate (including, without limitation, any members or limited partners thereof in connection with any distributions in-kind or liquidating distributions); and (B) Transeo shall be permitted to transfer all or any portion of its Shares to Laurent Marteau subject to Laurent Marteau agreeing to be bound by the terms hereof. Notwithstanding the foregoing, to the extent any Stockholder Transfers any of its Shares in accordance with the prior sentence, such Stockholder shall deliver notice of such Transfer to the other Stockholders.

Section 2.2. <u>Compliance with Securities Laws</u>. In addition to the restrictions of <u>Section 2.1</u>, no Stockholder shall Transfer any Shares, or any interest therein, and the Company shall not reflect on its books and records any such Transfer, unless (a) the proposed purchaser, assignee, pledgee, mortgagee or other transferee is an Accredited Investor (as defined below), (b) the Transfer is made pursuant to an effective Registration Statement under the Securities Act of 1933, as amended (the "**Securities Act**"), and in compliance with the provisions of any applicable state securities or "Blue Sky" laws; or (c) the Transfer is exempt from the requirements of the Securities Act and applicable state securities or "Blue Sky" laws and the Company shall have received an opinion of counsel satisfactory in form and substance to the Company that such Transfer is so exempted. "**Accredited Investor**" means an accredited investor, as such term is defined in Regulation D of the Securities Act of 1933, as amended (the "**Securities Act**".

Section 2.3. <u>Reasonableness of Restraints</u>. Each Stockholder acknowledges that the restraints on Transfers of Shares, or interests therein, contained in this Agreement are fair and reasonable to protect the legitimate interest of the Company and the Stockholders and are necessary to promote the proper conduct of the business of the Company.

# ARTICLE III

## Certain Transfers; Determination of Fair Value Per Share

Section 3.1. <u>Voluntary Transfers to Third Parties; Right of First Refusal</u> for BVP; <u>Right of Notice for Transeo.</u>  Notwithstanding the restrictions on transfer set forth in <u>Article II</u> above:

(a)     Upon compliance with the terms of this <u>Section 3.1</u>, any Stockholder may Transfer voluntarily some or all of the Shares Beneficially Owned by it to any other Person.  In the event that a Stockholder (other than BVP) desires to Transfer Shares, such Stockholder (the "**Selling Stockholder**") shall give written notice to the Company and BVP (a "**Seller's Notice**") stating that the Selling Stockholder proposes to Transfer Shares of which it is the Beneficial Owner, stating the number of Shares proposed to be Transferred (the "**Offered Securities**"), and the price and other terms of the Proposed Transfer.  Each Seller's Notice shall constitute an irrevocable offer by the Selling Stockholder to sell to the Company and, if applicable, BVP, the Offered Securities on the terms and conditions (including per share price) as set forth in the Seller's Notice.

(b)     For a period of thirty (30) days following receipt of a Seller's Notice, upon written notice to the Selling Stockholder (a "**Company Notice**"), the Company shall have the right to purchase all or any portion of the Offered Securities on the terms set forth in the Seller's Notice.  The Company Notice shall constitute an irrevocable commitment to purchase that amount of Offered Securities specified in the Company Notice from the Selling Stockholder on the same terms and conditions (including per share price) as set forth in the Seller's Notice.

(c)     In the event that the Company elects not to purchase all of the Offered Securities, or fails to comply with the provisions of this <u>Section 3.1</u>, within the thirty (30)-day period provided in <u>Section 3.1(b)</u> above, then BVP shall have the right for thirty (30) days thereafter to offer to purchase, and upon due exercise of such right the Selling Stockholder shall have the obligation to sell to BVP, all or any portion of the Offered Securities on the same terms and conditions (including per share price) set forth in the Seller's Notice.  To exercise its rights hereunder, BVP shall give to the Selling Stockholder, with a copy to the Company, a notice (the "**Buyer's Notice**") prior to the expiration of such thirty (30)-day period stating (x) the maximum number of such Offered Securities that BVP elects to purchase; (y) that the election made in the Buyer's Notice is irrevocable; and (z) that BVP irrevocably commits to purchase that amount of Offered Securities specified in the Buyer's Notice on the same terms and conditions (including per share price) as set forth in the Seller's Notice.  The Buyer's Notice shall be deemed to be an irrevocable commitment to purchase from the Selling Stockholder the number of Offered Securities that BVP has elected to purchase pursuant to the Buyer's Notice on the terms set forth in the Seller's Notice.

(d)     Subject to <u>Section 4.1</u>, if the Company and BVP fail to elect to purchase all or any portion of the Offered Securities within the time periods specified in this <u>Section 3.1</u>, then the Selling Stockholder (i) shall be under no obligation to sell the remaining Offered Securities to the Company or BVP, unless the Selling Stockholder so elects, and (ii) may, within a period of ninety (90) days from and after the date of the Seller's Notice, Transfer all (but not less than all) of the remaining Offered Securities to one or more Persons on terms no less favorable to the Selling Stockholder than the terms contained in the Seller's Notice.

(e)      If the Company and BVP do not elect to purchase all or any portion of the Offered Securities on the terms set forth in the Seller's Notice and the Selling Stockholder shall not have consummated the Transfer of the remaining Offered Securities to any Transferee or Transferees prior to the expiration of the ninety (90)-day period specified in clause (d), then the provisions of this Section 3.1 shall again apply to any Shares not so Transferred.

(f)      In the event BVP contemplates the Transfer of any Shares or Rights to another stockholder or a third party (other than an Affiliate of BVP or as provided for in Section 2.1), BVP shall provide written notice thereof to Transeo not less than fifteen (15) days prior to the date of such contemplated Transfer and shall consider in good faith any offer Transeo or Laurent Marteau (or another entity he controls) may make for some or all of the Shares or Rights that is the subject of the contemplated Transfer; *provided, however*, BVP shall have no obligation to accept any offer from Transeo and/or Laurent Marteau.

Section 3.2.  Option to Purchase Shares Upon Involuntary Transfer.  Upon the occurrence of any Involuntary Transfer of any Shares, the Stockholder making such Involuntary Transfer and/or the Person to whom such Shares have been Transferred (the "**Involuntary Transferee**"), as the case may be, shall within two (2) business days of such Involuntary Transfer furnish written notice to the Company and each other Stockholder indicating that the Involuntary Transfer has occurred, specifying the name, address and identity of the Involuntary Transferee, and giving a detailed description of the circumstances giving rise to, and stating the legal basis for, such Involuntary Transfer.  As used herein, the term Involuntary Transfer means any Transfer of Shares upon default, foreclosure, forfeit, court order, or otherwise other than by a voluntary act on the part of a Stockholder, including but not limited to, Transfers occurring in connection with the insolvency or divorce of a Stockholder, but excluding the death or permanent disability of such Stockholder.  For a period of thirty (30) days following receipt of such notice, upon written notice to the Involuntary Transferee, the Company shall have the right to purchase, and upon the due exercise of such right the Involuntary Transferee shall have the obligation to sell, all (but not less than all) of the Shares acquired by the Involuntary Transferee for a cash purchase price equal to the Fair Value Per Share multiplied by the amount of the Shares being purchased by the Company as of the date of the Involuntary Transfer.  In the event that the Company elects not to purchase the Shares, or fails to comply with the provisions of this Section 3.2, then the other Stockholders shall have the right for thirty (30) days thereafter to purchase, and upon due exercise of such right the Involuntary Transferee shall have the obligation to sell, all (but not less than all) of the Shares acquired by the Involuntary Transferee for a cash purchase price equal to the Fair Value Per Share multiplied by the number of Shares being purchased by such Stockholders as of the date of the Involuntary Transfer.  The Stockholders shall be entitled to purchase all of the remaining Shares not purchased by the Company pursuant to this Section 3.2 on a *pro rata* basis which pro rata allocation shall be determined by multiplying the number of remaining Shares by a fraction, the numerator of which is the aggregate number of Shares then held by such Stockholder and the denominator of which is the number of Shares held by all Stockholders wishing to exercise such right (excluding for purposes of such calculation any Shares that are the subject of the Involuntary Transfer) or in such other manner as they shall determine by mutual written agreement.  Each Stockholder wishing to purchase such Shares shall give to the Involuntary Transferee notice of its election to purchase prior to the expiration of such thirty (30)-day period.

Section 3.3.  Closing of Transfers; Deliveries at Closing.  The closing of the

purchase and sale of any Shares upon any Transfer subject to this Article III shall take place on such date, not earlier than twenty (20) nor later than sixty (60) days following the termination of the last notice specified in Section 3.1 or 3.2, as the case may be, or as may otherwise be agreed among the parties thereto. The closing shall be held at the principal office of the Company, or at such location as may otherwise be agreed among the parties to the Transfer. At such closing, (i) the Selling Stockholder or the Involuntary Transferee, as the case may be, shall deliver to each Person purchasing Shares certificates representing the Shares being sold, free and clear of any lien, claim, or encumbrance (and each Selling Stockholder and Involuntary Transferee, as the case may be, hereby represents and warrants that such Shares shall, immediately prior to such sale, be so free and clear), (ii) each such Person shall deliver to the Selling Stockholder or the Involuntary Transferee, as the case may be, the consideration to be paid for such Shares in accordance with the provisions of Article III hereof, and (iii) the Selling Stockholder or the Involuntary Transferee, as the case may be, and each other Person who is party to the Transfer shall execute such other documents and take such other action as shall be reasonably necessary to consummate the purchase and sale of the applicable Shares on the terms contemplated by Article III hereof. In the event of an Involuntary Transfer, the Involuntary Transferee also shall deliver such other documents, including evidence of ownership and authority, as the purchaser or purchasers of such Shares reasonably may request.

Section 3.4. Fair Value Per Share; Determination.  (a)  For the purposes hereof, "**Fair Value Per Share**" shall mean the quotient of (A) the fair market value of the Company taken as a whole on the date of (x) an Involuntary Transfer pursuant to Section 3.2 hereof; or (y) receipt by the Company of a Redemption Election pursuant to Section 5.1 (the "**Date of Determination**") (taking into account all the factors relevant thereto, including, without limitation, the highest price that could be obtained in an all cash transaction from an arms'-length sale without unreasonable time constraints of (i) all or substantially all of the assets of the Company subject to or after satisfaction of all liabilities of the Company (including reasonable fees and costs of sale) which would be payable by the Company, or (ii) all of the stock of the Company, whether by stock sale, merger, consolidation or otherwise, less the reasonable fees and costs of sale to the Stockholders), divided by (B) the number of outstanding Shares on the Date of Determination.

(b)     The Fair Value Per Share shall initially be determined by the Board as of the Date of Determination. To the extent any member of the Board is considered to be an interested director with respect to any such determination (i.e., the Stockholder that appointed such director or an Affiliate thereof or a Restricted Company is either (a) in possession of any Shares as a result of any involuntary transfer or (b) is redeeming Shares in accordance with Article V hereof), then such director shall recuse himself or herself from any votes related thereto (including appointment of an appraiser by the Company) and the Fair Value Per Share determination  shall be made by the remaining disinterested directors. Within ten (10) calendar days after receiving notification of the Board's determination of the Fair Value Per Share, the Involuntary Transferee or Withdrawing Stockholder, as the case may be, may request that the Company obtain an opinion of an independent appraiser as to the Fair Value Per Share as of such Date of Determination, to be obtained at the expense of the Company. If the Involuntary Transferee or Withdrawing Stockholder, as the case may be, objects to the Fair Value Per Share determined by the independent appraiser appointed by the Company within twenty (20) calendar days after being given notice of the results of such appraisal, then the Involuntary Transferee or Withdrawing Stockholder, as the case may be, shall notify the Company of the objection and shall promptly obtain, at the Involuntary Transferee's or

-6-

Withdrawing Stockholder's sole expense, as the case may be, an opinion of a second independent appraiser as to the Fair Value Per Share as of the Date of Determination. If the two appraisals are made and if the higher appraisal does not exceed one hundred ten percent (110%) of the lower appraisal, the Fair Value Per Share shall be the average of the two appraisals. If the two appraisals are further apart, a third independent appraiser will be selected by the first two appraisers within twenty (20) calendar days after the Company and the Involuntary Transferee or Withdrawing Stockholder, as the case may be, shall have received a copy of the second appraisal. The third appraiser will determine which of the first two appraisals is closer to the Fair Value Per Share in the opinion of the third appraiser, and this determination by the third appraiser shall be final and binding for purposes of determining the Fair Value Per Share. The cost of the third appraiser shall be borne equally by the Involuntary Transferee or Withdrawing Stockholder, as the case may be, and the Company. All appraisals shall be completed within forty five (45) calendar days of appointment of the appraiser and written notice of the results of such appraisals shall be given to the parties within such time. The parties shall act in good faith and with reasonable promptness in carrying out the appraisal process. The Company and the Involuntary Transferee or Withdrawing Stockholder, as the case may be, may at any time agree upon the Fair Value Per Share, which shall render unnecessary the appraisal process.

## ARTICLE IV

### Certain Other Transfers

Section 4.1. <u>Tag-Along</u>. (a) No Stockholder (an "**Initiating Stockholder**"), whether acting alone or in concert with any other Stockholder, shall enter into any Contract to Transfer, arrange for the Transfer of or Transfer, directly or indirectly or through one or more intermediaries, in a single transaction or a series of related transactions, any Shares or any interest therein, unless all Major Stockholders are given the opportunity to Transfer an amount up to that portion of each Major Stockholder's Shares that represents the same percentage of such Shares as the Shares being sold by the Initiating Stockholder represent to all Shares owned by the Initiating Stockholder concurrently with such proposed Transfer on terms (including, without limitation, the form and amount of, and the time of receipt of, consideration therefor) identical to those applicable to such proposed Transfer. To the extent BVP is not the Initiating Stockholder and elects to exercise its tag-along rights hereunder as a Major Stockholder, Gelblat shall be deemed a Major Stockholder for purposes of this <u>Section 4.1</u> and shall be entitled to exercise tag-along rights as a Major Stockholder in connection with such transfer by the Initiating Stockholder.

(b)     No opportunity shall be deemed given to any Major Stockholder for purposes of <u>Section 4.1(a)</u> unless (i) such Major Stockholder shall have received written notice from the Initiating Stockholder setting forth the material terms of the proposed Transfer, and shall have been given at least thirty (30) days after receipt of such notice to exercise its rights contained in this <u>Section 4.1</u> by giving written notice thereof to the Initiating Stockholder; (ii) if such Major Stockholder is then the holder of any Rights, such Major Stockholder shall be permitted to exercise, convert or exchange such Rights strictly in accordance with the terms thereof; (iii) the terms on which the Initiating Stockholder actually sells its Shares are no more favorable to the Initiating Stockholder (including, without limitation, the form and amount of, and the time of receipt of, consideration therefor), than the terms set forth in the notice given by it pursuant to <u>clause (i)</u> of this sentence; (iv) the Person or group to which the applicable Transfer is proposed to be made makes an offer to

-7-

purchase any or all outstanding Shares (including Shares issuable upon the exercise, conversion, or exchange of Rights) that (A) is distributed in writing to all record holders of Shares; (B) is open for acceptance by all record holders of Shares for a period of at least thirty (30) business days after such distribution; and (C) provides for per Share consideration identical to that being paid in the Transfer to each holder who accepts such offer; and (v) the Person or group to which the Initiating Stockholder Transfers its Shares, purchases, at or prior to the time of purchase of such Shares, from each Stockholder exercising his or its rights pursuant to this <u>Section 4.1</u>, at least such number of Shares as such Stockholder shall specify in the notice given by such Stockholder pursuant to <u>clause (i)</u> of this sentence.

Section 4.2. <u>Drag-Along Obligations</u>.

(a)     <u>Definitions</u>.     A "**Sale of the Company**" shall mean either (i) a transaction or series of related transactions in which any Person, or a group of related Persons, acquires from Stockholders all of the issued and outstanding capital stock of the Company (a "**Stock Sale**"), or (ii) a transaction including (A) the merger or consolidation of the Company into or with another corporation, which will result in shares representing more than fifty-percent (50%) of the outstanding voting power of the Company immediately after the effective date of such transaction being directly or indirectly owned by Persons other than the direct or indirect holders of such voting power immediately prior to such transaction, or (B) the sale or conveyance of all or substantially all of the assets of the Company.

(b)     <u>Actions to be Taken</u>.     In the event that:  the holders of at least seventy percent (70%) of the issued and outstanding Common Stock then outstanding, voting together as a single class on an as-converted basis (the "**Company Selling Stockholders**"), approve a Sale of the Company in respect of the Company, then each Stockholder hereby agrees:

(i)     if such transaction requires Stockholder approval, with respect to all Shares that such Stockholder owns or over which such Stockholder otherwise exercises voting power, to vote (in person, by proxy or by action by written consent, as applicable) all Shares in favor of, and adopt, such Sale of the Company and to vote in opposition to any and all other proposals that could reasonably be expected to delay or impair the ability of the Company to consummate such Sale of the Company;

(ii)     if such transaction is a Stock Sale, to sell the same proportion of shares of capital stock of the Company beneficially held by such Stockholder as is being sold by the Company Selling Stockholders to the Person to whom the Company Selling Stockholders propose to sell their Shares (and to require the purchase thereof);

(iii)     to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company or the Company Selling Stockholders in order to carry out the terms and provision of this <u>Section 4.2</u>, including without limitation executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, share certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances) and any similar or related documents, and approving a stockholder representative in connection with such Sale of the Company;

(iv)     not to deposit, and to cause their Affiliates not to deposit, except as provided in this Agreement, any Shares owned by such party or Affiliate in a voting

-8-

trust or subject any Shares to any arrangement or agreement with respect to the voting of such Shares, unless specifically requested to do so by the acquiror in connection with the Sale of the Company; and

(v)     to waive and refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company.

Section 4.3. <u>Exceptions</u>.  Notwithstanding the forgoing, a Stockholder shall not be required to comply with <u>Section 4.2</u> above in connection with any proposed Sale of the Company (the "**Proposed Sale**") unless:

(i)     the Stockholder shall not be liable for the inaccuracy of any representation or warranty made by any other Person in connection with the Proposed Sale, other than the Company; and

(ii)     the liability for indemnification, if any, of such Stockholder in the Proposed Sale and for the inaccuracy of any representations and warranties made by the Company in connection with such Proposed Sale, is several and not joint with any other Person, and is pro rata in accordance with such Stockholder's relative stock ownership of the Company.

Section 4.4. <u>Multiple Prices</u>.   If any transaction or series of related transactions subject to <u>Section 4.1</u> involves more than one price to be paid to the Initiating Stockholder for Shares, for purposes of <u>Section 4.1</u> the price per Share shall be deemed to be the highest of the prices, and the other terms and conditions of the Transfer shall be deemed to be the most favorable of the terms and conditions, to be paid or included as part of such transaction or transactions.

## ARTICLE V

### Share Redemptions; Sale Process

Section 5.1. <u>Triggering Events</u>.

(a)     <u>General</u>.       At any time, and from time to time (but subject to Section 5.1(b) below), after June 7, 2012, each Major Stockholder (the "**Redeeming Holders**") shall be entitled, by written request (a "**Redemption Election**") delivered to the Company and the other Major Stockholders, to require that any or all of the Shares held by such Redeeming Holder be redeemed.  The Company shall, to the extent it may lawfully do so, redeem that number of Shares specified in the Redemption Election (the "**Redeemed Shares**") in accordance with the procedures set forth in this <u>Section 5</u>.

(b)     <u>Sale</u>.  Subject to Laurent Marteau being the Chief Executive Officer of the Company, on or after June 7, 2012 Transeo shall be entitled to request that the Company appoint an investment bank to conduct a sale of the Company.  Promptly upon such request, Transeo and BVP shall take such steps as are necessary to select and appoint such investment bank, which shall be a firm of national or international reputation with substantial experience in the software industry.  From the date of such notice by Transeo and for so long as the appointed investment bank's engagement is in effect, no Major Stockholder shall be entitled to make a Redemption Election.  BVP and Transeo shall agree on the terms of engagement (including termination) of such investment bank.

(c)   BVP Interested Party Transactions.  To the extent that the Company undertakes a business combination or other reorganization of Intego SA involving one or more Affiliates of BVP or any Restricted Company, which transaction is not approved by Transeo, Transeo shall be entitled to have all of its Shares redeemed for a cash purchase price equal to the Fair Value Per Share multiplied by the number of Shares being redeemed as of the date of any such election.  The closing of such redemption shall be consummated in accordance with the provisions of Section 5.3, as applicable.

Section 5.2.  Redemption.  In the event that a Redeeming Holder delivers to the Company a Redemption Election pursuant to Section 5.1, the Company shall purchase all (but not less than all) of the Shares Beneficially Owned by such Redeeming Holder submitting the Redemption Election (a "**Withdrawing Stockholder**") including, without limitation, Shares issuable upon exercise of Rights then owned by such Withdrawing Stockholder, if any, for a cash purchase price equal to the Fair Value Per Share multiplied by the number of Shares being redeemed as of the date of the Redemption Election; provided, however, that if the Company is then prohibited from purchasing the Shares due to limitations on the amount of distributions payable to Stockholders of the Company, the Company shall purchase, from time to time, such Shares as the Company is then legally permitted to purchase, and any amount otherwise payable to the Withdrawing Stockholder pursuant to this Article V but for the provisions of this proviso shall bear interest at a rate of twelve percent (12%) per annum until paid in full, calculated on the basis of a three hundred sixty (360)-day year for the number of days actually elapsed.  Notwithstanding the foregoing, any Major Stockholder, upon receipt of notice of a Redemption Election as provided in Section 5.1 above, shall be entitled to join in such Redemption Election, on a pro rata basis, provided such Major Stockholder(s) delivers notice (a "**Joining Notice**") to the Company and the Redeeming Holder(s) that delivered such Redemption Election not later than fifteen (15) days after receipt of such Redemption Election.  For purposes of this Section 5.2 upon receipt by the Company and the Redeeming Holder(s) of a Joining Notice, the Company shall redeem all such Shares proposed to be redeemed in the Redemption Election and any Joining Notice, pro rata, as if such elections were made simultaneously as part of the same Redemption Election.

Section 5.3.  Closing of Transfers; Deliveries at Closing.  The closing of the purchase and sale of any Shares subject to a Redemption Election shall take place on such date, not earlier than thirty (30) nor later than sixty (60) days following the Company's receipt of the initial Redemption Election, or as may otherwise be agreed among the parties thereto.  The closing shall be held at the principal office of the Company, or at such other location as the parties to such Transfer may agree.  At such closing, (a) each Withdrawing Stockholder shall deliver to the Company certificates representing the Shares being sold, free and clear of any lien, claim, or encumbrance (and each Withdrawing Stockholder hereby represents and warrants that such Shares shall, immediately prior to such sale, be so free and clear); (b) the Company shall deliver to each Withdrawing Stockholder the consideration to be paid for such Shares in accordance with the provisions of this Article V; (c) each Withdrawing Stockholder and the Company shall execute such other documents and take such other action as shall be reasonably necessary to consummate the purchase and sale of the applicable Shares on the terms contemplated by this Article V.

## ARTICLE VI

## Right of First Offer

-10-

Section 6.1. <u>Right of Certain Stockholders to Acquire Company Offered Securities</u>. (a) If the Company proposes to issue, grant, or sell Shares or Rights ("**Company Offered Securities**"), the Company shall first give the Major Stockholders (the "**Rights Holders**") a notice setting forth in reasonable detail the price and other terms on which such Company Offered Securities are proposed to be issued or sold, the terms of such Company Offered Securities and the amount thereof proposed to be issued, granted, or sold (the "**Rights Notice**"). Each Rights Holder shall thereafter have the right, upon written notice given to the Company no later than twenty (20) days after receipt of the Rights Notice, to purchase up to that number of such Company Offered Securities as is equal to such Rights Holder's Basic Amount for the price and other terms set forth in the Rights Notice. Any notice by a Rights Holder exercising its right to purchase any Company Offered Securities pursuant to this <u>Article VI</u> shall constitute an irrevocable commitment to purchase from the Company any Company Offered Securities specified in such notice, subject to the maximum set forth in the preceding sentence. If the Basic Amounts subscribed for by all Rights Holders are less than the total of all of the Basic Amounts available for purchase, then BVP (to the extent it has purchased all of its Basic Amount) shall have the right to purchase up to all of the remaining Company Offered Securities that were not subscribed for by the other Rights Holders. The closing of the purchase of any Company Offered Securities by the Rights Holders shall take place on such date, no less than ten (10) and no more than thirty (30) days after the expiration of the twenty (20)-day period referred to above, as the Company may determine; provided, that the Company shall give the purchasing Rights Holders prompt prior notice of such date.

(b)    If the Rights Holders do not exercise their rights to purchase their full Basic Amounts, the Company shall use its good faith and commercially reasonable efforts to issue, grant, or sell the remaining Company Offered Securities on the terms set forth in the Rights Notice. From the expiration of the twenty (20)-day period first referred to in <u>Section 6.1(a)</u> and for a period of ninety (90) days thereafter, the Company may offer, issue, grant, or sell to any Person, other than a Stockholder, the remaining Company Offered Securities having the terms set forth in the Rights Notice relating to such Company Offered Securities for a price and other terms no less favorable to the Company, and including no less cash, than those set forth in the Rights Notice (without deduction for reasonable underwriting, sales agency, and similar fees payable in connection therewith); *provided, however,* that the Company may not issue, grant, or sell any Company Offered Securities in an amount greater than the amount set forth in the Rights Notice minus the amount purchased or committed to be purchased by the Rights Holders upon exercise of their rights set forth in this <u>Section 6</u>.

Section 6.2. <u>Exceptions</u>. (a) The provisions of <u>Section 6.1</u> shall not apply to (i) the grant of employee stock options to purchase Shares pursuant to any stock option plan adopted in accordance with <u>Section 8.1(g)</u>; (ii) the issuance of Shares upon the exercise of any of the employee stock options specified in clause (i) above or upon exercise of any Rights issued in accordance with <u>Section 6.1</u>; and (iii) the issuance of any Shares or Rights in order to effect any merger, consolidation, or other acquisition of any Person, business division, or assets outside the ordinary course of business, which merger, consolidation, or other acquisition has been approved in accordance with <u>Section 8.1(a)</u>, and as may otherwise be required by the Company's Certificate of Incorporation.

(b)    Any issuance of Shares or Rights, other than grants and issuances pursuant to <u>Section 6.2(a)(i)</u> and <u>6.2(a)(ii)</u>, shall be made for consideration at least equal to the Fair Value Per Share as of the date of issuance of such Shares or Rights.

## ARTICLE VII

### Management; Board of Directors

Section 7.1. <u>Composition of Board of Directors</u>.  (a)  Subject to <u>Section 7.4</u>, each Stockholder shall and the Company shall use its best efforts to take and cause to be taken all necessary action (corporate and other), including the voting of Shares, to set the number of directors at no more than five (5) and to elect as the members of the Board the following individuals: (a) one (1) individual selected and nominated by Transeo for so long as Transeo (1) remains a Major Stockholder, and (2) such individual selected and nominated by Transeo remains Laurent Marteau (except in case of death or disability), (b) two (2) individuals selected and nominated from time to time by BVP, which individuals shall initially be Jeremy Levine and Philippe Gelblat; and (c) two (2) individuals selected and nominated from time to time by BVP and mutually agreeable to all other members of the Board elected pursuant to (a) and (b) above, which individuals shall not be employees of the Company or otherwise affiliated with the Company and/or any Stockholders which seats shall initially remain vacant until such time as BVP nominates individuals therefore.  So long as a Person is entitled to designate a director pursuant to the preceding sentence, each Person shall at all times have the right, exercisable by such Person in his sole discretion, to cause the Stockholders to remove, with or without cause, the director(s) selected and nominated by such Person.  Each Stockholder shall vote for such removal at a meeting of the Stockholders or shall execute a written consent to such effect without a meeting upon request by such Person.  Each Stockholder consents to the prompt holding of a special meeting for that purpose, at the written request of the Person seeking to remove such director given to the Company.

Section 7.2. <u>Quorum</u>.  At all meetings of the Board, the presence, in person or by proxy, of all of the directors then serving on the Board shall constitute a quorum for the transaction of business.

Section 7.3. <u>Replacement of Directors Other Than by Election</u>.  In the event of the resignation, removal or death of a director, the Company shall use its best efforts to, and each Stockholder who is or has a representative on the Board shall (or, failing that, the Stockholders shall), call a special meeting of Stockholders, and the Stockholders shall elect a replacement director as follows:  if such director to be replaced was a director selected and nominated by Transéo, each Stockholder shall appoint or elect pursuant to this <u>Section 7.3</u> the successor nominee of Transeo; and if such director to be replaced was a director selected and nominated by BVP, each Stockholder shall appoint or elect pursuant to this <u>Section 7.3</u> the successor nominee of BVP.

Section 7.4. <u>Action by Stockholders to Reconstitute Board of Directors</u>.  If at any time and for any reason the Board shall fail to be constituted as required by this <u>Article VII</u>, then, at the request of any Stockholder, the Company shall cause a special meeting of Stockholders to be held or the Stockholders shall act by written consent of Stockholders without a meeting for the purpose of taking whatever action may be necessary to assure that the Board is constituted as set forth in this <u>Article VII</u> as promptly as practicable.

Section 7.5. <u>Certain Covenants</u>.  Each Stockholder shall vote, in person or by proxy, all Shares over which it may have or share voting power, at any annual or special meeting of Stockholders of the Company called for the purpose of voting on the election of directors, or to execute written consents of Stockholders without a meeting with respect to the

-12-

election of directors, to vote in favor of the election of each director nominated in accordance with <u>Section 7.3</u> and against any other nominees and in favor of the removal of any director who is required to be removed pursuant to <u>Section 7.1</u> and to take all other necessary and appropriate actions to cause such events to occur.  The Company shall use its best efforts to cause Persons to be so nominated, elected, or removed, as the case may be, in accordance with the applicable provisions of this Agreement.  Each Stockholder shall vote all Shares over which it may have or share voting power and shall take all other actions necessary and appropriate (including, without limitation, removing any director) to ensure that the Company's Certificate of Incorporation and by-laws do not at any time conflict with the provisions of this Agreement, and such Stockholder shall not vote to approve (or consent to the approval of) any amendment to the Company's Certificate of Incorporation or by-laws that would be inconsistent with this Agreement.

## ARTICLE VIII

### Other Corporate Matters

Section 8.1.  <u>Actions Requiring Consent</u>.  The Company shall not, and no officer of the Company shall have the power or authority to cause the Company to, without the consent of BVP, given in writing or at a meeting of the Stockholders of the Company duly called and held:

    (a)  without prejudice to the application of Section 4.2, merge or consolidate with or into any Person, or permit any Person to merge or consolidate with or into it, or enter into any joint venture, partnership or other business combination with any other Person (or adopt a plan to do any of the foregoing);

    (b)  commence any voluntary proceeding seeking liquidation, reorganization, readjustment, or other relief under any bankruptcy, insolvency or similar law or consent to a decree or order for relief or the filing of a petition thereunder or to the appointment of a trustee, receiver, or liquidator, or otherwise take any voluntary action in furtherance of the bankruptcy, reorganization, liquidation, dissolution, or termination of its corporate status;

    (c)  sell, lease, transfer, assign, or otherwise dispose of (i) any real property of the Company or (ii) any other material properties or assets, tangible or intangible, of the Company otherwise than in the ordinary course of business;

    (d)  pledge, mortgage, grant a security interest in or otherwise encumber (i) any real property of the Company; or (ii) any other material properties or assets, tangible or intangible, of the Company, in the case of clause (i) or (ii) otherwise than by way of liens arising as a matter of law, and in the case of clause (ii) otherwise than in the ordinary course of business to the extent such liens do not materially adversely affect the business, operations or financial condition of the Company;

    (e)  incur, assume or become liable, whether directly, contingently, or otherwise, for any indebtedness of the Company or any other Person for borrowed money in excess of $100,000, whether pursuant to an instrument, guarantee, or otherwise (but not including trade debt arising in the ordinary course of business);

(f)     adopt any "employee benefit plan", as defined in <u>Section 3(3)</u> of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), or any stock option, restricted stock, bonus (other than bonuses payable to the Company's sales teams which bonuses have been provided for in a Board-approved operating plan) stock appreciation, profit sharing, or other similar equity incentive compensation plan;

(i)     enter into any Contract or transaction with or for the direct or indirect benefit of, or pay or provide any money or other form of consideration, directly or indirectly, to or for the benefit of, or assume, guarantee, or otherwise become liable for any indebtedness or other obligations of, or sell, lease (as lessor or lessee), transfer, give, or otherwise assign or acquire any properties or assets, tangible or intangible, or services to or from, a Stockholder or any Relative or Affiliate thereof or any Person in which any of the foregoing is the direct or indirect Beneficial Owner of a material interest; *provided, that* to the extent that the subject transaction in this <u>subsection (i)</u> is a transaction with an Affiliate of BVP or a Restricted Company and is undertaken for purposes other than the equity or debt financing of the Company, such transaction also shall be subject to the approval of the disinterested members of the Board;

(j)     purchase or otherwise acquire (by merger, consolidation or otherwise) any stock or equity interests in or of any other Person, or any substantial assets of any other Person, or any business (or a substantial part of any business) as a going concern;

(k)     amend, modify, or supplement the Certificate of Incorporation or by-laws of the Company, or adopt or effect any plan of recapitalization, reclassification, stock dividend, stock split, reverse stock split, combination, or similar transaction;

(l)     declare, set aside, or pay any dividend or distribution on or in respect of any Shares, unless the holder of each Share is entitled to an identical such dividend or distribution, or redeem, purchase, or otherwise acquire for value any Shares other than pursuant to the terms of this Agreement;

(m)     except as provided in <u>Article VI</u>, issue or offer to issue or sell any Shares, Rights, other equity securities, or any options, warrants, rights, or other instruments convertible into, exchangeable or exercisable for, or otherwise giving the holder thereof the right to acquire, directly or indirectly, any such other equity securities;

(n)     surrender any life insurance policy maintained by it pursuant to <u>Article IX</u> hereof for the cash value thereof or borrow against the cash value of any such insurance policy.

(o)     hire, terminate or otherwise replace any executive officer of the Company the compensation of which will be or is equal to or greater than €120,000 or alter any such compensation payable to any such officer; or

(p)     enter into, assume, or become bound by any Contract to do any of the foregoing or otherwise attempt to do any of the foregoing.

Section 8.2.  <u>Limit on Share Purchases</u>.  Notwithstanding any other provision of this Agreement to the contrary, the Company shall not have the right to purchase any Shares except out of funds legally available therefor and subject to the limitations of applicable law.

Section 8.3    Responsible Party; Taxes    Each    Stockholder    (the "**Responsible Stockholder**") shall be responsible for the payment of (a) any liability to pay taxes, fees, or similar charges, as well as interest, penalties, or other additions to tax, that are imposed upon the Responsible Stockholder under any applicable law in connection with (i) any Transfers subject to this Agreement and (ii) any acquisition of stock of the Company by any of the Stockholders, whether occurring prior to or subsequent to this Agreement (together such taxes, fees, and similar charges and interest, penalties, and other additions to tax, the "**Stockholder Taxes**") and (b) any Stockholder Taxes that are imposed upon any other Stockholder under applicable law (including through joint or several liability) as a result of a position taken by the Responsible Stockholder on a tax return.

## ARTICLE IX

### Legend

Section 9.1. Legends.    Any certificates evidencing Shares subject to this Agreement shall be stamped or endorsed with a legend in substantially the following form; provided, however, that in the event that Shares are registered under the Securities Act, the Company promptly upon request, but in any event not later than is necessary in order to consummate any sale pursuant to any underwriting agreement or sales agency agreement relating thereto, shall deliver a replacement certificate not containing the first paragraph of the legend below in exchange for the legended certificate (it being understood that such legend shall be placed on such replacement certificate if the sale does not occur in accordance with the terms of the registration statement); and provided, further, that the Company shall upon termination of this Agreement promptly upon request deliver a replacement certificate not containing the second paragraph of the legend below in exchange for the legended certificate:

**THE SHARES OF COMMON STOCK REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR APPLICABLE STATE SECURITIES LAWS, AND ACCORDINGLY NEITHER THE SHARES NOR ANY INTEREST THEREIN MAY BE SOLD, TRANSFERRED, PLEDGED, OR OTHERWISE DISPOSED OF UNLESS SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.**

**IN ADDITION, TRANSFERS, VOTING, AND OTHER MATTERS IN RESPECT OF THE SHARES OF COMMON STOCK REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A STOCKHOLDERS' AGREEMENT DATED AS OF [*DATE*] AMONG THE COMPANY AND CERTAIN STOCKHOLDERS NAMED THEREIN, A COPY OF WHICH AGREEMENT IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY AND MAY BE OBTAINED WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY, WHICH AGREEMENT, AMONG OTHER THINGS, PROVIDES THAT UPON ANY INVOLUNTARY TRANSFER (AS DEFINED IN SECTION 3.2) THE STOCKHOLDERS OF THE CORPORATION SHALL HAVE THE RIGHT TO REPURCHASE SUCH SHARES FROM THE TRANSFEREE AT FAIR VALUE.**

## ARTICLE X

### Effectiveness; Termination

-15-

Section 10.1. <u>Effectiveness; Termination of Agreement</u>.   This Agreement shall become effective as of the date first above written (the "**Commencement Date**") and shall terminate upon the earliest to occur of the following:  (a) the unanimous written consent of the Stockholders; (b) the tenth (10th) anniversary of the Commencement Date; (c) if none of the parties hereto is a Stockholder in the Company; or (d) the merger or consolidation of the Company with or into any other Person, or the sale of all or substantially all of the Company's assets to any other Person; in either case only to the extent that such transaction has been duly approved pursuant to this Agreement; provided, however, that no such termination shall relieve any Person of any liability for a breach or default.

## ARTICLE XI

## Miscellaneous

Section 11.1. <u>Recapitalizations, Exchanges, and Other Transactions Affecting the Common Stock</u>.  The provisions of this Agreement shall apply to the full extent set forth herein with respect to (a) the Shares and (b) any and all shares of capital stock of the Company or any successor or assign of the Company (whether it became a successor or assign by merger, consolidation, sale of assets, or otherwise) that may be issued in respect of, in exchange for, or in substitution for the Shares, by reason of any stock dividend, split, reverse split, combination, recapitalization, reclassification, merger, consolidation, or otherwise.  In the event of any change in the capitalization of the Company, as a result of any stock split, stock dividend, or stock combination, the provisions of this Agreement shall be adjusted appropriately.

Section 11.2. <u>No Joint Venture or Partnership</u>.   No one shall have any authority to bind or commit any other party hereto, and no such authority shall be implied by the provisions hereof.  Nothing herein shall be deemed or construed to create a joint venture, partnership, or agency relationship between any of the parties hereto for any purpose.

Section 11.3. <u>Injunctive Relief</u>.  Each party hereto acknowledges that it would be impossible to determine the amount of damages that would result from a breach of any of the provisions of this Agreement and that the remedy at law for any breach, or threatened breach, of any of such provisions would likely be inadequate and, accordingly, each other party shall, in addition to any other rights or remedies that it may have, be entitled to seek such equitable and injunctive relief as may be available from any court of competent jurisdiction to compel specific performance of, or restrain any party from violating, any of such provisions.  In connection with any action or proceeding for injunctive relief, each party hereto hereby waives the claim or defense that a remedy at law alone is adequate and, to the maximum extent permitted by law, consents to have each provision of this Agreement specifically enforced against him or it, without the necessity of posting bond or other security against him or it, and consents to the entry of injunctive relief against him or it enjoining or restraining any breach or threatened breach of any provision of this Agreement.

Section 11.4. <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns, and legal representatives.  This Agreement shall be for the sole benefit of the parties to this Agreement and their respective successors, assigns, and legal representatives and is not intended, nor shall be construed, to give any Person, other than the parties hereto and their respective successors, assigns, and legal representatives, any legal or equitable right, remedy, or claim hereunder.  This Agreement may not be assigned by operation of law or otherwise, and any

attempted assignment shall be null and void, except that, subject to the following sentence, any Stockholder may assign its rights hereunder, in whole but not in part, in connection with a Transfer of Shares made in strict compliance with all of the provisions of this Agreement. If any Stockholder shall acquire additional Shares and if any Transferee of any Stockholder shall acquire any Shares, in each case in any manner, whether by a Transfer permitted hereunder, operation of law, or otherwise, such Shares shall be held subject to all of the terms of this Agreement, and by taking and holding such Shares, such Person shall be deemed conclusively to have agreed to be bound by and to comply with all of the terms and provisions of this Agreement.  In furtherance of the foregoing, and not in limitation thereof, any Transferee shall execute an instrument in the form of <u>Exhibit A</u> hereof agreeing to be bound by the provisions hereof.

    Section 11.5.  <u>Amendment; Waiver</u>.   (a) This Agreement may be amended only by a written instrument duly executed by the parties hereto.

        (b)    No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon breach thereof shall constitute a waiver of any such breach or of any other covenant, duty, agreement, or condition, any such waiver being effective only if contained in a writing executed by the waiving party.

        (c)    BVP shall not amend the bylaws or certificate of incorporation of the Company where the primary purpose of such amendment is to defeat any rights of Transeo under this Agreement, and Transeo does not waive any rights under this Agreement by virtue of any such amendment to the bylaws or certificate of incorporation effected without its consent.

    Section 11.6.  Notices. All notices, claims, certificates, requests, demands and other communications hereunder shall be in writing and shall be given as follows:

- if to Transeo, to the address listed at the head of this Agreement

    With a copy to:

    Nixon Peabody LLP
    437 Madison Avenue
    New York, NY 10022
    Attention: Douglas S. Glucroft, Esq.

- if to BVP, at the following address:

    Bessemer Venture Partners
    1865 Palmer Avenue, Suite 104
    Larchmont, New York 10538
    Attn: Ed Colloton

    With a copy to:

    Lowenstein Sandler PC
    65 Livingston Avenue

-17-

Roseland, NJ 07068
Attn: Edward M. Zimmerman, Esq.

or to such other address as the Party to whom notice is to be given may have furnished to the other Parties in writing in accordance herewith. Any such notice or communication shall be given by internationally recognized overnight courier (with tracking number and signature requirement upon receipt), and shall be deemed received on the second business day after the date when sent.

Section 11.7. <u>Inspection</u>. For so long as this Agreement shall be in effect, this Agreement, any amendments hereto, and a complete list of the names and addresses of all Stockholders shall be made available for inspection and copying on any weekday other than a legal holiday by any Stockholder at the offices of the Company at the address thereof set forth in <u>Section 11.6</u> above.

Section 11.8. <u>Applicable Law</u>. This Agreement and any controversy arising out of or relating to this Agreement shall be governed by and construed in accordance with the General Corporation Law of the State of Delaware as to matters within the scope thereof, and as to all other matters shall be governed by and construed in accordance with the internal laws of State of New York, without regard to conflict of law principles that would result in the application of any law other than the law of the State of New York.

Section 11.9. <u>Headings</u>. The descriptive headings of the several sections in this Agreement are for convenience only and do not constitute part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

Section 11.10. <u>Integration; Priority over other documents</u>. This Agreement and the other writings referred to herein or delivered pursuant hereto, which form a part hereof, contain the entire understanding of the parties with respect to its subject matter. This Agreement supersedes all prior agreements and understandings between the parties with respect to its subject matter. There are no restrictions, agreements, promises, representations, warranties, covenants, or undertakings with respect to its subject matter other than those expressly set forth or referred to herein. In the event of any inconsistency between this Agreement, and any other document or agreement of any kind relating to the governance of the Company (including the bylaws), the terms of this Agreement shall prevail, and the parties hereto shall exercise any rights they may have under applicable law or the such other governance documents in a manner that is consistent with the terms and purposes of this Agreement.

Section 11.11. <u>Severability</u>. If any term or provision of this Agreement or any application of this Agreement shall be declared or held invalid, illegal, or unenforceable, in whole or in part, whether generally or in any particular jurisdiction, such provision shall be deemed amended to the extent, but only to the extent, necessary to cure such invalidity, illegality, or unenforceability, and the validity, legality, and enforceability of the remaining provisions, both generally and in every other jurisdiction, shall not in any way be affected or impaired thereby.

Section 11.12. <u>Consent to Jurisdiction</u>. In connection with any suit, claim, action or proceeding arising out of this Agreement, each Stockholder hereby consents to the in personam jurisdiction of the state and federal courts located in the State of New York; each Stockholder hereby agrees that service using one of the methods set forth in <u>Section 11.6</u>

hereof shall be valid and sufficient for all purposes; and each Stockholder irrevocably waives any objection to appearing in any such courts based on forum non conveniens or venue.

Section 11.13. <u>Counterparts</u>.   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the date set forth above.

**NEUTRAL HOLDINGS, INC.**

By: _____
Name: Jeremy Levine
Title: President

**BVP:**

**BESSEMER VENTURE PARTNERS VI L.P.**
**BESSEMER VENTURE PARTNERS VI INSTITUTIONAL L.P.**
**BESSEMER VENTURE PARTNERS CO-INVESTMENT L.P.**

By: Deer VI & Co. LLC, General Partner

By: _____
J. Edmund Colloton, Executive Manager

**TRANSEO**

By: _____
Name:      LAURENT MARENT
Title:
[Address]
[FAX]

**PHILIPPE GELBLAT**

_____

*En accord avec les parties, les présentes ont été reliées par le procédé ASSEMBLACT R.C. empêchant toute substitution ou addition et sont seulement signées à la dernière page.*

18232/13
04/21/2007 2148278.04

EXHIBIT A

## CONSENT TO AGREEMENT

In consideration of the Transfer of Shares to the undersigned, the undersigned, having all due authority, hereby agrees to be bound as a Stockholder of such Shares by the terms and provisions of the Stockholders' Agreement, dated as of June 7, 2007 (the "**Stockholders' Agreement**"), of Neutral Holdings, Inc.  Any capitalized defined term used in this Consent to Agreement without definition shall have the meaning assigned to such term in the Stockholders' agreement.

_____

_____

By:_____

    Name
    Title

Date:

_____

# EXHIBIT 2

# Neutral Holdings, Inc.
## 1865 Palmer Avenue, Suite 104
## Larchmont, NY 10538


To:     Board Members

From:  Jeff Erwin, President and CEO

Date:   July 14, 2011

Re:     Meeting of the Board of Directors of Neutral Holdings, Inc. (the "Company")


Dear Board Members:

 Please be advised that in accordance with Article IV Section 4.01 of the Company's Bylaws, at the request of three members of the Board of Directors of the Company (the "Board"), a Special Meeting of the Board has been scheduled for Monday August 1, 2011, at 9:00AM EST to 11:00AM EST.  The dial-in information is provided in the attached agenda hereto.

Sincerely,

Jeff Erwin
Chief Executive Officer

AGENDA
MEETING OF THE BOARD OF DIRECTORS
OF
NEUTRAL HOLDINGS, INC.

August 1, 2011

Dial-in:

- Toll-free dial in number (US): 866-906-9888

- International dial-in number: 857-288-2555

- Access code: 9382486#

**Agenda Items:**

1. Call to order

2. Consider approving Business Information Confidentiality Policy

3. Sales, financial and business update

4. Appoint Pete Price CFO and Secretary

5. Consider approving new 409A valuation

6. Consider approving amendment to 2007 Stock Option Plan

7. Consider approving option grants to Jeff Erwin and Pete Price

8. Consider approving stockholder distributions, including possible partial payment of stockholder "dividend in kind" notes"

9. Update on AVG discussions

10. Consider approving minutes from March 1, 2011 meeting

# EXHIBIT 3

AMENDED AND RESTATED

BY-LAWS

Of

NEUTRAL HOLDINGS, INC.

(a Delaware Corporation)

Adopted June 7, 2007


ARTICLE I

OFFICES

Section 1.01 <u>Registered Office</u>.  The registered office of NEUTRAL HOLDINGS, INC. (the "<u>Corporation</u>") in the State of Delaware shall be at 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle, and the name of the registered agent in charge thereof shall be Corporation Service Company.

Section 1.02 <u>Other Offices</u>.  The Corporation may also have offices at such other places within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.


ARTICLE II

STOCKHOLDER MEETINGS

Section 2.01 <u>Annual Meeting</u>.  The annual meeting of stockholders of the Corporation shall be held for the election of directors at such date, time and place either within or without the State of Delaware as may be designated by the Board of Directors from time to time.  Any other proper business may be transacted at the annual meeting.

If the election of directors shall not be held on the day designated for the annual meeting or at any adjournment thereof, the Board of Directors shall cause such election to be held at a special meeting of stockholders as soon thereafter as convenient.  At such meeting the stockholders may elect directors and transact other business with the same force and effect as at an annual meeting duly called and held.

Section 2.02 <u>Special Meeting</u>.  Special meetings of the stockholders of the Corporation, for any purpose or purposes, unless otherwise prescribed by statute or by the Certificate of Incorporation, may be called by the Chairperson of the Board, if any, the President

or any officer of the Corporation instructed by the Board of Directors to call such a meeting, and shall be called by the Chairperson of the Board, if any, the President or the Secretary at the request in writing of at least three (3) directors or of the holders of record of at least one-third of the issued and outstanding capital stock of the Corporation then entitled to vote thereat. Such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 2.03   Place and Time.   Annual meetings and special meetings shall be held at such place, within or without the State of Delaware, and such time as the Board of Directors may, from time to time, fix, or in the event that stockholders entitled to call a special meeting, call the same, then at such place, within or without the State of Delaware, and such time as such stockholders may fix. Whenever the Board of Directors or the officer of the Corporation calling a meeting shall fail to fix such place or time, or whenever stockholders entitled to call a special meeting shall fail to fix such place or time, the meeting shall be held at the office of the Corporation in the State of Delaware at ten o'clock A.M.

Section 2.04   Notice.   Notice of all meetings shall be in writing and shall state the place, date and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called and to which its business will be limited. The notice for a special meeting shall also indicate that it is being issued by or at the direction of the person or persons calling the meeting. A copy of the notice of any meeting shall be given not less than 10 days nor more than 60 days before the date of the meeting, to each stockholder entitled thereto. Such notice shall be deemed given as follows:

-   if to Transeo, at the following address:

10 rue Say
75009 Paris
France
Attn: Laurent Marteau


-   if to BVP, at the following address:

Bessemer Venture Partners
1865 Palmer Avenue, Suite 104
Larchmont, New York 10538
USA
Attn: Ed Colloton

or to such other address as the stockholder to whom notice is to be given may have furnished to the Secretary of the Corporation. Any such notice shall be given by internationally recognized overnight courier (with tracking number and signature requirement upon receipt), and shall be deemed received on the second business day after the date when sent.

Notice of a meeting need not be given to any stockholder who attends such meeting, in person or by proxy, without protesting at the beginning of the meeting that such meeting is not lawfully called or convened or who submits a signed waiver of notice in person or by proxy, before or after the meeting.

Section 2.05   Conduct of Meetings.   Meetings of the stockholders shall be presided over by one of the following officers in the order of seniority and if present and acting - the Chairperson of the Board, if any, the President, a Vice President, or, if none of the foregoing is in office and present and acting, by a chairperson to be chosen by the stockholders.   The Secretary of the Corporation, or in his absence, an Assistant Secretary, shall act as secretary of every meeting, but if neither the Secretary nor an Assistant Secretary is present, the chairperson of the meeting shall appoint a secretary of the meeting.   The order of business at all meetings of the stockholders shall be determined by the chairperson of the meeting.

Section 2.06   Appointment of Inspectors.   The Board of Directors, in advance of any meeting, may, but need not, appoint one or more inspectors, who need not be stockholders, to act at the meeting or any adjournment thereof.   If an inspector or inspectors are not appointed, the person presiding at the meeting may, but need not, appoint one or more inspectors.   In case any person who may be appointed as an inspector fails to appear or act, the vacancy may be filled by appointment made at the meeting by the person presiding thereat.   Each inspector, if any, before entering upon the discharge of his duties, shall take and sign an oath faithfully to execute the duties of inspector at such meeting with strict impartiality and according to the best of his ability.   The inspectors, if any, shall determine the number of shares of stock outstanding and the voting power of each, the shares of stock represented at the meeting, the existence of a quorum, the validity and effect of proxies, and shall receive votes, ballots or consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate all votes, ballots or consents, determine the result, and do such acts as are proper to conduct the election or vote with fairness to all stockholders.   On request of the person presiding at the meeting or any stockholder, the inspector or inspectors, if any, shall make a report in writing of any challenge, question or matter determined by him or them and execute a certificate of any fact found by him or them.

Section 2.07   List of Stockholders.   The officer of the Corporation who has charge of the stock ledger of the Corporation shall prepare and make, at least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.   Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least 10 days prior to the meeting, either at a place within the city or other municipality or community where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held.   The list shall also be produced and kept at the time and place of the meeting during the whole time thereof and may be inspected by any stockholder who is present.



Section 2.08   Quorum.   Except as otherwise provided by statute or by the Certificate of Incorporation, the presence, in person or by proxy, of the holders of a majority of the issued and outstanding shares of stock of the Corporation entitled to vote thereat shall constitute a quorum at a meeting of stockholders for the transaction of any business.  When a quorum is once present to organize a meeting, it is not broken by the subsequent withdrawal of any stockholders.  If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.   At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified.  If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 2.09   Proxy Representation.   Any stockholder may authorize another person or persons to act for him by proxy in all matters in which a stockholder is entitled to participate, whether by waiving notice of any meeting, voting or participating at a meeting, or expressing consent or dissent without a meeting.  Every proxy must be signed by the stockholder or by his attorney-in-fact. No proxy shall be voted or acted upon after 3 years from its date unless such proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and, if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.

Section 2.10   Voting.   (a)   Except as otherwise provided by statute or by the Certificate of Incorporation, each holder of record of shares of stock of the Corporation having voting rights shall be entitled at each meeting of stockholders to one vote for each share of stock of the Corporation standing in his name on the records of the Corporation on the date fixed as the record date for the determination of the stockholders entitled to notice of and to vote at such meeting.

(b)   Except as otherwise provided by statute, the Certificate of Incorporation or these By-Laws, any corporate action, other than the election of directors, to be taken by vote of the stockholders shall be authorized by a majority of the votes cast at a meeting of stockholders by the holders of shares of stock present, in person or by proxy, and entitled to vote on such action.  Directors shall be elected as provided in Section 3.02 of Article III.  No vote need be by ballot, but in case of a vote by ballot, each ballot shall be signed by the voting stockholder or his proxy and shall state the number of shares of stock voted.

Section 2.11   Action without a Meeting.   Whenever the stockholders are required or permitted to take any action by vote, such action may be taken without a meeting on written consent, setting forth the action so taken, signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action





at a meeting at which all stockholders having a right to vote thereon were present and voted. Every written consent shall bear the date of signature of each stockholder who signs the consent. Prompt notice of the taking of corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of stockholders to take the action were delivered to the Corporation.

## ARTICLE III

## DIRECTORS

Section 3.01  <u>Powers, Qualifications and Number</u>.  The property, business and affairs of the Corporation shall be managed by or under the direction of its Board of Directors, which may exercise all such authority and powers of the Corporation and do all such lawful acts and things as are not by statute or the Certificate of Incorporation directed or required to be done by the stockholders. A director need not be a stockholder, a citizen of the United States, or a resident of the State of Delaware. The number of directors which shall constitute the whole Board of Directors shall be determined from time to time by resolution of the stockholders of the Corporation, but in no event shall be less than one (1) at any given time.  The use of the phrase "whole board" in these By-Laws refers to the total number of directors which the Corporation would have if there were no vacancies.

Section 3.02  <u>Election, Term and Vacancies</u>.  Directors shall be elected at each annual meeting of stockholders by a plurality of the votes cast thereat by the holders of shares of stock present, in person or by proxy, and entitled to vote in the election; such directors and directors who are elected in the interim prior to such a meeting to fill newly created directorships shall hold office until the next annual meeting of stockholders and until their respective successors have been elected and qualified or until their earlier resignation or removal.  If at the time a vacancy is to be filled, an agreement is in effect among the stockholders of the Corporation and the Corporation which contains provisions governing the election and composition of the Corporation's Board of Directors, such vacancy shall be filled in accordance with such agreement, otherwise any such vacancy may be filled by the affirmative vote of the holders of a majority of the issued and outstanding shares of stock of the Corporation entitled to vote.  A director elected to fill a vacancy shall hold office for the unexpired term of his predecessor.

Section 3.03  <u>Resignation and Removal</u>.  Any director may resign at any time by giving written notice of his resignation to the Board of Directors, the Chairperson of the Board, if there is one, the President or the Secretary.  Any such resignation shall take effect at the time of receipt thereof or at any later time specified therein, and, unless specified therein, the acceptance of such resignation shall not be necessary to make it effective. Unless otherwise provided in the Certificate of Incorporation, at any special meeting of stockholders duly called as provided in these By-Laws, any director or directors may, by the affirmative vote of the holders of a majority

of all of the shares of stock outstanding and then entitled to vote for the election of directors, be removed from office, either with or without cause.

Section 3.04 <u>Committees</u>. The Board of Directors may, by resolution passed by at least three (3) members of the Board, designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Any such committee to the extent provided in the resolution of the Board of Directors or in these Bylaws, shall have and may exercise all of the powers and authority of the Board of Directors and may authorize the seal of the Corporation to be affixed to all papers which may require it, but no such committee shall have the power or authority in reference to the following matters: (i) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the Delaware General Corporation Law to be submitted to stockholders for approval or (ii) adopting, amending or repealing any bylaw of the Corporation. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board of Directors. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

Section 3.05 <u>Direction of Management</u>. The business of the Corporation shall be managed under the direction of its Board of Directors, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these Bylaws directed or required to be exercised or done by the stockholders.

Section 3.06 <u>Compensation of Directors</u>. The Board of Directors shall have authority to fix the compensation of directors for services to the Corporation in any capacity, including a fixed sum and reimbursement of expenses for attendance at meetings of the Board of Directors and committees thereof. Nothing herein contained shall be construed to preclude any director from serving the Corporation, its subsidiaries or affiliates, if any, in any capacity and receiving compensation therefor.

Section 3.07 <u>Reimbursement</u>. The Corporation shall promptly reimburse in full each Director of the Corporation who is not an employee of the Corporation for all of his or her reasonable out-of-pocket expenses incurred in attending each meeting of the Board of Directors of the Corporation.

## ARTICLE IV

## MEETINGS OF THE BOARD OF DIRECTORS

Section 4.01 <u>Place, Time, Call and Notice</u>. Meetings of the Board of Directors shall be held at such time and at such place, within or without the State of Delaware, as the Board of Directors may, from time to time, fix or as shall be specified in the notice of any such meeting, except that the first meeting of a newly elected Board of Directors for the election or appointment of officers and the transaction of other business shall be held as soon after its



election as the directors may conveniently assemble and, if possible, at the place at which the annual meeting of stockholders which elected them was held. No call or notice shall be required for regular or stated meetings for which the time and place have been fixed, and no notice shall be required for any first meeting of a newly elected Board of Directors which is held immediately following an annual meeting of stockholders at the same place as such meeting. If any day fixed for a regular or stated meeting shall be a legal holiday at the place where the meeting is to be held, such meeting shall be held at the scheduled hour on the next business day not a legal holiday. Special meetings may be called by or at the direction of the Chairperson of the Board, if any, the President, or at least three (3) of the directors of the Corporation, and notice of the time and place thereof and of any first meeting of a newly elected Board of Directors which is not held immediately following an annual meeting of stockholders at the same place as such meeting shall be given by the Secretary of the Corporation to each director as follows:

if to a director selected by Transeo, at the following address:

10 rue Say
75009 Paris
France
Attn: Laurent Marteau

if to a director selected by BVP, at the following address:

Bessemer Venture Partners
1865 Palmer Avenue, Suite 104
Larchmont, New York 10538
USA
Attn: Ed Colloton

or to such other address as the director to whom notice is to be given may have furnished to the Secretary of the Corporation. Any such notice shall be given by internationally recognized overnight courier (with tracking number and signature requirement upon receipt), and shall be deemed received on the second business day after the date when sent.

The notice of any meeting need not specify the purpose thereof. Any requirement of furnishing a notice shall be waived by any director who submits a signed waiver of notice before or after the meeting or who attends the meeting without protesting at the beginning of the meeting that such meeting is not lawfully called or convened.

Section 4.02 <u>Quorum and Action.</u> (a) At least three (3) members of the Board of Directors shall constitute a quorum, except that when a vacancy or vacancies prevent such number, a majority of the directors then in office shall constitute a quorum, provided such majority shall constitute at least one-third of the whole Board of Directors. A majority of the directors present, whether or not a quorum, may adjourn a meeting to another time and place. Notice of any such adjournment shall be given to any directors who were not present and, unless

-7-



announced at the meeting, to the other directors. At any adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the meeting originally scheduled.

(b) Except as otherwise provided by statute, the Certificate of Incorporation or these By-Laws, the vote of at least three (3) of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

Section 4.03 <u>Conduct of Meetings</u>. The Chairperson of the Board, if there is one and if such Chairperson is present, shall preside at all meetings of the Board. Otherwise, the President or any other director chosen by the Board of Directors shall preside. The Secretary of the Corporation, if present, shall act as secretary of the meeting and keep the minutes thereof. Otherwise, a director appointed by the chairperson of the meeting shall act as secretary and keep the minutes thereof.

Section 4.04 <u>Informal Action</u>. Any member or members of the Board of Directors or of any committee designated by the Board of Directors may participate in a meeting of the Board of Directors or any such committee, as the case may be, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear, and be heard by, each other. Any action required or permitted to be taken at any meeting of the Board of Directors or any committee thereof may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing and the writing or writings are filed with the minutes of the proceedings of the Board of Directors or such committee.



## ARTICLE V

## OFFICERS

Section 5.01 <u>Number, Election and Vacancies</u>. The Board of Directors at its first meeting after the election of directors in each year shall elect or appoint a President, a Secretary and a Treasurer. The Board of Directors may at any time and from time to time elect or appoint a Chairperson of the Board, one or more Vice Presidents, one or more Assistant Vice Presidents, one or more Assistant Secretaries, one or more Assistant Treasurers and other officers as it may deem desirable. The Chairperson of the Board, if there is one, must be a director of the Corporation. Any number of offices may be held by the same person unless otherwise provided in the Certificate of Incorporation or these By-Laws. The election or appointment of an officer shall not of itself create any contract rights. A vacancy in any office may be filled for the unexpired term by the Board of Directors at any meeting.

Section 5.02 <u>Term of Office, Resignation and Removal</u>. Unless otherwise prescribed by the Board of Directors, each officer of the Corporation shall hold office until the meeting of the Board of Directors following the next annual meeting of stockholders and until his successor has been elected and qualified or until his earlier resignation or removal. Any officer



may resign at any time by giving written notice of his resignation to the Board of Directors, the Chairperson of the Board, if there is one, the President or the Secretary. Any such resignation shall take effect at the time of receipt thereof or at any later time specified therein, and, unless specified therein, the acceptance of such resignation shall not be necessary to make it effective. Any officer may be removed by the Board of Directors with cause or without cause.

Section 5.03  <u>Security</u>.  The Board of Directors may require any officer, agent or employee of the Corporation to post a bond or give other security for the faithful performance of his duties.

Section 5.04  <u>Chairperson of the Board</u>.  The Chairperson of the Board of Directors, if there is one, shall preside at all meetings of the Board of Directors and the stockholders and shall perform such other duties, if any, as may be specified by the Board of Directors from time to time. The Chairperson of the Board may also be designated by the Board to serve as the chief executive officer of the Corporation. If the Chairperson of the Board is designated to serve as the chief executive officer, the Chairperson of the Board shall have the general powers and duties of supervision and management usually vested in the office of the chief executive officer of a corporation and shall have general supervision, direction and control of the business of the Corporation. The Chairperson of the Board shall have such further duties and powers as may from time to time be assigned to the Chairperson of the Board by the Board of Directors or as these By-Laws provide.

Section 5.05  <u>President</u>.  If the Chairperson of the Board is not designated as the chief executive officer of the Corporation, the President shall be the chief executive officer of the Corporation, shall have the general powers and duties of supervision and management usually vested in the office of the chief executive officer of a corporation and shall have general supervision, direction and control of the business of the Corporation. If the Chairperson of the Board is designated as the chief executive officer of the Corporation, the President shall have such executive duties as shall be assigned to the President by the Chairperson of the Board and by the Board of Directors of the Corporation. In the absence of the Chairperson of the Board, the President shall preside at all meetings of the stockholders and the Board of Directors. In general, the President shall have such duties and powers as may from time to time be assigned to the President by the Board of Directors or as these By-Laws provide.

Section 5.06  <u>Vice Presidents</u>.  Each Vice President shall have such designation as the Board of Directors may determine and such powers and duties as the Board of Directors or, subject to the control of the Board of Directors, the Chairperson of the Board, if there is one, or the President may from time to time assign to him. In the absence of the President or in the event of his inability or refusal to act, the Vice President (or in the event there is more than one Vice President, the Vice Presidents in the order designated, or in the absence of any designation, then in the order of their seniority) shall perform the duties of the President, and when so acting, shall have all the powers of, and be subject to all the restrictions upon, the President.

Section 5.07  <u>Secretary</u>.  The Secretary shall, if present, act as the secretary of and keep the minutes of all meetings of the stockholders and of the Board of Directors, and shall be





responsible for the giving of notice of all meetings of the stockholders and of the Board of Directors. He shall be custodian of the seal of the Corporation, if any, which he shall affix to any instrument requiring it whose execution has been authorized, and of the corporate records (except accounting records), and shall have such other powers and duties as generally pertain to his office and as the Board of Directors or, subject to the control of the Board of Directors, the Chairperson of the Board, if there is one, or the President may from time to time assign to him.

Section 5.08  <u>Treasurer</u>.  The Treasurer, subject to the direction of the Board of Directors, shall have charge of the funds, securities, receipts and disbursements of the Corporation.  He shall keep full and accurate accounts of such receipts and disbursements, shall be responsible for deposits in and withdrawals from the depositories of the Corporation, shall disburse the funds of the Corporation as directed by the Board of Directors or, subject to the control of the Board of Directors, the Chairperson of the Board, if there is one, or the President, shall render an account of the financial condition of the Corporation and of his transactions as Treasurer whenever requested by the Board of Directors, the Chairperson of the Board, if there is one, or the President and shall have such other powers and duties as generally pertain to his office and as the Board of Directors or, subject to the control of the Board of Directors, the Chairperson of the Board, if there is one, or the President may from time to time assign him.

Section 5.09  <u>Other Officers; Absence and Disability</u>.  The other officers of the Corporation shall have such powers and duties as generally pertain to their respective offices and as the Board of Directors or, subject to the control of the Board of Directors, the Chairperson of the Board, if there is one, or the President may from time to time assign to them.  The Assistant Vice Presidents, the Assistant Secretaries and the Assistant Treasurers, if any, shall, in the order of their respective seniorities, in case of the absence or disability of a Vice President, the Secretary or the Treasurer, respectively, perform the duties of, and be subject to the restrictions upon, such officer and have such powers and other duties as the Board of Directors, the Chairperson of the Board, if there is one, or the President may from time to time prescribe.  In case of the absence or disability of any officer of the Corporation and of any person herein authorized to act in his place, the Board of Directors may from time to time delegate the powers and duties of such officer to any other officer or any person whom it may select.

Section 5.10  <u>Compensation of Officers</u>.  The Board of Directors shall have authority to fix the salary and other compensation, if any, of any officer of the Corporation or to appoint a committee for such purpose.  Nothing herein contained shall be construed to preclude any officer from receiving a salary or other compensation by reason of the fact that he is also a director of the Corporation, but any such officer who is also a director shall not have any vote in the determination of the salary or other compensation to be paid to him.





ARTICLE VI

CORPORATE RECORDS; BANK ACCOUNTS

Section 6.01 <u>Form of Records</u>. Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account and minute books, may be kept on or be in the form of punch cards, magnetic tape, photographs, microphotography or any other information storage device, provided that the records so kept can be converted into clearly legible written form within a reasonable time.

The Corporation shall so convert any records so kept upon the request of any person entitled to inspect the same.

Section 6.02 <u>Location of Records</u>. The books, accounts and records of the Corporation may be kept at such place or places as the Board of Directors may from time to time determine.

Section 6.03 <u>Bank Accounts</u>. The Board of Directors may from time to time authorize the opening and maintenance of general and special bank accounts with such banks, trust companies or other depositories as the Board of Directors may designate or as may be designated by any officers of the Corporation to whom such power of designation may from time to time be delegated by the Board of Directors. The Board of Directors may make such special rules and regulations with respect to such bank accounts, not inconsistent with the provisions of these By-Laws, as it may deem expedient.



ARTICLE VII

SHARES OF STOCK

Section 7.01 <u>Certificates Representing Stock</u>. Every holder of stock in the Corporation shall be entitled to have a certificate signed by, or in the name of, the Corporation by the Chairperson of the Board of Directors, if there is one, or by the President or a Vice President and by the Treasurer or an Assistant Treasurer or the Secretary or an Assistant Secretary of the Corporation certifying the number of shares owned by him in the Corporation. Any and all signatures on any such certificate may be facsimiles. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer, transfer agent or registrar at the date of issue.

Whenever the Corporation shall be authorized to issue more than one class of stock or more than one series of any class of stock, and whenever the Corporation shall issue any shares of its stock as partly paid stock, the certificates representing shares of any such class or series or of any such partly paid stock shall set forth thereon the statements prescribed by the



-11-

Delaware General Corporation Law. Any restrictions on the transfer or registration of transfer of any shares of stock of any class or series shall be noted conspicuously on the certificate representing such shares.

The Corporation may issue a new certificate of stock in place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, upon production of such evidence of such loss, theft or destruction as the Board of Directors may require and on delivery to the Corporation, if the Board of Directors shall so require, of a bond sufficient to indemnify the Corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of any such new certificate. The Board of Directors shall have the right from time to time to prescribe such rules and procedures as it shall deem advisable with respect to lost, stolen, destroyed or mutilated certificates and the issuance of new certificates in place thereof.

Section 7.02  Stock Transfers.  Upon compliance with provisions restricting the transfer or registration of transfer of shares of stock, if any, transfers or registration of transfers of shares of stock of the Corporation shall be made only on the stock ledger of the Corporation by the registered holder thereof, or by his attorney thereunto authorized by power of attorney duly executed and filed with the Secretary of the Corporation or with a transfer agent or a registrar, if any, and on surrender of the certificate or certificates for such shares of stock properly endorsed and the payment of all taxes due thereon.

Section 7.03  Record Date For Stockholders.  For the purpose of determining the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or the allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the directors may fix, in advance, a record date, which shall not be more than 60 days nor less than 10 days before the date of such meeting, nor more than 60 days prior to any other action.  If no record date is fixed, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; the record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is necessary, shall be the day on which the first written consent is expressed; and the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.  A determination of stockholders of record entitled to notice of or to vote at any meeting of stockholders shall apply to any adjournment of the meeting, provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

Section 7.04  Transfer Agents and Registrars.  The Board of Directors may appoint one or more transfer agents and one or more registrars, whose respective duties shall be defined by the Board of Directors. The duties of transfer agent and registrar may be combined. No certificate for shares of stock shall be valid unless countersigned by a transfer agent, if the

-12-



Corporation has a transfer agent, or by a registrar, if the Corporation has a registrar. The signature of a transfer agent or a registrar may be a facsimile.

ARTICLE VIII

MISCELLANEOUS PROVISIONS

Section 8.01 <u>Checks, Drafts, etc</u>. All notes, drafts, bills of exchange, acceptances, checks, endorsements and other evidences of indebtedness of the Corporation, and its orders for the payment of money, shall be signed by such officer or officers or such agent or agents of the Corporation, and in such manner, as the Board of Directors (or such officer or agent as may be authorized by the Board to make such determination) from time to time may determine.

Section 8.02 <u>Fiscal Year</u>. The fiscal year of the Corporation shall be such fiscal year as the Board of Directors may, from time to time, fix.

Section 8.03 <u>Voting of Shares of Stock in Other Corporations</u>. Shares of stock in other corporations which are held by the Corporation may be voted by the Chairperson of the Board, if there is one, or the President, or in case both are absent or unable to act, the Vice Presidents of the Corporation in order of their seniority, or by a proxy or proxies appointed by one of them, <u>provided</u>, <u>however</u>, that the Board of Directors may in its discretion appoint some other person to vote such shares of stock.

ARTICLE IX

INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 9.01 <u>Indemnification</u>. Any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that usch person is or was a director or officer of the Corporation, or is or was serving while a director or officer of the Corporation at the request of the Corporation as a director, officer, employee, agent, fiduciary or other representative of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, shell be indemnified by the Corporation against expenses (including attorneys' fees), judgments, fines, excise taxes and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding to the full extent permissible under Delaware law.

Section 9.02 <u>Advances</u>. Any person claiming indemnification within the scope of Section 9.01 shall be entitled to advances from the Corporation for payment of the expenses of defending actions against such person in the manner and to the full extent permissible under Delaware law.



-13-

Section 9.03  <u>Procedure</u>.  On the request of any person requesting indemnification under Section 9.01, the Board of Directors or a committee thereof shall determine whether such indemnification is permissible or such determination shall be made by independent legal counsel if the Board or committee so directs or if the Board or committee is not empowered by statute to make such determination.

Section 9.04  <u>Other Rights</u>.  The indemnification and advancement of expenses provided by this Article 9 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any insurance or other agreement, vote of shareholders or disinterested directors or otherwise, both as to actions in their official capacity and as to actions in another capacity while holding an office, and shall continue as to a person who has ceased to be a director or officer and shall inure to the benefit of the heirs, executors and administrators of such person.

Section 9.05  <u>Insurance</u>.  The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, fiduciary or agent of another corporation, partnership, joint venture, trust, plan or other enterprise, against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions of the Certificate of Incorporation.

Section 9.06  <u>Modification</u>.  The duties of the Corporation to indemnify and to advance expenses to a director or officer provided in this Article 9 shall be in the nature of a contract between the Corporation and each such director or officer, and no amendment or repeal of any provision of this Article 9 shall alter, to the detriment of such director or officer, the right of such person to the advancement of expenses or indemnification related to a claim baed on an act or failure to act which took place prior to such amendment, repeal or termination.

<u>ARTICLE X</u>

<u>CORPORATE SEAL</u>

The corporate seal, if any, shall be in such form as the Board of Directors shall prescribe.  The corporate seal on any corporate bond or other obligation for the payment of money may be a facsimile, engraved or printed.

-14-

## ARTICLE XI

## AMENDMENT OF BY-LAWS

Except as otherwise provided by statute, the Certificate of Incorporation or these By-Laws, only the stockholders of the Corporation, by the affirmative vote of the holders of a majority of the issued and outstanding shares of stock of the Corporation, entitled to vote, at any regular or special meeting, shall have the power to adopt, amend or repeal By-Laws of the Corporation.