UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
TRANSEO S.A.R.L. and PHILIPPE GELBLAT,
Individually and Derivatively on Behalf of Nominal
Defendant, NEUTRAL HOLDINGS, INC.,

                                    Plaintiffs,


                    - against -


BESSEMER VENTURE PARTNERS VI L.P., BESSEMER            **OPINION AND ORDER**
VENTURE PARTNERS VI INSTITUTIONAL L.P.,
BESSEMER VENTURE PARTNERS CO-INVESTMENT                    No. 11-CV-5331
L.P., DEER VI & CO. LLC, JEREMY LEVINE, JEFFREY
ERWIN, and PETER PRICE,

                                    Defendants,


                        and


NEUTRAL HOLDINGS, INC.,

                                    Nominal Defendant.


----------------------------------------------------------------------x

Appearances:
David Jacoby
Schiff Hardin LLP
New York, New York
*Counsel for Plaintiffs*

Michael B. Carlinsky
Hilary R. Ormond
Quinn Emanuel Urquhart & Sullivan, LLP
New York, New York
*Counsel for Defendants*

Seibel, J.

        Before the Court is Defendants' Motion to Dismiss Plaintiff's Second Amended Verified

Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 26.)  For the following

reasons, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

## I. **Background**

For the purposes of the present Motion, the Court accepts as true the facts (but not the conclusions) stated in Plaintiffs' Second Amended Verified Complaint ("SAC"), (Doc. 17).

### A. *Factual Background*

#### 1. The Parties

Plaintiff Transeo S.A.R.L. ("Transeo") is a French limited liability company with its principal place of business in Paris, France.  (SAC ¶ 8.)  Laurent Marteau owns Transeo, which acts as a holding company for shares of stock in Nominal Defendant Neutral Holdings, Inc. ("NHI").  (*Id.* ¶¶ 2, 18.)  NHI is a Delaware corporation formed in 2007 when Bessemer Venture Partners ("BVP"), a venture capital firm, through Defendants Bessemer Venture Partners VI L.P., Bessemer Venture Partners VI Institutional L.P., and Bessemer Venture Partners Co-Investment L.P., all Delaware limited partnerships (collectively, "Bessemer"), acquired a controlling interest in Intego S.A., a French corporation, and its wholly-owned subsidiary, Intego, Inc., a Florida corporation (collectively, "Intego").  (*Id.* ¶¶ 2, 5, 15-17.)  NHI is the holding company for Intego shares.  (*Id.* ¶ 18.)  Marteau was the President and Chief Executive Officer ("CEO") of NHI and CEO of Intego.  (*Id.* ¶ 22.)

Intego is a software company founded by Marteau in 1997 that specializes in security software solutions for Apple, Inc. computers and devices.  (*Id.* ¶ 16.)  In June 2007, through a stock purchase agreement ("SPA"), Bessemer acquired a controlling interest in Intego.  (*Id.* ¶ 17.)  Today, Bessemer owns slightly less than 85% of NHI's outstanding shares; Transeo owns slightly less than 15%; and Plaintiff Philippe Gelblat and John Goldsmith, who is not a party to this action, each own less than 1%.  (*Id.* ¶¶ 18, 29, 32.)  At all times, Bessemer was the majority shareholder of NHI.  (*Id.* ¶ 27.)

Gelblat is a French citizen residing in Switzerland and was a director of NHI until February 2011.  (*Id.* ¶¶ 9, 80.)  Defendant Deer VI & Co. LLC ("Deer") is a Delaware limited liability company that is the general partner of each of the Bessemer limited partnerships.  (*Id.* ¶¶ 5, 11, 231-32.)  Defendant Jeremy Levine is a partner at BVP and a director of NHI and Intego.  (*Id.* ¶ 12.)  Defendant Jeffrey Erwin is the President, CEO, and a director of NHI and Intego.  (*Id.* ¶ 13.)  Defendant Peter Price is the Secretary and Chief Financial Officer ("CFO") of NHI.  (*Id.* ¶ 14.)

### 2.   The NHI Stockholders' Agreement

At the same time that the SPA was executed in June 2007, Bessemer, Transeo, Gelblat, and NHI entered into the Stockholders' Agreement ("SA").  (*Id.* ¶ 19; *id.* Ex. 1.)  Pursuant to the SA, NHI's Board of Directors ("BOD") could consist of five individuals – one nominated by Transeo at its sole discretion; two nominated by Bessemer at its sole discretion; and two nominated by Bessemer subject to the approval of the other members of the BOD.  (*Id.* ¶ 30; *id.* Ex. 1 § 7.1.)  Although the SA allowed five directors, NHI had only four directors at all relevant times.  (*Id.* ¶ 78.)  From its initiation until February 2011, the BOD consisted of Marteau (appointed solely by Transeo); Gelblat and Levine (appointed solely by Bessemer); and Goldsmith (appointed by Bessemer and approved by the other members of the BOD).  (*Id.* ¶¶ 74, 80.)  In February 2011, Erwin took Gelblat's position following his removal.  (*Id.* ¶¶ 80-81.)

The SA also contains provisions on share redemptions and the sale of NHI.  Section 5.1(a) states:

> At any time, and from time to time (but subject to Section 5.1(b) below), after June 7, 2012, each Major Stockholder[1] (the "Redeeming Holders") shall be entitled by written request . . . to

---

[1] At all times, Transeo was a "Major Stockholder" as defined by the SA.  (SAC ¶ 28.)

> require that any or all of the Shares held by such Redeeming
> Holder be redeemed.

(*Id.* Ex. 1 § 5.1(a) (emphasis omitted).)  The following section states:

> Subject to Laurent Marteau being the Chief Executive Officer of
> the Company, on or after June 7, 2012 Transeo shall be entitled to
> request that the Company appoint an investment bank to conduct a
> sale of the Company.

(*Id.* Ex. 1 § 5.1(b).)

### 3.  The Proposed Loan

Bessemer approached Silicon Valley Bank without informing the NHI BOD to secure a term sheet for an $8,000,000 loan – formalized in November 2010 – to finance a cash dividend payment to NHI shareholders, which allegedly was structured to give a disproportionate tax benefit to Bessemer.  (*Id.* ¶¶ 34-35, 40.)  Both Marteau and Gelblat opposed the proposed loan, which Bessemer eventually agreed not to pursue, apparently after lengthy discussions with Marteau.  (*Id.* ¶¶ 42-43, 46.)

### 4.  The Promissory Note Dividend

On December 28, 2010, NHI paid a dividend in the form of a promissory note to its stockholders, which allegedly was structured so that Bessemer did not have to report the proceeds as taxable income in the United States.  (*Id.* ¶¶ 46-48.)

### 5.  Relocation of Intego Assets

Plaintiffs allege that following the dividend dispute, Bessemer relocated most of Intego's assets – its computer web services and associated intellectual property, including source code – from Intego's headquarters in Paris to the United States, apparently in an effort to exercise "tighter control" of Intego's assets and to use "NHI's assets and cash" for Bessemer's benefit.  (*Id.* ¶¶ 50, 57, 63.)  Plaintiffs allege that the relocation disrupted Intego's services; compromised

4

the security of Intego's clients; damaged Intego's reputation; facilitated the hacking of Intego's website; and potentially violated European data privacy laws. (*Id.* ¶¶ 60-61, 65.)

6.   The AVG Offer & Gelblat's Removal from the NHI BOD

Beginning in June 2009, AVG Technologies N.V. and its affiliates (collectively, "AVG"), a Dutch internet software security company, approached NHI about a possible sale, and AVG expressed renewed interest in early 2011. (*Id.* ¶¶ 67, 69.) On February 24, 2011, Levine wrote an email in which he stated that the NHI BOD expected to "receive an M&A offer from AVG [that] week," and it would be important to respond to AVG quickly "to keep the deal alive and warm." (*Id.* ¶ 96.) Goldsmith also wrote an email dated February 26, 2011 acknowledging that the NHI BOD "must meet and deliberate" to satisfy its duty "to do what is in the best interest of the company." (*Id.* ¶ 97.)

AVG memorialized its offer in a February 28, 2011 letter, which annexed a non-binding letter of intent valid until March 2, 2011. (*Id.* ¶ 69; Ormond Decl. Ex. B.)[2] AVG offered to acquire NHI for $25 million on a "cash free" basis, which meant that NHI's cash on hand would be distributed *pro rata* to shareholders. (SAC ¶ 70.) Levine had indicated earlier in February 2011, before receiving the AVG offer letter, that Bessemer would regard as "compelling" an offer to acquire NHI for $20 million, or possibly as low as $17 million. (*Id.* ¶ 66.) Approximately $10 million of the $25 million AVG offer was tied to various contingencies,

---

[2] "Ormond Decl." refers to the Declaration of Hilary R. Ormond. (Doc. 28.)

The AVG offer letter is not attached as an exhibit to the SAC. When deciding a motion to dismiss, the Court's "review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference." *Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation marks omitted). Many of Plaintiffs' claims arise from the AVG offer, making it a document integral to the SAC that I may consider on a motion to dismiss.

including "the retention of key employees," which Plaintiffs allege refers to Marteau remaining active with NHI and Intego.  (*Id.* ¶¶ 71-72; Ormond Decl. Ex. B, at 2.)

Half of the NHI BOD – Marteau and Gelblat – favored pursuing the AVG offer, and Plaintiffs allege that Bessemer removed Gelblat from the NHI BOD on February 24, 2011 because of his stance vis-à-vis the offer.  (SAC ¶¶ 79-80.)  Erwin – who was not a BVP employee but allegedly had an "extensive and long-standing" relationship with the venture capital firm – filled Gelblat's position on the NHI BOD.  (*Id.* ¶ 81.)

7.  Marteau's Termination from NHI and Intego

At a BOD meeting on March 1, 2011, which was purportedly scheduled to examine the AVG offer, the NHI BOD ratified the terminations of Marteau as President and CEO of NHI and of Transeo's consulting and management services contract with NHI.  (*Id.* ¶¶ 86, 98.)  There were no deliberations at the meeting related to these terminations – which were allegedly not based on dissatisfaction with Marteau's or Transeo's performance or any other valid business reason, and instead occurred on Bessemer's orders – and Erwin replaced Marteau as NHI's President and CEO.  (*Id.* ¶¶ 87-88, 99.)  A few days after the March 1 meeting, Marteau was terminated as an officer and director of Intego, which is the subject of a pending lawsuit in France.  (*Id.* ¶¶ 113-14.)

8.  Refusal to Consider the AVG Offer

Following Marteau's termination as NHI's President and CEO at the March 1 meeting, Marteau volunteered to be a member of a committee to continue discussions with AVG and advised the BOD that it should conduct the appropriate analysis to determine the strength of the offer, but Erwin moved to take sole control of talks with AVG – a motion supported by the other NHI BOD members.  (*Id.* ¶¶ 94, 102-04, 120.)  Subsequently, neither Erwin nor the other

Bessemer-affiliated NHI directors took steps to analyze the AVG offer, such as procuring an outside analysis by an investment bank, conducting a valuation of NHI, considering a counter-offer, or anything beyond the cursory discussions at the March 1 meeting. (*Id.* ¶¶ 109, 118-19.) The AVG offer expired on its own terms on March 2, 2011, and it has not been pursued by either NHI or AVG since that date. (*Id.* ¶¶ 111-12.)

9. Transeo Demands to Inspect NHI's Books & Records

Transeo demanded an inspection of NHI's books and records pursuant to Section 220(c) of the Delaware General Corporation Law ("DGCL") by letters dated June 20, 2011 and June 30, 2011. (*Id.* ¶¶ 129, 133.) NHI has not responded to Transeo's demands. (*Id.* ¶ 134.)

10. Marteau's Termination from the NHI BOD

In a letter dated July 14, 2011, Erwin advised the NHI BOD that three directors had requested a special meeting, which was held on August 1, 2011. (*Id.* ¶¶ 137, 142; *id.* Ex. 2.) Several of the enumerated agenda items for the meeting were either entirely unaddressed or insufficiently addressed. (*Id.* ¶¶ 147-49, 156-63.) At the end of the meeting, Erwin demanded Marteau's resignation from the NHI BOD. (*Id.* ¶ 164.) When Marteau did not voluntarily resign, Erwin read a prepared statement advising Marteau that NHI had formed a committee composed of other members of the BOD, and the committee had already elected to remove Marteau as a director. (*Id.* ¶ 166.) Since the August 1 meeting, Bessemer has denied Marteau access to documents and information to which directors are entitled, including draft and approved meeting minutes of the BOD, and has not paid him directors' fees. (*Id.* ¶¶ 168, 181.)

11. Bessemer's Other Improper Conduct

Plaintiffs allege that Bessemer has caused Erwin and Price, as officers and directors of NHI, to commit the following improper or illegal activities: (1) creation of false documents and

commission of fraud in connection with the adoption of the "Neutral Holdings, Inc. 2009 Stock Option Plan for Employees and Directors of French Affiliates," (the "2009 Stock Option Plan"), which was purportedly approved at a February 14, 2012 NHI shareholder meeting that neither Transeo nor Gelblat knew of nor attended, and also allegedly approved by the NHI BOD at a meeting Marteau neither knew of nor attended; (2) creation of false and fraudulent documents in connection with grants of stock options pursuant to the 2009 Stock Option Plan; (3) forgery of a false document regarding the Annual General Meeting of Intego S.A. that stated that Erwin attended the meeting in person when he allegedly did not; (4) refusal to provide information about NHI's financials to Plaintiffs for tax reporting and other business purposes despite demand; and (5) refusal to permit Transeo to inspect NHI's books and records despite demand. (*Id.* ¶ 171.)

## B. *Procedural Background*

Transeo initiated the instant suit against the Bessemer Defendants on July 29, 2011 and filed an Amended Complaint against the same defendants on August 23, 2011. (Docs. 1, 3.) At a conference on January 6, 2012, I granted Transeo leave to amend. The SAC, filed on May 14, 2012, added Gelblat as a Plaintiff; Deer, Levine, Erwin, and Price as Defendants; and NHI as a Nominal Defendant, and alleged nine causes of action under Delaware and New York law. (Doc 17.) Defendants filed the instant Motion to Dismiss on July 27, 2012. (Doc. 26.)

## II. **Legal Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'"  *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

## III.  Discussion

### A.  *Delaware Law Claims*

#### 1.  Direct Breach of Fiduciary Duty

Transeo and Gelblat bring a direct breach of fiduciary duty claim against Bessemer. Plaintiffs allege that under Delaware law, Bessemer – as NHI's majority shareholder – owed a fiduciary duty to them as NHI's minority shareholders, and that it breached that duty by using its

influence with the NHI BOD to ensure that the BOD's decisions disproportionately benefitted Bessemer.  (SAC ¶¶ 173-74.)  Specifically, Plaintiffs allege that Bessemer's actions with respect to the proposed loan, promissory note dividend, termination of key employees and officers, movement of Intego's assets to the United States, failure to examine the AVG offer, and causing or acquiescing in improper or illegal conduct (*i.e.*, the creation of false documents and refusal to provide NHI's financial information) constituted acts of self-dealing in breach of Bessemer's fiduciary duties to Plaintiffs.  (*Id.* ¶¶ 174-75.)  Defendants respond that Plaintiffs' claim is derivative in nature because it seeks relief for harm caused to all of NHI's shareholders – not just the minority shareholders – and accordingly Plaintiffs lack standing to bring a direct breach of fiduciary duty claim.  (Ds' Mem. 10-13.)[3]  In the alternative, Defendants argue that Plaintiffs have failed to allege that Bessemer's actions benefitted it at Plaintiffs' expense.  (*Id.* at 13-16.)

As NHI is a Delaware corporation, Delaware law governs whether Plaintiffs' breach of fiduciary duty claim is direct or derivative.  *San Diego Cnty. Emps. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 126 (S.D.N.Y. 2010).  Whether a claim is direct or derivative "turn[s] *solely* on the following questions:  (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (emphasis in original).  For a claim to be direct, Plaintiffs must allege an injury "independent of any alleged injury to the corporation" and be able to "prevail without showing an injury to the corporation."  *Id.* at 1039.

That Bessemer's actions diluted the value of NHI's shares is the gravamen of the majority of Plaintiff's factual allegations in support of their direct breach of fiduciary duty claim.

---

[3] "Ds' Mem." refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Second Amended Verified Complaint.  (Doc. 27.)

First, Plaintiffs allege that terminating Marteau from his NHI and Intego positions was self-dealing that allowed Bessemer to use NHI's assets and cash for its own purposes and to install a CEO who would "comply with Bessemer's demands, all to the detriment of the minority stockholders of NHI," which "resulted in a diminution in the value of NHI [and] further prejudiced the minority stockholders by reducing the value of their ownership irrespective of the AVG Offer." (SAC ¶¶ 63, 90, 93, 95, 128.) Further, the BOD's failure to examine the AVG offer "depressed the value of NHI" by over $10 million. (*Id.* ¶¶ 101, 126.) Finally, Plaintiffs allege that creating false documents in connection with stock option grants that valued NHI at below its fair market value "dilut[ed] the value of [shareholders'] NHI stock holdings." (*Id.* ¶ 171.)

"Equity dilution claims are typically viewed as derivative under Delaware law." *Feldman v. Cutaia*, 956 A.2d 644, 655 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008). Because NHI, not Plaintiffs exclusively, suffered harm from any alleged diminution of value, Plaintiff's allegations that Bessemer's actions reduced the value of their NHI shares cannot form the basis of a direct breach of fiduciary duty claim.[4] *Gentile*, 906 A.2d at 99 ("In the eyes of the

---

[4] The Delaware Supreme Court has recognized that one type of equity dilution claim can give rise to both direct and derivative actions. "A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders." *Gentile v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006).

The only allegations in the SAC that could come close to supporting such a claim relate to two apparently separate incidents involving stock option grants. The SAC alleges that an agenda item at the August 1, 2011 special meeting was to "[c]onsider approving amendment to 2007 Stock Option Plan" to provide options on 20,000,000 shares, allegedly mostly for Erwin – NHI's President, CEO, and director – and Price – NHI's Secretary and CFO. (SAC ¶¶ 157-58.) Marteau objected to amending the existing plan, noting that the SA contained specific anti-dilution mechanisms with which the BOD had not complied. (*Id.* ¶ 159; *see id.* Ex. 1, § 6.1.) There are no allegations that the 2007 Stock Option Plan was ever amended in the proposed manner or that Erwin or Price were granted stock options. Following Marteau's purported removal as a director, the SAC further alleges that Erwin and Price created false documents to adopt and implement the 2009 Stock Option Plan for "Employees and Directors of French Affiliates," which diluted the value of NHI's stock. (*Id.* ¶ 171.) Unlike here, *Gentile* involved allegations of corporate overpayment where the majority shareholder converted corporate debt owed to him into equity at a low

law, such equal 'injury' to the shares . . . is not viewed as, or equated with, harm to specific shareholders individually."); *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("[W]here a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative in nature."); *see Debussy LLC v. Deutsche Bank AG*, No. 05-CV-5550, 2006 WL 800956, at *3 (S.D.N.Y. Mar. 29, 2006) ("Because injury alleged by a diminution of investment value is indirect and contingent upon injury to the corporation, the claim is derivative."), *aff'd*, 242 F. App'x 735 (2d Cir. 2007).

As for Plaintiffs' remaining allegations, the SAC states that the proposed loan to finance a cash dividend could "put NHI at substantial risk as a going concern," thereby reducing the value of Transeo's right to redemption under the SA while disproportionately benefitting Bessemer through a tax benefit not realized by the minority shareholders.  (SAC ¶¶ 35, 41, 44.) This allegation is not actionable, however, as NHI never borrowed money to finance a dividend.

---

conversion rate, and the corporation's overpayment for this debt resulted in a "separate harm" to the minority in the form of "an extraction from the [minority], and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest," leaving the minority "entitled to recover the value represented by that overpayment" directly without regard to any derivative claim the corporation might have. *Id.* at 94, 100.  No similar transaction is alleged here, and dilution claims, without more, are derivative in nature. *Feldman*, 956 A.2d at 656 ("Mere claims of dilution . . . cannot convert a claim traditionally understood as derivative into a direct one.") (internal quotation marks omitted).

Plaintiffs do not allege that Bessemer exchanged anything or received any stock options pursuant to the 2009 Stock Option Plan, only that the grant "to [NHI] employees at a discounted U.S.$0.10 per share exercise price . . . had the additional fraudulent impact on stockholders of diluting the value of their NHI stock holdings."  (SAC ¶ 171.) Although Plaintiffs argue in their brief that the issuance of options caused Plaintiffs direct harm distinct from harm to NHI because the options were disproportionately granted to Erwin and Price, who were affiliated with Bessemer, (Plaintiffs' Memorandum of Law in Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss ("P's Mem."), (Doc. 30), 10), the SAC only makes conclusory allegations that Plaintiffs suffered "disproportionate[] dilut[ion]," (SAC ¶ 251).  The SAC fails to allege specifically to whom the options were granted other than "employees," and a grant of stock options to NHI's employees – without more – would not disproportionately dilute the value of the minority shareholders' NHI stock.  (*Id.* ¶ 171.)  Moreover, even if the SAC alleged that Erwin and Price were the employees who benefitted, that they were associated with Bessemer does not make it plausible that options granted to them personally would benefit Bessemer.  Because Plaintiffs have not specifically alleged that the majority shareholders benefitted from the stock option grant at the minority shareholder's expense, and the facts do not plausibly suggest that Bessemer extracted a disproportionate benefit from the stock option grant, a direct breach of fiduciary duty claim based on any resulting dilution is unavailable.

Moreover, although the promissory note dividend was allegedly structured so Bessemer could

avoid having to report the proceeds as taxable income in the United States, (*id.* ¶ 48), that

Bessemer may have received a tax advantage from the structure does not plausibly allow me to

infer that Plaintiffs were correspondingly harmed by the dividend's structure in the absence of

such an allegation and factual support for it.  Likewise, the movement of Intego's assets into the

United States allegedly allowed Bessemer to use NHI's assets and cash for its own purposes, but

the SAC only alleges that this action harmed Intego – not Plaintiffs – through disruption of

Intego's services; compromising the security of Intego's clients; damage to Intego's reputation;

hacking of Intego's website; and potentially violation of European data privacy laws.  (*Id.* ¶¶ 60-

61, 63, 65, 95, 128.)  There are no facts rendering plausible the inference that the move in fact

reduced the value of NHI, let alone Plaintiffs' shares in particular.

       In opposition, Plaintiffs advance new arguments related to its direct breach of fiduciary

duty claim – specifically, that Transeo suffered a distinct harm through the denial of its

contractual right to have Marteau on the BOD and termination of its service contract without the

required notice.  (Ps' Mem. 9.)  Any allegation regarding the SA's provisions dictating the

composition of the BOD underlies Plaintiffs' breach of contract claim, (*see* SAC ¶¶ 177-83; *id.* ¶

178 ("Pursuant to the Stockholders' Agreement, Transeo was and is entitled to appoint Marteau

to the NHI BOD.")), and thus cannot be the basis for a breach of fiduciary duty claim.  *See*

*Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010) ("It is a well-settled principle that where a

dispute arises from obligations that are expressly addressed by contract, that dispute will be

treated as a breach of contract claim.  In that specific context, any fiduciary claims arising out of

the same facts that underlie the contract obligations would be foreclosed as superfluous.").

Regarding Transeo's service contract with NHI, the SAC states that "Bessemer, without

explanation and operating through the NHI BOD, used this majority position to terminate . . .

Transeo's consulting and management services contract with NHI . . . [at] a special meeting of

the NHI BOD to ratify this decision . . . on March 1, 2011" and "without providing the period of

notice called for under that contract."  (SAC ¶¶ 86, 206.)  As the required notice also appears

contractual in nature, this allegation cannot be addressed in a breach of fiduciary duty claim.  *See*

*Nemec*, 991 A.2d at 1129.

     As Plaintiffs have not alleged any harm independent of diminution in the value of NHI's

stock, Defendants' Motion to Dismiss is granted with respect to Plaintiffs' direct breach of

fiduciary duty claim against Bessemer.[5]

     2.  Derivative Breach of Fiduciary Duty Claim[6]

     In the alternative, Plaintiffs allege a derivative breach of fiduciary duty claim on behalf of

Nominal Defendant NHI against Bessemer, Deer,[7] Erwin, and Levine based on:  the BOD's

---

[5] Given this disposition, I need not and do not address Defendants' assertion that Plaintiffs have also failed to allege that Bessemer's actions benefitted Bessemer at Plaintiffs' expense.

[6] Although it is not clear whether there is a *per se* rule in the Second Circuit prohibiting Plaintiffs from pursuing simultaneous derivative and direct claims, *see Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d 778, 793-94 (S.D.N.Y. 2011), *aff'd*, 479 F. App'x 375 (2d Cir. 2012), I need not address Defendants' allegations that Plaintiffs in doing so have a conflict of interest and cannot fairly and adequately represent the NHI shareholders, given that I have dismissed Plaintiffs' direct breach of fiduciary duty claim.  Further, even though "there is always a theoretical conflict of interest in situations where a plaintiff in a single lawsuit seeks redress on behalf of the business entity and from the business entity," *id.* at 794 (alterations and internal quotation marks omitted), that is not the case here, as Plaintiffs seek redress on behalf of the business entity in the derivative breach of fiduciary duty claim, from its majority shareholders in its direct breach of fiduciary duty claim, and from its majority shareholders and/or directors in its remaining claims under New York law.  Finally, because Plaintiffs must represent the interests of all NHI shareholders in the derivative claims in which they have named Bessemer as Shareholder Defendants, Defendants assert that "[a]llowing this derivative claim to proceed would be tantamount to allowing Bessemer to sue itself," (Ds' Mem. 32 & n.18), but Defendants cite no authority for the proposition that a minority shareholder cannot "fairly and adequately represent the interests of shareholders," Fed. R. Civ. P. 23.1(a), in a derivative breach of fiduciary duty claim against a majority shareholder, and the Court does not view this as an atypical posture suggesting an impermissible conflict of interest.

[7] Defendants assert that Deer should be dismissed as a Defendant because the SAC contains no alleged wrongdoing with respect to Deer, and, quoting only the second sentence of DGCL § 15-306(c), because a general partner is not personally liable for an obligation solely by acting as a partner.  (Ds' Mem. 26 n. 10.)  But the quoted portion of DGCL § 15-306(c) refers to "such an obligation," the antecedent of which is in the first sentence, and refers specifically to limited liability partnerships.  Del. Code Ann. tit. 6, § 15-306(c) ("An obligation of a partnership arising out of or related to circumstances or events occurring while the partnership is a *limited liability partnership*

failure to consider the AVG offer; the BOD's purported removal of Marteau; and Erwin's "[b]latant [m]isconduct" related to the 2009 Stock Option Plan, the Annual General Meeting of Intego S.A., withholding financial results from Plaintiffs, refusal to allow Transeo access to NHI's books and records, and relocation of Intego's assets to the United States.  (SAC ¶¶ 227, 238-49.)  Plaintiffs concede that they did not make demand on the NHI BOD to pursue such a claim on the corporation's behalf and allege that such demand would have been futile.  (*Id.* ¶¶ 253-56.)

       *a.  Demand Futility*

Defendants contend that Plaintiffs inadequately pleaded futility of demand.  (Ds' Mem. 27-28.)  Directors are entitled to the presumption that they will be faithful to their fiduciary duties, and demand will be excused only if Plaintiffs can show that the NHI BOD is "incapable of making an impartial decision regarding the pursuit of the litigation."  *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004).

---

or incurred while the partnership is a *limited liability partnership*, whether arising in contract, tort or otherwise, is solely the obligation of the partnership.") (emphasis added).  "Limited liability partnership" is a defined term in the DGCL, and refers specifically to "a domestic partnership that has filed a statement of qualification under § 15-1001 of this title."  *Id.* § 15-101(8).  While a partner in a "limited liability partnership" as so defined would be entitled to the so-called "full shield" protection of DGCL § 15-306(c), *see* Revised Unif. P'ship Act § 306 author's cmt. 7(a) & n.25 (2012) (Delaware is an early adopter of these provisions, wherein "[a] limited liability partnership formed pursuant to Section 1001 receives the liability shield in Section 306(c)," which applies to all partners for "all partnership obligations"), a general partner of a limited partnership – an entity governed by a different chapter of the DGCL – is liable for all obligations of the partnership, *see* Del. Code Ann. tit. 6, § 17-403(b); *see also Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 391 (D. Del. 2000) ("General partners in limited partnerships . . . are liable for the debts of the partnership."); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243, 268 (Bankr. S.D.N.Y. 2010) ("Under applicable Delaware law, a general partner of a limited partnership is jointly and severally liable for all of the debts and obligations of the partnership.") (footnote omitted); *In re LJM2 Co-Inv., L.P.*, 866 A.2d 762, 772 (Del. Ch. 2004) ("The basic premise of limited partnership law is that general partners are personally liable for partnership obligations but limited partners are not.").  According to the SAC, the Bessemer entities are "limited partnerships formed and existing under the laws of the State of Delaware," (SAC ¶ 230), and Deer is the general partner of each of them, (*id.* ¶ 231); Defendants do not contend otherwise.  Thus, I cannot dismiss the claim against Deer on the ground advanced by Defendants.  I will assume that Defense counsel's incomplete citation of DGCL § 15-306(c) was simply an oversight.

The demand requirement for derivative actions contains both a procedural aspect –
enumerated in Federal Rule of Civil Procedure Rule 23.1(b)[8] – and a substantive requirement
under state law. *Cordts-Auth*, 815 F. Supp. 2d at 793 ("There are two components to the demand
requirement; one procedural, the other substantive. . . . While Rule 23.1 governs the procedural
aspects of the demand requirement, the second, substantive dimension of the demand
requirement, which concerns the adequacy of the efforts actually put forth by a plaintiff, is
governed by state law.")  Rule 23.1 is solely concerned with the adequacy of the SAC, "merely
requir[ing] that [it] allege the facts that will enable [the] court to decide whether such a demand
requirement has been satisfied."  *Halebian v. Berv*, 590 F.3d 195, 211 (2d Cir. 2009) (internal
quotation marks omitted).  For the reasons set forth below, I find that Plaintiffs have pleaded
particularized facts plausibly rebutting the presumption that the Bessemer-affiliated directors
were independent, thus satisfying the procedural requirements of Rule 23.1.

Substantively, Delaware law governs whether Plaintiffs' allegations of demand futility
are adequate.  To show demand futility for an exercise of BOD action, Plaintiffs must plead facts
creating "a reasonable doubt . . . that:  (1) the directors are disinterested and independent and (2)
the challenged transaction was otherwise the product of a valid exercise of business judgment."
*Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds, Brehm v. Eisner*,
746 A.2d 244 (Del. 2000).  "If a plaintiff can demonstrate a reasonable doubt as to the first or
second prong of the *Aronson* test, then he has demonstrated that demand would have been
futile."  *In re Goldman Sachs Mortg. Servicing S'holder Derivative Litig.*, No. 11-CV-4544,
2012 WL 3293506, at *4 (S.D.N.Y. Aug. 14, 2012).  Where the complaint alleges BOD inaction,
however, the demand futility inquiry focuses only on the first prong of *Aronson* – whether

---

[8] "The complaint must be verified and must . . . state with particularity . . . any effort by the plaintiff to obtain the
desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and .
. . the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b).

Plaintiffs have established a "reasonable doubt that . . . the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). "Where there is no conscious decision by directors to act or refrain from acting, the business judgment rule has no application." *Id.* at 933.

> b. *Directorial Independence and Disinterestedness*

Although Defendants allege that the *Aronson* test applies to Plaintiffs' allegations that challenge BOD action or the decision to refrain from acting – *i.e.*, the failure to review the AVG offer and Marteau's purported removal as a director – and the *Rales* test applies to the examples of Erwin's alleged misconduct, (Ds' Mem. 28 n.11), Plaintiffs argue that the distinction between the two tests is inconsequential in this case because demand would be futile where, as here, there was no majority of disinterested and independent directors, (Ps' Mem. 25). If the SAC pleads facts raising a reasonable doubt as to the NHI BOD's disinterestedness and independence, *see In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 820 (Del. Ch. 2005) ("The two prongs of the *Aronson* test are disjunctive, meaning that if either part is satisfied, demand is excused."), *aff'd*, 906 A.2d 766 (Del. 2006), demand will be futile with respect to all of Plaintiffs' allegations. The SAC alleges that demand was futile generally because half of the NHI BOD – Erwin, a Bessemer affiliate, and Levine, a Bessemer employee – was under the "domination and control of Bessemer," (SAC ¶ 254), and thus interested and not independent. *See In re The Limited, Inc. S'holders Litig.*, No. CV-17148, 2002 WL 537692, at *7 (Del. Ch. Mar. 27, 2002) ("[W]here the challenged actions are those of a board consisting of an even number of directors, plaintiffs meet their burden of demonstrating the futility of making demand on the board by showing that half of the board was either interested or not independent.").

Under Delaware law, "[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales*, 634 A.2d at 936 (citation omitted).  Although the SAC contains a conclusory allegation that the majority of NHI's BOD was "not disinterested" with respect to the AVG offer, (SAC ¶ 243), it contains no allegations that any NHI directors stood to receive a personal financial benefit from, or that any director might be injured by, the decisions at issue – a failure to pursue the AVG offer; the purported removal of Marteau; and Erwin's alleged misconduct – except potentially Erwin, as an employee and director of NHI and Intego, who perhaps benefitted from the 2009 Stock Option Plan.[9]  The essence of Plaintiffs' allegations is that Bessemer purposely acted to diminish the value of NHI by using its influence on NHI's BOD to let the AVG offer expire, to remove Marteau from leadership positions, and to allow Erwin's allegedly tortious actions.  While it is alleged that Bessemer stood to gain through the misappropriation of NHI's cash and assets and that Bessemer sought to maximize NHI's short-term profits – at the expense of its long-term prospects – the SAC does not specifically allege that any potentially interested director – Erwin, Levine, or Goldsmith – would have received a personal benefit, or suffered a materially detrimental impact, not equally shared by the shareholders.  The SAC thus does not plausibly allege interestedness.

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences. . . . [I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling

_____

[9] The SAC does not say whether Erwin received stock options pursuant to the 2009 Stock Option Plan, which was for "Employees and Directors of French Affiliates."  (SAC ¶ 171.)

the outcome of a corporate election." *Aronson*, 473 A.2d at 816. Specifically, "a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Id.* (internal quotation marks omitted). With respect to Levine, Plaintiffs allege that he is a partner at BVP and a Bessemer-appointed NHI director, (SAC ¶ 12), who also:

- stated in February 2011 that Bessemer would consider an offer in the range of $17 to $20 million for NHI to be "compelling," but who shortly thereafter terminated Gelblat as an NHI director because of his support for the $25 million AVG offer and replaced him with Erwin, who voted as directed by Bessemer to block consideration of any AVG acquisition, (*id.* ¶¶ 66, 70, 80-81, 85);

- emailed the NHI BOD on February 24, 2011 about expecting an offer from AVG and stressing the importance of responding quickly to "keep the deal alive and warm" only to replace Marteau with Erwin as CEO and President of NHI at the March 1, 2011 meeting to facilitate the rejection of the AVG offer by removing an employee AVG allegedly considered essential, (*id.* ¶¶ 86, 89, 96);

- conspired with the other Bessemer-appointed directors, Erwin and Goldsmith, to form an unsanctioned committee that voted to remove Marteau as a director of NHI prior to the August 1, 2011 special meeting of the BOD, (*id.* ¶¶ 166, 180-81); and

- proposed increasing NHI's authorized shares by 20,000,000 at the August 1 meeting to benefit Erwin and Price, (*id.* ¶¶ 157-58), and participated in a BOD

19

meeting that excluded Marteau where the 2009 Stock Option Plan was approved, (*id.* ¶ 171).

With respect to Erwin, Plaintiffs allege that he had a long-standing relationship with Bessemer, who chose him to replace Marteau as the CEO and President of Intego and NHI despite Erwin's lack of professional and practical skills necessary for the positions, such as experience with Apple's hardware and software products and requisite French language ability to communicate with the majority of Intego's Paris-based employees.  (*Id.* ¶¶ 55, 81-84, 90.) Installing Erwin allegedly furthered Bessemer's control of NHI and Intego as he:

- replaced Gelblat on the NHI BOD to block consideration of the AVG offer, which he accomplished by moving to take sole control of the talks with AVG at the BOD meeting, a motion that was supported only by the other Bessemer-appointed directors, and subsequently failing to pursue the offer at all by, for example, obtaining outside advisors to assess its merits, conducting due diligence, or making a counter-proposal, (*id.* ¶¶ 104, 109, 117-19);

- conspired with the other Bessemer-appointed directors, Levine and Goldsmith, to form an unsanctioned committee that voted to remove Marteau as a director of NHI prior to the August 1, 2011 special meeting of the BOD, (*id.* ¶¶ 166, 180-81);

- proposed a stock option grant that would primarily benefit himself and Price, (*id.* ¶ 157), and participated in a BOD meeting that excluded Marteau where the 2009 Stock Option Plan was approved, (*id.* ¶ 171);

- created false and fraudulent documents in connection with the approval of the 2009 Stock Option Plan by NHI's shareholders and directors; the fair market

value of the stock options granted pursuant to the plan; and the minutes of Intego

S.A.'s annual meeting held on June 29, 2011, (*id.*);

- withheld financial information and the books and records of NHI from Plaintiffs, (*id.*); and

- relocated Intego's cash and assets from France to the United States, (*id.* ¶ 249).

While Defendants are correct that conclusory allegations regarding the influence of a third party on the NHI BOD are insufficient to satisfy Plaintiffs' obligations to plead independence with particularity, *see Fink v. Weill*, No. 02-CV-10250, 2005 WL 2298224, at *3 (S.D.N.Y. Sept. 19, 2005), the SAC has done more than merely state that Bessemer had influence over Levine and Erwin.  Independence involves "an inquiry into whether the director's decision resulted from that director being *controlled* by another," which can occur if a director is "*dominated* by that other party" or "*beholden* to the allegedly controlling entity."  *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002) (emphases in original).  Although "mere personal friendship or a mere outside business relationship" is insufficient to raise a reasonable doubt about a director's independence, *Beam*, 845 A.2d at 1050, and "a director's appointment at the behest of a controlling shareholder does not suffice to establish a lack of independence," *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 588 (Del. Ch. 2007), Plaintiffs have alleged sufficiently more control over and influence on the decisions of Levine and Erwin by Bessemer than exists in a typical business relationship.  First, Gelblat's removal from the NHI BOD and the installation of Erwin – who had an "extensive and long-standing" relationship with Bessemer but lacked qualifications related to Intego's business – as his replacement shortly before NHI's failure to consider an offer for at least $5 million more than the price Levine had stated only a month earlier would be a "compelling" offer raises a reasonable doubt as to whether

Levine's and Erwin's actions in not pursuing AVG's offer were based on "extraneous considerations or influences." *Aronson*, 473 A.2d at 816. Moreover, taking all of Plaintiff's allegations as true, the same doubts are raised by the actions of Levine and Erwin in removing Marteau – the successful founder of Intego – from his positions at Intego, NHI, and eventually (purportedly) the NHI BOD, particularly if Marteau was so integral to the companies that the AVG offer was contingent on his continued employment. As Plaintiffs have pleaded particularized facts plausibly raising doubts as to the independence of half of the NHI BOD at this stage, *The Limited, Inc. S'holders Litig.*, 2002 WL 537692, at *7 (demand futile where half of board "either interested or not independent") – in other words, facts rendering it plausible that a BOD composed of Levine, Erwin, and Goldsmith (with or without Marteau) would not vote to sue Bessemer or themselves – Plaintiffs' demand on the NHI BOD is thus excused.

### c.  *Breach of Fiduciary Duty*

#### i.   AVG Offer

Plaintiffs allege that the failure to investigate and respond to the AVG offer resulted in a breach of the fiduciary duties of loyalty, care, and good faith owed by Bessemer and Deer (collectively, "Shareholder Defendants"), and Erwin and Levine (collectively, "Director Defendants"), to Plaintiffs. (SAC ¶ 240.) Defendants argue that Plaintiffs have failed to articulate a basis of derivative liability as to the Shareholder Defendants, and that no Delaware law suggests that the Director Defendants have a duty of care or loyalty[10] to examine an

---

[10] As there is no independent duty of good faith, I will analyze whether the directors acted in good faith in the discharge of their duty of loyalty. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("[A]lthough good faith may be described colloquially as part of a 'triad' of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty. Only the latter two duties, where violated, may directly result in liability, whereas a failure to act in good faith may do so, but indirectly. The second doctrinal consequence is that the fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith. As the Court of Chancery aptly put it in *Guttman* [*v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003)], 'a director cannot act loyally towards the corporation unless

unsolicited offer to buy NHI.  (Ds' Mem. 31, 33.)  Moreover, they argue, the exculpatory

provision in NHI's Certificate of Incorporation pursuant to DGCL § 102(b)(7), (Ormond Decl.

Ex D, art. Seven), immunizes Erwin and Levine from personal liability for breaches of the duty

of care, and there is no other duty allegedly breached in connection with the BOD's refusal to

consider the AVG offer.  (Ds' Mem. 31 n.16.)

       As a preliminary matter, the NHI Certificate of Incorporation is not attached to the SAC

or incorporated in the SAC by reference.  Defendants assert that I may take judicial notice of the

"significant fact" that it exculpates the directors to the fullest extent available under Delaware

law.  *See La. Mun. Police Emps. Ret. Sys. v. Blankfein*, No. 08-CV-7605, 2009 WL 1422868, at

*7 (S.D.N.Y. May 19, 2009).  Where an exculpatory provision in the Certificate of Incorporation

is raised for the first time in a brief in support of a Rule 12(b)(6) motion, however, it is properly

considered only on summary judgment.  *Cf. Ad Hoc Comm. of Equity Holders of Tectonic*

*Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 561 (D. Del. 2008) (footnote omitted) ("Delaware

state courts characterize a [Section] 102(b)(7) charter provision as in the nature of an affirmative

defense. . . . [and] such defenses will generally not form the basis of a Rule 12(b)(6) dismissal.");

*Malpiede v. Townson*, 780 A.2d 1075, 1092 (Del. 2001) (although not reversible error when

district court considered exculpatory provision without converting to motion for summary

judgment, stating for future cases that, "[i]n the case of a Rule 12(b)(6) motion, as here, if the

Section 102(b)(7) charter provision is raised for the first time in the motion or brief in support of

the motion, it is a matter outside the pleading.  If not excluded by the court, the existence of such

matter means that the motion will be converted, by clear force of the pleading rules, into a

motion for summary judgment under Rule 56 . . . .").  Further, "when a duty of care breach is not

---

she acts in the good faith belief that her actions are in the corporation's best interest.'") (alteration and footnote
omitted).

the *exclusive* claim, a court may not dismiss based upon an exculpatory provision." *Alidina v. Internet.com Corp.*, No. CV-17235, 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002) (emphasis in original). Because Plaintiffs allege that the Director Defendants breached the duty of loyalty as well, "the [Section] 102(b)(7) provision cannot operate to negate plaintiffs' duty of care claim on a motion to dismiss," *id.*, and I will not consider any potential effect of the Certificate of Incorporation's exculpatory provision here.

1) Director Defendants

All directors of a Delaware corporation are fiduciaries of the corporation's stockholders – here, Plaintiffs, Goldsmith, and Bessemer. *See Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989). Defendants argue that the directors' refusal to pursue the AVG offer does not implicate the duties of care or loyalty, as Plaintiffs suggest.

"Any time a stockholder challenges an action taken by the board of directors, the Court must first determine the appropriate standard of review to use in analyzing the challenged action." *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 27 (Del. Ch. 2010). The business judgment rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812. To avoid application of this deferential standard, "[t]he burden falls upon the proponent of a claim to rebut the presumption by introducing evidence either of director self-interest, if not self-dealing, or that the directors either lacked good faith or failed to exercise due care." *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989).

In analyzing demand futility, I found that Plaintiffs had plausibly pleaded that the Director Defendants were not independent and were instead controlled by Bessemer, NHI's

majority shareholder.  Presuming the truth of Plaintiff's allegations, the SAC plausibly alleges that Bessemer used the Director Defendants to effect its plan to maintain access to NHI's cash and assets through refusing to consider the AVG offer.  Specifically, Levine – despite having recently indicated that an offer of $17 million to $20 million would be "compelling" – notified Gelblat that he would no longer be an NHI director after Gelblat expressed support for pursuing the offer, and Bessemer selected Erwin to replace Gelblat on the BOD to ensure that the AVG offer would not reach fruition.  (SAC ¶¶ 79-81).  When the offer was discussed at the March 1, 2011 meeting, Erwin moved to take sole control of talks with AVG, a motion supported by the other Bessemer-controlled NHI BOD members, and the BOD subsequently took no actions to analyze the offer, such as hiring an investment bank or conducting a valuation of NHI.  (*Id.* ¶¶ 104, 109, 117-19.)

Although the Director Defendants might eventually be protected by the Certificate of Incorporation's exculpatory provision, the SAC's allegations, taken as true, plausibly suggest that their actions were not undertaken in good faith to advance the best interest of NHI, and thus do not merit protection under the business judgment rule.  *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) ("The good faith required of a corporate fiduciary includes not simply the duties of care and loyalty . . . but all actions required by a true faithfulness and devotion to the interests of the corporation and its shareholders.  A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . .") (internal quotation marks omitted).  Because Plaintiffs have plausibly alleged that the Director Defendants may not be entitled to business judgment protection for their actions in ensuring NHI would not pursue the AVG offer, Defendants' motion to dismiss on that ground is denied.

2)  Shareholder Defendants

Majority shareholders owe fiduciary duties to minority shareholders, *see Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 958 (Del. 1985) (citing *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486, 491 (Del. Ch. 1923)), but the duty is narrow and breached when majority shareholders exploit the minority shareholders, *Thorpe v. CERBCO, Inc.*, No. CV-11713, 1993 WL 443406, at *7 (Del. Ch. 1993) ("The principle that a controlling shareholder may not utilize his control to deprive minority shareholders of the value of their stock is, however, far different from the proposition that a controlling stockholder *qua* stockholder has an affirmative duty to support a particular transaction, even if it is not in their interest as a shareholder to do so. . . . Controlling shareholders, while not allowed to use their control over corporate property or processes to exploit the minority, are not required to act altruistically towards them."); *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 599 (Del. Ch. 1986) (breach of fiduciary duty where the minority was financially injured and the majority shareholder gained what the minority shareholders lost).  Defendants allege that Plaintiffs have not shown that the Shareholder Defendants' purported conduct benefitted the majority at Plaintiffs' expense, but rather only that the Shareholder Defendants were benefitted disproportionately to Plaintiffs, (Ds' Mem. 13; Ds' Reply Mem. 6),[11] and Delaware law does not require a parity of benefits between majority and minority shareholders, *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993) ("It is well established in our jurisprudence that stockholders need not always be treated equally for all purposes."); *eBay*, 16 A.3d at 37 n.122 ("Disparate treatment of stockholders is not a *per se* violation of Delaware law.").

---

[11] "Ds' Reply Mem." refers to the Reply Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Second Amended Verified Complaint.  (Doc. 29.)

Even though the fiduciary duty owed by the majority is narrow, the SAC contains allegations – convoluted though they may be – that render plausible Plaintiffs' claim that Shareholder Defendants exercised control over the NHI BOD to ensure the AVG offer would not be pursued, which ultimately benefitted the Shareholder Defendants at Plaintiffs' expense. Specifically, Plaintiffs allege that the Shareholder Defendants sought to maximize NHI's short-term cash flow and ensure their access to its cash and intellectual property, while Plaintiffs sought to protect and advance NHI's long-term prospects and goodwill.  (SAC ¶ 241.)  After the Shareholder Defendants replaced Gelblat – one of their own appointed directors – once his support for pursuing the offer became known, the Shareholder Defendants could control the actions of the NHI directors, aside from Marteau, with respect to the consideration of the offer. (*Id.* ¶¶ 79-81, 85.)  The Shareholder Defendants allegedly did not want to sell NHI in March 2011 because a sale would have culminated in a distribution of cash *pro rata* to all shareholders and ended their access to Intego's intellectual property, (*id.* ¶ 101), while letting the offer lapse instead depressed NHI's value, making it unlikely that Transeo would invoke its right of redemption or demand a sale after June 2012, actions that would have further hindered the Shareholder Defendants' access to cash and assets, (*id.* ¶¶ 101, 126, 128).  Taking all of Plaintiff's allegations in the SAC as true, as I must on a motion to dismiss, Plaintiffs have alleged facts sufficient to suggest that Shareholder Defendants ensured that the NHI BOD would not consider the AVG offer, in order to maintain their access to NHI and Intego's cash and assets at the expense of the minority shareholders, who were thereafter "deprive[d] . . . of the value of their stock." *Thorpe*, 1993 WL 443406, at *7.  Defendants' Motion on this ground is accordingly denied.

ii.     Marteau's Purported Removal from the NHI BOD

Plaintiffs allege that since August 1, 2011, following Marteau's purported removal from the BOD, Marteau has not been afforded notice of NHI BOD meetings, given minutes of prior meetings, or provided with information about NHI to which a director is entitled.  (SAC ¶¶ 245-46.)  Plaintiffs further allege that any meeting held without all directors present violates the SA and renders several actions taken by the NHI BOD after August 1, 2011 void.  (*Id.* ¶¶ 247-48.)  Defendants contend, on the other hand, that Plaintiffs have failed to allege that Marteau's exclusion from BOD business breached any identifiable fiduciary duty or that any breaches were committed in bad faith.  (Ds' Mem. 32.)

It is clear that any claim based on Marteau's alleged removal or exclusion from the BOD arises from the contractual provisions of the SA – a fact acknowledged by Plaintiffs.  (*See* SAC ¶ 47 ("The conduct of any meeting of the NHI BOD without all directors present violates Section 7.2 of the Stockholders' Agreement . . . ."); Ps' Mem. 29 ("The purported removal [of Marteau] was in violation of the Stockholders' Agreement, as was Board action to establish such a committee in the first place without Marteau's presence in person or by proxy.").)  Because Plaintiffs' injury is contractual, it is not redressable through a breach of fiduciary duty claim, *see Nemec*, 991 A.2d at 1129, and Plaintiffs have thus failed to state a claim related to Marteau's purported termination or exclusion from the NHI BOD.  Defendants' Motion to Dismiss is granted with respect to this aspect of the derivative breach of fiduciary duty claim.

iii.    Erwin's Misconduct

Plaintiffs allege that Erwin – with either the direct knowledge or acquiescence of the Bessemer-controlled NHI directors – created false documents in connection with the adoption and approval of the 2009 Stock Option Plan; forged a false document about the Intego S.A.

28

annual meeting; withheld NHI's financial information from Plaintiffs; refused to permit Transeo to inspect NHI's books and records; and relocated Intego's assets and cash from France to the United States.  (SAC ¶ 249.)  Through these actions, the SAC alleges that the Shareholder and Director Defendants breached their duty of loyalty to Plaintiffs.  (*Id.* ¶ 250.)  Defendants respond that Plaintiffs have identified no basis for liability for either the Shareholder or Director Defendants, and that pursuant to the Certificate of Incorporation, the Director Defendants can only face liability for breaches of the duty of loyalty or for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, which Plaintiffs have failed to plausibly allege.  (Ds' Mem. 33.)

As a preliminary matter, this Court does not have subject matter jurisdiction related to Plaintiffs' claims for withholding financial information or inspection of NHI's books and records, as discussed in more detail below.  *See* Del. Cod. Ann. tit. 8, § 220(c) ("If the corporation, or an officer or agent thereof, refuses to permit an inspection sought by a stockholder . . . [t]he Court of Chancery is hereby vested with exclusive jurisdiction to determine whether or not the person seeking inspection is entitled to the inspection sought.").  Moreover, Delaware courts have held that books and records violations should be litigated in distinct proceedings, not via breach of fiduciary duty claims.  *Cf. Ravenswood Inv. Co., L.P. v. Winmill & Co.*, No. CV-7048, 2013 WL 396178, at *1 (Del. Ch. Jan. 31, 2013) ("The Section 220 and fiduciary duty claim should not have been brought together. . . . It is perhaps worth noting that, unlike most cases, the Section 220 aspect and the fiduciary duty aspect do overlap and relate to the rights of minority shareholders to receive corporate information.  The Court holds the view that moving forward with the books and records aspect of this matter will clarify the issues . . . . Thus, the Court will separate the two claims; resolve the Section 220 aspect; and then, address

the fiduciary duty claim, if it remains.") (footnote omitted); *TravelCenters of Am., LLC v. Brog*, No. CV-3516, 2008 WL 868107, at *1 (Del. Ch. Mar. 31, 2008) (general rule that books and records violations should be litigated in proceedings distinct from other claims); *Khanna v. Covad Commc'ns Grp., Inc.*, No. CV-20481, 2004 WL 187274, at *6 (Del. Ch. Jan. 23, 2004) ("A Section 220 action is not the proper forum for litigating a breach of fiduciary duty case."); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 714 A.2d 96, 103-04 (Del. Ch. 1998) ("This Court has consistently rejected the injection into a [Section] 220 proceeding of collateral issues . . . .").  It would be an end-run around the rule that a Section 220 action should be a distinct proceeding brought only in the Delaware Court of Chancery were I to consider allegations in Plaintiffs' breach of fiduciary duty claim premised upon conduct redressable in the first instance through a Section 220 claim.  I will thus not analyze whether the Director or Shareholder Defendants plausibly breached their fiduciary duties by withholding financial information or refusing to allow an inspection of NHI's books and records.

### 1)  Director Defendants

The duty of loyalty is implicated where there are allegations of self-dealing – where, for example, a director is on both sides of a transaction or stands to benefit financially from it.  *Cf. Stone*, 911 A.2d at 370.  Although the SAC refers to the examples of Erwin's misconduct in conclusory fashion as "self-dealing that is not in the best interest of NHI," (SAC ¶ 250), it contains no specific allegations that the Director Defendants' actions in allegedly falsifying documents and relocating Intego's assets were interested transactions or enriched the Director Defendants at the shareholders' expense.  *See Zimmerman v. Crothall*, No. CV-6001, 2012 WL 707238, at *13 (Del. Ch. Mar. 27, 2012).

The duty of loyalty is also implicated in instances "where the fiduciary fails to act in good faith." *Stone*, 911 A.2d at 370.  "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Walt Disney*, 906 A.2d at 67 (internal quotation marks omitted).

> [A] plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had actual or constructive knowledge that their conduct was legally improper. Therefore, the issue before [the Court] is whether the [SAC] alleges particularized facts that, if proven, would show that . . . the [Director D]efendants knowingly engaged in fraudulent or illegal conduct or breached in bad faith the covenant of good faith and fair dealing.

*Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (footnote and internal quotation marks omitted).

The SAC alleges several instances where Erwin – allegedly with the direct knowledge or acquiescence of the other Bessemer-appointed NHI directors, including Levine – plausibly failed to act in good faith through intentional violations of the law.  First, the SAC alleges that Erwin created false and fraudulent documents in connection with the adoption of the 2009 Stock Option Plan that recited its approval at (improperly convened) meetings of NHI stockholders and the BOD, whereas Plaintiffs and Marteau, respectively, were not notified of or in attendance at these meetings.  (SAC ¶ 171.)  Further, the SAC alleges that Erwin created false and fraudulent documents in connection with the stock options granted pursuant to the 2009 Stock Option Plan that valued NHI below fair market value in violation of Section 409A of the Internal Revenue Code.  (*Id.*)  Next, the SAC alleges that Erwin forged a document falsely indicating he was present in person at a July 29, 2011 Annual Meeting of Intego S.A. in violation of French law.

(*Id.*)  Finally, the SAC alleges that Erwin took steps to relocate Intego's cash and assets from France to the United States, and that this relocation potentially violated European data privacy laws.  (*Id.* ¶¶ 65, 249.)  Taking the allegations in the SAC as true, Plaintiffs have plausibly alleged that Erwin directly, and Levine indirectly, knowingly falsified business records and relocated NHI's cash and assets, and further that these actions potentially violated applicable laws, thus rendering plausible that the Director Defendants breached their fiduciary duties to NHI.  *In re Massey Energy Co.*, No. CV-5430, 2011 WL 2176479, at *20 & n.145 (Del. Ch. May 31, 2011) ("[A] fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law.") (collecting cases); *Guttman*, 823 A.2d at 506 n.34 ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey."); *see Se. Pa. Transp. Auth. v. Volgenau*, No. CV-6354, 2012 WL 4038509, at *3 n.16 (Del. Ch. Aug. 31, 2012) ("[A] decision to cause a corporation to take an act in violation of its certificate of incorporation would appear analogous to a decision to cause the corporation to take an illegal act, which is typically viewed as a breach of the duty of loyalty.").  Accordingly, Defendants' Motion to Dismiss is denied with respect to this aspect of Plaintiffs' derivative breach of fiduciary duty claim.

2)   Shareholder Defendants

The SAC fails to allege that the Shareholder Defendants had any involvement in – or knowledge of – Plaintiffs' allegations that Erwin created false documents for the 2009 Stock Option Plan and forged a document related to the Intego S.A. annual meeting.  A majority shareholder's fiduciary duty to the minority is breached when the majority's actions benefit themselves at the expense of the minority, *see Gentile*, 906 A.2d at 103; *Thorpe*, 1993 WL 443406, at *7, and the SAC is bereft of any allegations connecting the Shareholder Defendants to

Erwin's actions or explaining how any alleged misconduct with respect to these documents exploited Plaintiffs in particular. Accordingly, Defendants' Motion to Dismiss is granted with respect to this aspect of Plaintiffs' derivative breach of fiduciary duty claim.

Finally, Plaintiffs' assertion that the Shareholder Defendants breached their fiduciary duty to the minority through Erwin's steps to relocate Intego's assets and cash from France to the United States is unavailing. Although Bessemer allegedly sought to relocate Intego's assets, (*see, e.g.*, SAC ¶¶ 56-57, 63-65, 128), the SAC alleges only that the relocation harmed Intego, (*id.* ¶¶ 60-61, 65), not that the harm to Intego reduced the value of Plaintiffs' interest in NHI, and thus not that the Shareholder Defendants' access to Intego's assets "benefit[ted] [themselves] at the expense of the minority stockholders," *Gentile*, 906 A.2d at 103. Moreover, the SAC makes only conclusory allegations that the Shareholder Defendants sought to relocate Intego's assets so they might exercise "tighter control" of them, (SAC ¶ 57), but it fails to allege that the Shareholder Defendants did anything to cause Erwin to relocate the assets. *See Gentile*, 906 A.2d at 103. Although Plaintiffs have plausibly alleged that Bessemer exercised control over the Bessemer-affiliated directors, the SAC's factual allegations do not plausibly allow me to infer "more than the mere possibility of misconduct" by the Shareholder Defendants in connection with Erwin's alleged relocation of Intego's assets, *Iqbal*, 556 U.S. at 679, and thus Defendants' Motion to Dismiss is granted with respect to this aspect of Plaintiffs' derivative breach of fiduciary duty claim.

3.  Breach of DGCL § 220(c)

Transeo brings a claim against Bessemer for refusing to allow Transeo to inspect NHI's books and records in violation of DGCL § 220(c). (SAC ¶ 192-96.) Although Section 220 permits a stockholder to examine a corporation's books and records, it also vests exclusive

jurisdiction with the Delaware Court of Chancery to determine whether the person seeking inspection is entitled to the inspection.  Del. Cod. Ann. tit. 8, § 220(c); *see Reserve Solutions Inc. v. Vernaglia*, 438 F. Supp. 2d 280, 289 (S.D.N.Y. 2006) (finding court lacked subject matter jurisdiction to adjudicate Section 220 claim).

Plaintiffs do not seem to dispute Defendants' contention that this Court lacks subject matter jurisdiction to adjudicate a Section 220 claim.  (Ps' Mem. 17 n.12.)  Defendants' Motion to Dismiss the Section 220 claim is thus granted.

B.  *New York Law Claims*[12]

1.  Breach of Contract

Plaintiffs bring a breach of contract claim against Bessemer for violation of the SA. Specifically, Plaintiffs allege that the SA grants Transeo the right to appoint Marteau to the NHI BOD and to remove Marteau, and specifies that meetings of the NHI BOD may not be held without the required quorum.  (SAC ¶¶ 178-79, 182.)

"To state a claim for breach of contract under New York law, a plaintiff must allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 12-CV-3634, 2013 WL 909184, at *1 (2d Cir. Mar. 12, 2013) (summary order) (internal quotation marks omitted).  When interpreting a contract, "words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (alteration and internal quotation marks omitted); *see Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 10-CV-1772, 2012 WL

---

[12] The SA contains a provision providing that DGCL governs matters within its scope and New York law governs all other matters.  (SAC Ex. 1 § 11.8.)  The parties agree that New York law applies to the following six claims.

1611830, at *3 (E.D.N.Y. May 9, 2012) ("[W]here the language of [a contract] is unambiguous on its face, it must be enforced according to the plain meaning of its terms" in order to give effect to the parties' intent).

Defendants allege that Plaintiffs have not identified a specific provision of the SA that forbids Marteau's removal[13] by an entity other than Transeo. (Ds' Mem. 16.) Section 7.1 of the SA, however, allows Transeo to elect one director so long as "Transeo (1) remains a Major Stockholder, and (2) such individual selected and nominated by Transeo remains Laurent Marteau (except in case of death or disability)." (*Id.* Ex. 1 § 7.1.) It further requires that, "[s]o long as a Person is entitled to designate a director . . . each Person shall at all times have the right, exercisable by such Person in his sole discretion, to cause the Stockholders to remove, with or without cause, the director(s) selected and nominated by such Person." (*Id.*)

The SAC alleges that Erwin demanded Marteau's resignation from the NHI BOD at the August 1, 2011 special meeting, and when Marteau did not voluntarily resign, Erwin advised Marteau that the other directors had already elected to remove him. (*Id.* ¶¶ 164, 166.) The plain language of the SA gives Transeo – and no one else – the right to remove its appointed director, and although the SA contains no other restrictions on the removal of a director, the actions of Erwin and the other directors – who did not appoint Marteau – in attempting to remove Marteau plausibly violate the plain language of Section 7.1. *See LaSalle*, 424 F.3d at 206 ; *see also Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002) ("Where the contract is unambiguous, courts must effectuate its plain language."). In other words, Plaintiffs have plausibly alleged that Bessemer breached Section 7.1 of the SA when Bessemer-appointed

---

[13] Although Defendants argue that Marteau has not been formally removed from the NHI BOD, (Ds' Mem. 16), the SAC contains sufficient allegations – denial of access to notices and information to which a director is entitled and refusal to pay directors' fees since the August 1 special meeting – plausibly indicating that Marteau has at least been *de facto* removed as an NHI director, (SAC ¶ 181).

directors removed Marteau, because Transeo – Marteau's appointor to the BOD – was vested

with that right "in [its] sole discretion," pursuant to the SA's unambiguous language.  (SAC Ex.

1 § 7.1.)  As there is no dispute as to the other elements of a *prima facie* breach of contract claim,

Defendants' Motion is denied with respect to Marteau's removal.

Defendants allege that because Section 7.1 does not address how a board member may be

involuntarily removed from the BOD,[14] Delaware law should fill in the gap and allow a director

to be removed by "the holders of a majority of the shares."[15]  (Ds' Mem. 16-17 (quoting Del.

Code. Ann. tit. 8, § 141(k)); Ds' Reply Mem. 6-7.)  It seems to the Court that the absence of a

provision for involuntary removal might signify not an oversight, but rather the parties' intention

not to allow for such removal.  Assuming for the sake of argument that the SA is ambiguous on

that score, whether Delaware law should provide a mechanism for removal of a director beyond

what Section 7.1 contemplates depends on the intent of the parties, which is a question of fact

inappropriate for disposition on a motion to dismiss.  *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d

63, 67 (2d Cir. 2005) ("'However, when the meaning of the contract is ambiguous and the intent

of the parties becomes a matter of inquiry, a question of fact is presented . . . .'") (quoting

*Ruttenberg v. Davidge Data Sys. Corp.*, 626 N.Y.S.2d 174, 193 (1st Dep't 1995)); *see New

Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006) ("[I]f the

contract is ambiguous and relevant extrinsic evidence as to its meaning is available, its

---

[14] In response to Defendants' assertion that the SA is silent on how a director may be involuntarily removed from the BOD, Plaintiffs quote Humpty Dumpty, (P's Mem. 6 n.6 ("'When *I* use a word,' Humpty Dumpty said, in a rather scornful tone, 'it means just what I choose it to mean – neither more nor less.' '[T]he question is,' said Alice, 'whether you can make words mean so many different things.'") (emphasis in original)), to insinuate that Defendants' argument is mere semantics.  This quotation is not from Lewis Carroll's *Alice in Wonderland* (which is actually entitled *Alice's Adventures in Wonderland*), to which Plaintiffs attribute it, but rather Lewis Carroll's *Through the Looking Glass*.

[15] Notably, Delaware's provisions on director removal would not seem to aid Defendants in any event, as Plaintiffs allege that Marteau was removed at the election of the other three NHI directors, not by a vote of the majority shareholders.  (SAC ¶ 166.)

interpretation is a question of fact for the factfinder."); *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 142 (S.D.N.Y. 2004) ("Under New York law, the interpretation of an unambiguous contract is a question of law for the court.  When an agreement is ambiguous, however, its meaning is a question of fact. . . . The existence of an ambiguity depends on whether there is a reasonable basis for difference of opinion as to the meaning of the contract.") (footnotes omitted).  I thus cannot determine on a motion to dismiss what the parties to the SA may have intended with respect to involuntary removal (assuming for the sake of argument that the removal provision they did include nevertheless creates ambiguity).

Regarding Plaintiffs' allegations that BOD meetings occurred without the required quorum, Defendants argue that the SA is silent about whether meetings can be conducted without all directors present.  (Ds' Mem. 17-18.)  Section 7.2 of the SA states, "[a]t all meetings of the Board, the presence, in person or by proxy, of all of the directors then serving on the Board shall constitute a quorum for the transaction of business."  (SAC Ex. 1 § 7.2.)  This language makes plain that a quorum for transaction of business at a NHI BOD meeting requires the presence of all directors.  *See LaSalle*, 424 F.3d at 206; *Seabury Constr. Corp.*, 289 F.3d at 68.  While Defendants are correct that the SA is not explicit regarding what happens if not all directors are present at a meeting, it stands to reason that in that instance a quorum has not been established and business thus cannot be transacted.  While perhaps technically a meeting can take place without a quorum, no corporate business can be conducted at such a meeting.  The SAC plausibly alleges, however, that corporate business was conducted at a meeting lacking a quorum, (SAC ¶¶ 171, 181), and the Motion is thus also denied with respect to conducting BOD meetings without a quorum.

37

Defendants further contend that Delaware law, as well as NHI's by-laws, allow for BOD business to be delegated to committees. (Ds' Mem. 18; Ds' Reply 7-8; *see* SAC Ex. 3 § 3.04 ("The Board of Directors may, by resolution passed by at least three (3) members of the Board, designate one or more committees . . . [which] shall have and may exercise all of the powers and authority of the Board of Directors . . . .").) Defendants' argument ignores that a quorum – consisting of all directors, per the SA – must vote whether to designate business to a committee. That only three directors need to vote to delegate business to a committee consistent with the by-laws does not change the fact that a quorum for the transaction of business by the BOD – such as delegation to a committee – requires the presence of all directors. Plaintiffs have alleged that Marteau was excluded from meetings of the NHI BOD after March 1, 2011, (*id.* ¶ 168), thus rendering plausible the assertion that a quorum of directors was not present for these meetings in violation of Section 7.2 of the SA. Defendant's Motion to Dismiss the breach of contract claim is accordingly denied.

2. Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs bring a claim for the breach of the implied covenant of good faith and fair dealing against Bessemer, alleging that Bessemer's actions prevented Transeo from redeeming its shares of NHI or allowing Marteau to sell NHI, and that Bessemer conducted BOD meetings without the required quorum or notice to Transeo. (SAC ¶¶ 188-190.)

Under New York law, "'[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.'" *Sheppard v. Manhattan Club Timeshare Ass'n, Inc.*, No. 11-CV-4362, 2012 WL 1890388, at *7 (S.D.N.Y. May 23, 2012) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)). As a preliminary matter, a claim alleging a breach of this covenant will not stand if it is duplicative of a breach of contract claim. *See*

*Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405, 2012 WL 1538357, at *6 (S.D.N.Y. May 2, 2012) ("New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.") (alteration and internal quotation marks omitted); *4Kids Entm't, Inc. v. Upper Deck Co.*, 797 F. Supp. 2d 236, 241 (S.D.N.Y. 2011) (dismissing *sua sponte* plaintiff's good faith/fair dealing claims because "New York does not recognize a separate claim for breach of an implied covenant of good faith where a contract exists.  Either the contract's terms were breached or they were not, and 'good faith and fair dealing' does not imply any obligation above and beyond the terms of the parties' actual agreement.").  Thus, Plaintiffs may not bring a good faith and fair dealing claim regarding the exclusion of Marteau from BOD meetings as it is duplicative of Plaintiffs' breach of contract claim.

The covenant of good faith and fair dealing "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Dalton*, 87 N.Y.2d at 389 (internal quotation marks omitted); *see Toledo Fund, LLC v. HSBC Bank USA, Nat'l Ass'n*, No. 11-CV-7686, 2012 WL 2850997, at *6 (S.D.N.Y. July 9, 2012) ("[T]he implied covenant of good faith and fair dealing includes a promise not to act arbitrarily or irrationally. . . .") (internal quotation marks omitted).  To survive a motion to dismiss, Plaintiffs must allege facts that tend to show that the defendant "act[ed] in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement."  *Frankini v. Landmark Constr. of Yonkers, Inc.*, 937 N.Y.S.2d 80, 83 (2d Dep't 2012) (internal quotation marks omitted); *accord Russo v. Banc of Am. Sec., LLC*, No. 05-CV-2922, 2007 WL 1946541, at *6 (S.D.N.Y. June 28, 2007) (covenant "ensures that parties to a contract perform the substantive,

bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly

bargained-for benefits") (internal quotation marks omitted).  The scope of potential liability is

narrow; the covenant does not create new contractual rights or impose additional duties.  *Broder*

*v. Cablevision Sys. Corp.*, 418 F.3d 187, 198 (2d Cir. 2005) ("The implied covenant can only

impose an obligation consistent with other mutually agreed upon terms in the contract.")

(internal quotation marks omitted).  "A claim for breach of the covenant of good faith and fair

dealing may be brought, if at all, only where one party's conduct, though not breaching the terms

of the contract in a technical sense, nonetheless deprived the other party of the benefit of its

bargain." *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007)

(internal quotation marks omitted).

Regarding Transeo's contractual rights under the SA, Plaintiffs allege that Bessemer

decided to remove Marteau as CEO of NHI to prevent Transeo from redeeming its NHI shares or

pursuing a sale of NHI pursuant to Section 5.1 of the SA.  (SAC ¶¶ 186-87.)[16]  With respect to

Transeo's right of redemption under Section 5.1(a), the only restriction on the provision is

temporal:  the right may only be invoked after June 7, 2012.  (*Id.* Ex. 1 § 5.1(a).)  Plaintiffs have

alleged no actions by Bessemer depriving Transeo of its redemption right.  That such redemption

may currently be a financially unappealing option for Transeo does not bear on the question of

whether Bessemer "destroy[ed] or injur[ed] the right of [Transeo] to receive the fruits of the

contract."  *Dalton*, 87 N.Y.2d at 389 (internal quotation marks omitted).  To the extent Plaintiffs

argue that Transeo cannot decide whether to pursue its redemption right because Marteau has

been excluded from the BOD and not given access to NHI's financials, (Ps' Mem. 17-18), this

allegation is duplicative of Plaintiffs' breach of contract claim regarding Marteau's removal from

---

[16] Plaintiffs' allegation that Bessemer had no intention of keeping Marteau as CEO of NHI in June 2007 when the SA was finalized is unsupported by facts and thus implausible, and will not be considered.

the BOD, and/or of Plaintiffs' claim (which may be brought in Delaware) regarding its right as a shareholder to inspect NHI's books and records pursuant to Section 220(c), and thus cannot be pursued as a breach of the implied covenant of good faith and fair dealing. *See Fleisher*, 2012 WL 1538357, at *6.

Regarding Transeo's right to request a sale of NHI pursuant to Section 5.1(b), (SAC Ex. 1 § 5.1(b) ("Subject to Laurent Marteau being the Chief Executive Officer of [NHI], on or after June 7, 2012 Transeo shall be entitled to request that [NHI] appoint an investment bank to conduct a sale of [NHI].")), Marteau's employment as CEO is a condition precedent to Transeo's ability to request a sale of NHI.  Although Plaintiffs attempt to allege a breach of the implied covenant of good faith and fair dealing through the actions culminating in Marteau's termination – apparently not for any valid performance or business reasons – the by-laws nonetheless expressly permit that the BOD may terminate the CEO at any time, with or without cause.  (*Id.* Ex. 3 § 5.02.)  Similarly, the SA does not contemplate a contractual or other right for Marteau to remain CEO in perpetuity; indeed, it expressly contemplates that he might be removed.  (*See id.*) Plaintiffs have not alleged any other actions by Bessemer to deprive Transeo of its right to seek a sale of NHI post-June 2012 aside from terminating Marteau, which it plainly retained the right to do.  Likewise, that it may not presently be profitable to sell NHI has no bearing on whether Transeo's contractual right to appoint an investment bank to pursue that option has been injured or destroyed. *See Dalton*, 87 N.Y.2d at 389.  As the covenant of good faith and fair dealing cannot be construed to create additional contractual rights, Defendants' Motion to dismiss the breach of the implied covenant of good faith and fair dealing claim is thus granted.[17]

---

[17] I need not address whether Gelblat has standing to pursue a breach of the implied duty of good faith and fair dealing because I have dismissed the claim entirely.

3.  <u>Unjust Enrichment</u>

Plaintiffs allege that Bessemer's actions have unjustly enriched it in the amount of the fair market value of Plaintiffs' NHI shares.  (SAC ¶¶ 199-200.)  A cognizable unjust enrichment claim requires a showing "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000); *see Clifford R. Gray, Inc. v. LeChase Constr. Servs., LLC*, 819 N.Y.S.2d 182, 187 (3d Dep't 2006).  "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'"  *Kaye*, 202 F.3d at 616 (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 685 N.Y.S.2d 381, 382 (4th Dep't 1999)); *accord Levin v. Kitsis*, 920 N.Y.S.2d 131, 134 (2d Dep't 2011).  "Enrichment alone will not suffice to invoke the remedial powers of a court of equity.  Critical is that under the circumstances and as between the two parties to the transaction the enrichment be unjust."  *1133 Taconic, LLC v. Lartrym Servs., Inc.*, 925 N.Y.S.2d 840, 840 (2d Dep't 2011) (internal quotation marks omitted).

The SAC is silent on what benefit was unjustly conferred on Bessemer at Plaintiffs' expense, and dismissal would be proper on that basis alone.  In their brief, Plaintiffs allege that the "benefit conferred on Bessemer was its slightly less than 85% ownership of NHI," (Ps' Mem. 19), but the SAC specifically alleges, and common sense dictates, that Bessemer compensated Plaintiffs to obtain that ownership, and thus there is no cognizable unjust enrichment claim. (SAC ¶ 2 ("Bessemer *purchased* [Intego] . . . in a transaction which left [Plaintiffs] with a minority interest in NHI . . . .") (emphasis added).)  Because Plaintiffs have failed to allege a benefit that Defendants received at Plaintiffs' expense other than the ownership interest in NHI for which it paid, Defendants' Motion to dismiss the unjust enrichment claim is granted.[18]

---

[18] To the extent that Plaintiffs allege that Bessemer's actions with respect to the 2009 Stock Option Plain diluted the value of Plaintiffs' shares, (Ps' Mem. 19-20 & n.13), this also fails to state a claim.  A *prima facie* unjust enrichment

4.  Tortious Interference with Prospective Contractual Advantage

Transeo brings a claim against Bessemer for tortious interference with prospective contractual advantage, alleging that "once Marteau had infuriated Bessemer by resisting its plan to borrow . . . to fund a cash dividend . . . Bessemer decided to . . . deprive Marteau of prospective contractual advantage, whether under an arrangement with AVG or by forcing a sale of NHI to another third party under Section 5.1(b) of the Stockholders' Agreement."  (SAC ¶ 208.)  Regarding a potential arrangement with AVG, Transeo alleges that Bessemer's actions in terminating Marteau as an officer of NHI and Intego were undertaken in part to prevent Marteau from working for AVG because his termination triggered a non-competition provision in the SPA.  (*Id.* ¶¶ 204-06.)

As a preliminary matter, Defendants assert that Transeo cannot pursue this claim because the SAC only alleges harm suffered by Marteau, not Transeo, and Marteau is not a party to this action.  (Ds' Mem. 21-22.)  I agree that Transeo lacks standing to assert this claim.  *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 175 (2d Cir. 2006) ("In order to have constitutional standing, first, the plaintiffs 'must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Transeo alleges no concrete and particularized harm it suffered as a result of Bessemer's actions.  The SAC states that "Bessemer . . . deprive[d] *Marteau* of prospective contractual advantage, whether under an arrangement with AVG or by forcing a sale of NHI to another third party under Section 5.1(b) of the Stockholders' Agreement," (SAC ¶ 208 (emphasis

---

claim requires allegations that the defendant – Bessemer in this cause of action – benefitted at Plaintiffs' expense.
Although it is not entirely clear, the SAC appears to allege that stock options were granted to NHI employees.  (SAC
¶ 171.)  The SAC does not allege that Bessemer received any of the granted stock options, and, in any event, the
grant of additional stock options would have diluted the value of the holdings of all of the NHI shareholders,
including Bessemer, equally.

added)), and further alleges that "*Marteau* would be . . . not be able to provide management and development capacity to AVG" and "*Marteau* would not be able to invoke the option to demand steps for a sale of NHI on or after June 7, 2012," (*id.* ¶ 206 (emphases added)).  Plaintiffs assert that this is a mere scrivener's error because Transeo would have been the vehicle through which Marteau's services would have been retained by AVG, given that "Marteau has always been Transeo's well-known banner bearer and service provider."  (Ps' Mem. 21 & n.15.)  No such allegations appear in the SAC.  To the contrary, the SAC only alleges that Transeo acts as a holding company for Marteau's shares of NHI.  (SAC ¶ 18.)  The SAC contains no allegations that AVG or another third party knew about Transeo or intended to enter into a business relationship or contract with Transeo, or that Transeo is known to be an alter ego of Marteau.

Even if Transeo had standing to pursue this claim, I would grant Defendants' Motion to Dismiss for failure to state a claim.  "In order to state a claim for tortious interference with prospective [contractual] advantage under New York law, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) that defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship."  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012).  Transeo must allege that Bessemer used dishonest, unfair, or improper means to injure Transeo's relations with a third party, but all the SAC alleges on that score is Bessemer's refusal to consider the AVG offer and termination of Marteau's positions. (SAC ¶ 206.)  First, a majority shareholder may refuse to sell its shares in a corporation, *see Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) ("Clearly, a stockholder is under no duty to sell its holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit the minority."), and the Bessemer-dominated NHI BOD plainly

had the authority to terminate Marteau as an officer in accordance with the by-laws, (SAC Ex. 3 § 5.02). Although Plaintiffs allege that it was improper for Erwin to inform AVG about "internal problems" at NHI in August 2011, (Ps' Mem. 21), it is pure speculation that Marteau or Transeo was one of the "internal problems;" a conversation with a potential acquirer about the status of the target is not dishonest, unfair, or improper; and Erwin is neither an employee of Bessemer nor a Defendant in this claim.[19] Second, Transeo's allegations about its potential relationships with a third party are wholly speculative and conclusory. That the "NHI/Intego management team – headed by Marteau," (Ps' Mem. 21), may have been involved with management after the AVG acquisition, had it occurred, is plausible, given the allegation that $10 million of the offer was contingent on Marteau remaining active, (SAC ¶ 71), but it fails to establish any extant business relationship between AVG and Transeo with which Bessemer interfered. Similarly, Transeo cannot plausibly allege the existence of a non-speculative business relationship between itself and whoever might have bought NHI had Transeo been able to invoke its right to sell NHI. Because Plaintiffs must assert factual allegations that "raise a right to relief above a speculative level," *Twombly*, 550 U.S. at 555, Defendants' Motion to Dismiss the tortious interference claim is granted.

### 5. Aiding and Abetting Breach of Fiduciary Duty

Plaintiffs allege that Bessemer, Levine, Erwin, and Price aided and abetted the breach of fiduciary duty related to the refusal to consider the AVG offer; Marteau's exclusion from the BOD and removal as NHI's President and CEO; and Erwin's and Price's preparation and

---

[19] Plaintiffs argue in their brief that "blatant violations of a contract, the removal or exclusion of a properly constituted member of the board and falsification of documents" are dishonest, unfair, or improper means employed by Bessemer. (Ps' Mem. 20.) The nexus between these allegations and NHI's failure to consider the AVG offer and Marteau's terminations from his NHI and Intego positions is not clear. Moreover, Plaintiffs may not amend their complaint through an opposition to a dispositive motion. *Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (summary order).

execution of false documents necessary for the approval of the 2009 Stock Option Plan and related to an Intego S.A. annual meeting.  (SAC ¶¶ 211-20.)  "A claim for aiding and abetting a breach of fiduciary duty under New York law requires:  (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach."  *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (alteration and internal quotation marks omitted).

Although Plaintiffs have established a plausible primary derivative breach of fiduciary duty claim with respect to Bessemer, Erwin, and Levine regarding the AVG offer, the aiding and abetting claim is duplicative with respect to those Defendants, and the SAC contains no allegations that Price had any involvement in the failure to consider the AVG offer or was even employed by NHI at the time.  This claim, as it relates to the AVG offer, is accordingly dismissed.

Plaintiffs have also established a plausible primary derivative breach of fiduciary duty claim against Erwin and Levine regarding the false documents created for 2009 Stock Option Plan and Intego S.A. annual meeting.  As discussed above, any aiding and abetting claim asserted against Erwin and Levine is duplicative, and there is no plausible primary breach with respect to Bessemer.  To plausibly state a claim for aiding and abetting a breach of fiduciary duty against Price, Plaintiffs must allege specifically how Price knowingly induced or participated in the breach.  *See Wilson v. Dantas*, No. 12-CV-3238, 2013 WL 92999, at *5 (S.D.N.Y. Jan. 7, 2013) ("The defendant must affirmatively assist, help conceal, or fail to act when required to do so, thereby enabling the breach to occur.  This substantial assistance must be the proximate cause of [Plaintiffs'] injury.") (alterations, internal quotation marks, and citation omitted).  The SAC alleges that Price had an extensive relationship with Bessemer before joining NHI, having served

as the CFO for other companies in which BVP had invested, including previously working as a

CFO under Erwin.  (SAC ¶¶ 151-52.)  Further, the SAC alleges that

> Erwin and Price, in their capacities as officers and directors of NHI
> . . . creat[ed] false documents and committ[ed] a fraud . . . in
> connection with the adoption of the [2009 Stock Option Plan], . . .
> creat[ed] false and fraudulent documents in connection with grants
> of stock options pursuant to the 2009 Stock Option Plan, . . . [and]
> forge[d] a false document with regard to the Annual General
> Meeting of Intego S.A., . . . the minutes of which purportedly were
> taken in French by defendant Price.

(SAC ¶ 171.) At this stage, taking all the allegations in the SAC as true, the SAC plausibly

alleges that Price – given that he was NHI's CFO and Secretary, and thus would be responsible

for financial and corporate record keeping – substantially aided in the Director Defendants'

falsification of corporate documents for the stock option grant and Intego S.A.'s annual meeting

by "affirmatively assist[ing]" in the falsification of documents.  *See Kaufman v. Cohen*, 760

N.Y.S.2d 157, 170 (1st Dep't 2003).

To state a claim for aiding and abetting, Plaintiffs must also plausibly allege that they

suffered damage as a result of Price's substantial assistance to the Director Defendants in

breaching their fiduciary duties to NHI.  The SAC asserts that the stock option grant diluted the

value of NHI's shares, and the improper annual meeting "render[ed] the conduct of the meeting,

and any action taken at it . . . invalid under French law."  (SAC ¶ 171.)  Plaintiffs specifically

allege that they have suffered at least $4.7 million in damages, which represents the approximate

fair market value of their NHI shares.  (*Id.* ¶ 221.)  While it is plausible that the stock option

grant harmed Plaintiffs through dilution of NHI's share value, the potential invalidation of any

action undertaken at Intego S.A.'s annual meeting fails to allege harm to Plaintiffs.  The SAC

contains no allegations of what actions – if any – were ratified at the meeting, and it is

implausible that Plaintiffs would suffer damages were any actions deemed invalid under French

law – particularly as Erwin had replaced Marteau as the President and CEO of Intego by the time

of the annual meeting, (*id.* ¶ 55), and the SAC does not allege that Plaintiffs had any further

involvement with Intego, other than ownership of shares via NHI, following this date, (*id.* ¶ 18).

As Plaintiffs have not alleged any damages caused by Price's falsification of documents for the

Intego S.A. meeting, Defendants' Motion to Dismiss is thus granted with respect to the annual

meeting documents.  But, as Plaintiffs have plausibly alleged damages caused by Price's

falsification of documents related to the stock option grant, Defendants' Motion is denied with

respect to that aspect of the aiding and abetting claim.

Regarding any other aiding and abetting the breach of fiduciary duty claims asserted by

Defendants, the SAC fails to plead these allegations with the requisite specificity.  *See Wilson*,

2013 WL 92999, at *5.  It is unclear from the SAC which alleged breaches were aided and

abetted by which Defendants or how these Defendants induced or participated in the breach.

(*See* SAC ¶ 220 ("Bessemer, Levine, Erwin and Price knowingly participated in the breach of

fiduciary duties owed to plaintiffs.").)  It is not even clear which Defendant is alleged to have

"affirmatively assist[ed], help[ed] conceal or fail[ed] to act when required to do so, thereby

enabling the breach to occur."  *Kaufman*, 760 N.Y.S.2d at 170.  Defendants' Motion to Dismiss

is thus granted with respect to any other potential claims for aiding and abetting the breach of

fiduciary duty.

6.   Other Blatant Tortious Misconduct

Plaintiffs bring a claim against Erwin and Price for "[o]ther [b]latant [t]ortious

[m]isconduct" based on their allegedly creating false documents in connection with the adoption

of the 2009 Stock Option Plan; forging a false document regarding an annual meeting of Intego

S.A.; withholding financial results from Plaintiffs; and refusing to permit Transeo to inspect

NHI's books and records.  (SAC ¶¶ 222-23.)  This is not a cause of action, and dismissal is proper on this ground alone.[20]  In an excess of caution, I assume (even though Plaintiffs have not said so) that they intended to bring a *prima facie* tort claim under New York law.

"A cause of action of *prima facie* tort consists of four elements:  (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful."  *Garrison v. Toshiba Bus. Solutions (USA), Inc.*, No. 11-CV-2214, 2012 WL 6025745, at *6 (E.D.N.Y. Dec. 3, 2012) (internal quotation marks omitted).  As discussed above, the Delaware Court of Chancery is vested with the exclusive jurisdiction to adjudicate claims under Section 220(c), and this Court lacks subject matter jurisdiction over Plaintiffs' allegations of misconduct related to inspection of NHI's books and records.  Further, Erwin and Price's refusal to provide financial information to minority shareholders is redressable through Section 220.  Finally, Plaintiffs cannot establish a *prima facie* tort for the creation of false documents related to the 2009 Stock Option Plan and Intego S.A.'s annual meeting because these alleged falsifications of business records would be illegal – as Plaintiffs admit.  (Ps' Mem. 20 n.14 (citing N.Y. Penal Law §§ 175.05, 175.10).)  Defendants' Motion to Dismiss is accordingly granted.

### C. *Leave to Amend*

Leave to amend should be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see Zucker v. Five Towns Coll.*, No. 09-CV-4884, 2010 WL 3310698, at *3 (E.D.N.Y. Aug. 18, 2010).  It is within the discretion of the district court to grant or deny leave to amend, *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), and "[l]eave to amend,

---

[20] A search of all federal and state cases in Westlaw has failed to yield any case in which a claim for anything similar to a "blatant tort" was alleged.  Moreover, Plaintiffs' contention that Official Form 12 sanctions the manner in which the SAC pleaded this claim is without merit.  Official Form 12 states the requirements for a complaint for negligence when the plaintiff does not know who is responsible.  None of the allegations set forth by Plaintiffs in support of this claim suggest negligence by an unknown individual.

though liberally granted, may properly be denied for: undue delay, bad faith or dilatory motive

on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility

of amendment, etc.," *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (internal

quotation marks omitted).  Furthermore, a district court has no obligation to grant leave to amend

*sua sponte*.  *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to

have erred in failing to grant a request [to amend the complaint] that was not made."); *Ariel (UK)*

*Ltd. v. Reuters Grp., PLC*, 277 F. App'x 43, 45-46 (2d Cir. 2008) (summary order) (district court

did not exceed its discretion in not *sua sponte* granting leave to amend where plaintiff had

already amended complaint once and amendment would have been futile); *see also Cuoco v.*

*Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (leave to amend should be denied as futile where

problem with complaint is substantive and better pleading would not cure it).

At a pre-motion conference held on January 6, 2012, Defendants sought leave to file a

motion to dismiss, and they had previously submitted a letter outlining the grounds on which

they intended to move.  (Doc. 10.)  At the conference, I gave Plaintiffs leave to amend their

complaint again, advising them to bolster certain allegations.  Following the pre-motion

conference, Plaintiffs filed the SAC, which added one plaintiff, four defendants, and five causes

of action – including a derivative claim on behalf of nominal defendant NHI.  With respect to the

previously pleaded claims, Plaintiff's failure to fix deficiencies in its previous pleadings is alone

sufficient ground to deny leave to amend *sua sponte*.  *See Payne v. Malemathew*, No. 09-CV-

1634, 2011 WL 3043920, at *5 (S.D.N.Y. July 22, 2011) ("That Plaintiff was provided notice of

his pleading deficiencies and the opportunity to cure them is sufficient ground to deny leave to

amend *sua sponte*."); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242

(S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted); *see also Ruotolo*, 514 F.3d at 191 (affirming denial of leave to amend "given the previous opportunities to amend"). Further, with respect to all claims, while Plaintiffs advert to my authority to grant leave to amend, (Ps' Mem. 35), Plaintiffs have not requested leave to file a Third Amended Complaint, submitted a proposed Third Amended Complaint, *see Eaton Vance*, 380 F. Supp. 2d at 242, or otherwise suggested that they are in possession of facts that could cure the pleading deficiencies. Accordingly, I decline to grant Plaintiff leave to amend *sua sponte* with respect to the dismissed claims. *See, e.g., Gallop*, 642 F.3d at 369; *see also Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 n.7 (2d Cir. 1980) ("[A]ppellants never sought leave to amend their complaint either in the district court or as an alternative form of relief in this court after [appellee] raised the issue of the sufficiency of appellants' complaint. Accordingly, we see no reason to grant such leave *sua sponte*.").

## IV.   Conclusion

For the reasons stated above, Defendants' Motion is GRANTED IN PART and DENIED IN PART.  The Court dismisses Plaintiffs' claims for (1) direct breach of fiduciary duty; (2) derivative breach of fiduciary duty regarding Marteau's purported removal from the NHI BOD; (3) derivative breach of fiduciary duty regarding Erwin's misconduct against the Shareholder Defendants; (4) violations of DGCL Section 220(c); (5) breach of the implied covenant of good faith and fair dealing; (6) unjust enrichment; (7) tortious inference with prospective contractual advantage; (8) aiding and abetting breach of fiduciary duty related to the AVG offer and Price's involvement with false documents related to the annual meeting of Intego S.A.; and (9) *prima facie* tort.  The following claims will go forward:  (1) derivative breach of fiduciary duty against the Director and Shareholder Defendants regarding the refusal to consider the AVG offer; (2) derivative breach of fiduciary duty claim against the Director Defendants regarding falsification and forging of documents; (3) breach of contract against Bessemer; and (4) aiding and abetting breach of fiduciary duty as to Price's involvement with the false documents related to the 2009 Stock Option Plan.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Doc. 26). The parties are directed to appear for a status conference on April 25, 2013 at 4:00 p.m.

**SO ORDERED.**

Dated:  March 29, 2012
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.